UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: ___7/8/2021_____

UNITED STATES OF AMERICA,

    -against-

NACHMAN HELBRANS, MAYER ROSNER,
ARON ROSNER, JACOB ROSNER, MATITYAU
MOSHE MALKA, and MORDECHAY MALKA,

                    Defendants.

S2 19-CR-497-01 (NSR)
S2 19-CR-497-02 (NSR)
S2 19-CR-497-03 (NSR)
S2 19-CR-497-04 (NSR)
S2 19-CR-497-05 (NSR)
S2 19-CR-497-09 (NSR)
OPINION & ORDER

NELSON S. ROMÁN, United States District Judge:

This case involves the alleged kidnapping of two minors ("the Minors") from their Mother in New York, by members of an insular religious community currently based in Guatemala, of which the Mother and the Minors were previously a part. Specifically, Defendants Nachman Helbrans, Mayer Rosner, Aron Rosner, Jacob Rosner, Matityau Moshe Malka, and Mordechay Malka (collectively, "Defendants") are charged by indictment with, among other things, various counts of international parental kidnapping and conspiracy to commit international parental kidnapping.[1] (ECF Nos. 49, 52, 229.)

The Court granted Defendants leave to file the instant pretrial motions, including motions to dismiss the Indictment. Before the Court are Defendants' pretrial motions filed by and through their counsel seeking, in sum and substance, (1) to dismiss the Indictment because (A) the International Parental Kidnapping Crime Act ("IPKCA") is unconstitutional as applied to Defendants where (i) the term "parental rights" is void for vagueness, and (ii) the term "has been in the United States" is void for vagueness; (2) to dismiss certain counts or counts against certain

---

[1] The Government also charges Shmiel, Yoil, and Yakov Weingarten; however, these individuals have not appeared in this case.

Defendants as follows (A) all claims against Helbrans who was allegedly removed from Mexico to the United States without lawful process, (B) the 2019 IPKCA Charge against Matityau Moshe Malka because his alleged provision of phones to Minor-1, even if true, does not amount to a kidnapping attempt, (C) the IPKCA Conspiracy Count as improperly duplicitous; (3) a bill of particulars with respect to Mayer Rosner and Jacob Rosner; (4) *in camera* review of the grand jury minutes; and (5) orders directing various pretrial disclosures.[2,3] (ECF Nos. 120, 123, 125, 131, 135, and 146.)

While the motions were pending, the Government filed a Superseding Indictment ("Superseding Indictment" or "S2" (ECF No. 229)), which contains the original four counts, now labeled Counts Three through Six (hereinafter the "IPKCA Counts"), as well as two additional Counts against Defendants Helbrans and Mayer Rosner.[4] While the basic allegations remain the same, the Superseding Indictment contains additional factual background applicable to all six counts.

Because the four counts of the Indictment are contained in and supplemented by the Superseding Indictment, the Court deems the pending motions as challenges to the IPKCA

---

[2] Defendants Nachman Helbrans and Matityau Moshe Malka also moved to suppress certain statements they made to law enforcement. (ECF No. 122, 123.) The suppression motions will be addressed in a separate, forthcoming opinion.

[3] Defendants also move to preclude the Government from arguing that Lev Tahor, is a "cult." (ECF No. 126.) The Government has indicated that it "will not refer to Lev Tahor as a cult at trial nor will it intentionally illicit testimony from witnesses such that the term cult would be used." (Gov't Opp'n at 1 n.2.) Accordingly, this issue is moot.

[4] The references to the minors were also swapped between the Indictment and the Superseding Indictment. In the Indictment, Minor-1 refers to the male and Minor-2 refers to the female who had been religiously "married" to Jacob Rosner. In the Superseding Indictment, Minor-1 refers to female and Minor-2 refers to the male. For clarity, the Court uses "Minor-1" to refer to the female and "Minor-2" to refer to the male.

Charges of the Superseding Indictment.[5] Additionally, to the extent that Defendants have requested to join in the motions of their Co-Defendants, those requests are granted.

For the following reasons, Defendants' Motions are otherwise DENIED.

## BACKGROUND

### 1. <u>Lev Tahor and the "Marriage" of Minor-1</u>

The Defendants are members of Lev Tahor, an insular Jewish religious community of about 250 members founded in the 1980s by the father of Defendant Nachman Helbrans. (S2 ¶ 3.) Nachman Helbrans (hereinafter "Helbrans") took over as the community's leader after his father passed away in 2016 or 2017. (S2 ¶ 3.)

In or about 2017, Helbrans arranged to have Minor-1, his then-twelve-year-old niece, engaged to be religiously "married" to Jacob Rosner, who was eighteen years old at the time. (S2 ¶ 6.) Minor-1 and Jacob Rosner were religiously "married" the following year when she was thirteen and he was nineteen. (S2 ¶ 6.)

### 2. <u>Mother and Minors Relocate to United States</u>

In or about October 2018, the Mother, who is Helbrans's sister, determined that it was no longer safer for her children to remain in the Lev Tahor community in Guatemala. (S2 ¶ 8). In early November 2018, the Mother and her six children, including the Minors, left Lev Tahor and relocated to the United States. (S2 ¶ 8.)

---

[5] For clarity, the Court will refer to Count One of the Indictment/Count Three of the Superseding Indictment as the "IKPCA Conspiracy Charge"; Count Two of the Indictment/Count Five of the Superseding Indictment as the "December 2018 Minor-2 IPKCA Charge"; Count Three of the Indictment/Count Four of the Superseding Indictment as the "December 2018 Minor-1 IPKCA Charge"; and Count Four of the Indictment/Count Six of the Superseding Indictment as the "2019 IPKCA Charge."

On or about November 14, 2018, Kings County Family Court (in Brooklyn, New York) granted the Mother temporary sole custody of her six children, including the Minors, and enjoined the children's father, Aaron Teller ("Teller"), from having any communication with the children. (S2 ¶ 8.)

### 3. **December 2018 Kidnapping**

At approximately 3:00 A.M. on or about December 8, 2018, Nachman Helbrans, Mordechay Malka, Jacob Rosner, and others kidnapped the Minors—then fourteen and twelve—from a home in Woodridge, New York. (S2 ¶ 10.) They, along with others, took the Minors to a hotel where they were provided with new clothes before they were driven to Scranton International Airport in Pennsylvania. Helbrans and the Minors, dressed in secular clothing, and using passports bearing the names of two of Helbrans' children proceeded through airport security in Scranton, flew to Washington, D.C., then to Texas, and then took a bus across the border to Mexico. (S2 ¶ 11.) Other Defendants, including Mordechay Malka and Jacob Rosner, took separate routes out of the country to Mexico. (S2 ¶ 12.) Once in Mexico, Nachman Helbrans and others transported the Minors to several hotels and residences with assistance from Lev Tahor members in the United States, Mexico, and Guatemala. At various times, Helbrans and the Minors were met by Mayer Rosner, Jacob Rosner, Matityau Moshe Malka, and others. (*Id.*)

On or about December 18, 2018, Mexican law enforcement raided a house in San Miguel Tlaixpan, Mexico, and detained Helbrans, Mayer Rosner, Jacob Rosner, and Matityau Moshe Malka, among other individuals.

On December 24, 2018, Aron Rosner was arrested in Brooklyn, New York.[6] (Minute Entry dated December 24, 2018.)

On December 26, 2018, officials from Mexico's immigration authority, Instituto Nacional de Migración ("INM"), informed the FBI that INM had elected to deport Helbrans, Mayer Rosner, Jacob Rosner, and Matityau Moshe Malka—all of whom were and are U.S. citizens—from Mexico and deliver them into the custody of the FBI. On December 27, 2018, two INM officials accompanied Helbrans, Mayer Rosner, Jacob Rosner, and Matityau Moshe Malka on a commercial flight from Mexico City to New York. The FBI arrested Helbrans, Mayer Rosner, Jacob Rosner upon their arrival at John F. Kennedy International Airport (Minute Entries dated December 27, 2018), pursuant to a Complaint alleging that Helbrans, Mayer Rosner, and Jacob Rosner conspired to kidnap two victims. (Dkt No. 18 MJ 10939, ECF No. 1.)

On or about December 27, 2018, the Minors were recovered at a hotel in Mexico after a three-week search involving various local, federal, and international law enforcement entities. (S2 ¶ 13.) At the time, the Minors were accompanied by Shmiel and Yoil Weingarten (*id.*), who were released by Mexican authorities, and have since returned, along with Yakov Weingarten, to Guatemala.

At the time of the December 2018 kidnapping, Lev Tahor was seeking asylum for the entire Lev Tahor community in Iran. (S2 ¶ 14.)

### 4. **March 2019 Kidnapping Attempt**

In or about March 2019, approximately three months after the Minors were recovered in Mexico, Helbrans, Yakov Weingarten, Matityau Moshe Malka, and others, attempted to kidnap

---

[6] On or about January 15, 2019, Aron Rosner was released on a personal recognizance bond.

Minor-1 a second time. (S2 ¶ 15.) During this attempt, Matityau Moshe Malka provided Minor-1 with a number of drop phones and pills of a mood-altering prescription drug. (*Id.*)

On March 26, 2019, a Complaint was filed charging Matityau Moshe Malka with conspiracy to kidnap and conspiracy to obstruct justice. (Dkt No. 19 MJ 3011, ECF No. 1.) Matityau Moshe Malka was arrested the same day. (Minute Entry dated March 26, 2019.)

**5. The 2019 Indictments**

On July 8, 2019, the Government sought and obtained a four-count Indictment charging (1) all Defendants with conspiracy (i) to commit international parental kidnapping, (ii) to unlawfully use a means of identification, and (iii) to enter by false pretenses the secure area of an airport, in violation of 18 U.S.C. § 371 ("IPKCA Conspiracy"); (2) all Defendants (except Mordechay Malka) with two counts of international parental kidnapping (one for each Minor in the December Kidnapping), in violation of 18 U.S.C. § 1204 ("IPKCA Count Two" and "IPKCA Count Three"); and (3) Helbrans, Matityau Moshe Malka, and Yakov Weingarten with another count of international parental kidnapping (for the March 2019 attempted kidnapping of Minor-1), in violation of 18 U.S.C. § 1204 ("IPKCA Count Four"). The Government charged Mordechay Malka and Yoil, Shmiel, and Yakov Weingarten, in a separate sealed superseding indictment containing the same counts and allegations, S1 19 Cr. 497 (ECF No. 52), because, at the time, these four Defendants were at-large. For ease of reference, both charging indictments (ECF Nos. 49 and 52) are addressed together as "the Indictment."

**6. Hague Convention Proceedings**

On May 29, 2019, Teller filed a petition in the United States District Court for the Eastern District of New York ("the Hague Court"), pursuant to the Hague Convention on the Civil Aspects of International Child Abduction, seeking the expedited return of his six children to Guatemala.

(*Teller v. Helbrans,* 19 Civ. 3172 (SJB) (E.D.N.Y.) (hereinafter, the "Hague Case") at ECF No. 1.)

On October 22, 2019, the Hague Court denied Teller's motion with prejudice, holding that Teller had "engaged in a pattern and practice of misconduct and paid little attention to and disregarded the obligations attendant to a litigant in a federal civil proceeding," noting that Teller had "repeatedly told [the court] that he [had] no intention of appearing for any trial," and that "[f]rom the start, Teller has resisted discovery, failed to attend any proceeding, and clearly never intended to appear in the United States." (Hague Case, ECF No. 110.)

On December 9, 2019, Teller filed a notice of appeal. (Dkt. No. 19-4063 (2d Cir.) ("Appeal") at ECF No. 1.) On February 7, 2020, the Second Circuit dismissed the appeal because Teller failed to file a required form. (Appeal, ECF No. 21.)

### 7. **March 2021 Kidnapping Attempt**

In or about March 2021, CC-1, a member of Lev Tahor, approached the Minors in New York and attempted to kidnap them again. (S2 ¶ 16.) At the time of the attempted kidnapping, CC-1 possessed three bus tickets from New York to Georgia, drop phones, children's clothing, and birth certificates for two children of ages similar to the Minors. By late March 2021, CC-1 had returned to Guatemala. (*Id.*)

### 8. **Pre-Trial Motions**

The Court set the initial schedule for pre-trial motions at a status conference on November 19, 2019. In February 2020, Mordechay Malka and Matityau Moshe Malka requested a three-week extension of the briefing schedule that Co-Defendants either joined or did not object to and which the Government did not object to (ECF Nos. 65 and 66), which the Court granted (ECF Nos. 67 and 68). Before the motions were filed, Helbrans and Mayer Rosner sought leave to file *pro se*

motions, (ECF No. 72), which the Court denied (ECF No. 73). On March 18, 2020, Jacob Rosner sought a one-month extension of the briefing schedule that Co-Defendants either joined or did not object to (ECF No. 74), which the Court granted (ECF No. 75).

By letter dated March 20, 2020, Matityau Moshe Malka requested a hearing to consider his application for *pro se* representation, commonly referred to as a "*Faretta* hearing." (ECF No. 77). The Court granted the request and scheduled a *Faretta* hearing for April 28, 2020. (ECF No. 78.) Mayer Rosner and Mordechay Malka sought hearings to consider their applications for *pro se* representation on April 2, 2020. (ECF Nos. 80 and 81.)

By order dated April 6, 2020, the Court further extended the briefing schedule for the pre-trial motions in light of the COVID-19 Pandemic, rescheduled the *Faretta* hearing for Matityau Moshe Malka to May 27, 2020 and scheduled the *Faretta* hearings for Mayer Rosner and Mordechay Malka for May 27, 2020 and June 3, 2020, respectively. (ECF No. 82.)

On May 13, 2020, Defendants requested a sixty-day extension of the pre-trial motion briefing schedule due to logistical impediments to attorney-client communication due to the COVID-19 pandemic (ECF No. 86), which the Court granted (ECF No. 87). In light of the COVID-19 Pandemic, the limited resources of the Courts, and the need to obtain a Yiddish interpreter, the Court also adjourned the *Faretta* hearings for Matityau Moshe Malka, Mayer Rosner, and Mordechay Malka to July 29, 2020, July 29, 2020 and August 5, 2020, respectively. (ECF No. 87.) In June 2020, Jacob Rosner and Helbrans requested *Faretta* hearings (ECF Nos. 93 and 96), which the Court scheduled for August 6, 2020 and July 30, 2020, respectively (ECF Nos. 97 and 98). In mid-July 2020, the Defendants requested a further one-week extension of the pre-trial motion schedule due to additional voluminous discovery that, due to the COVID-19 Pandemic,

Defendants were delayed in accessing. (ECF Nos. 99 and 100.) The Court granted this extension. (ECF Nos. 101 and 103.)

On July 19, 2020, Helbrans asked the Court to reschedule his *Faretta* hearing (ECF No. 104), which it did, rescheduling for September 15, 2020 (ECF No. 105). Jacob Rosner subsequently requested that his *Faretta* hearing be scheduled after September 15, 2020. (ECF No. 107.) During a status conference on July 24, 2020, the Court adjourned the *Faretta* hearings and indicated that it would extend the motion schedule due to additional anticipated discovery. On August 24, 2020, Matityau Moshe Malka requested that his *Faretta* hearing be rescheduled to occur after that of Helbrans. (ECF No. 111.) On November 20, 2020, Jacob and Aron Rosner requested that, since the Second Circuit had issued a decision in *United States v. Houtar*, 980 F.3d 268 (2d Cir. 2020), one week prior, Defendants be permitted to file their motions on or before December 4, 2020. (ECF No. 119).

On November 20, 2020, Helbrans, Matityau Moshe Malka, and Mordechay Malka filed their pre-trial motions. Helbrans moved (1) to dismiss the Indictment; (2) to suppress statements he made to law enforcement; (3) for an order directing various Government disclosures; and (4) for permission to join in any motions filed by his Co-Defendants. (ECF No. 120; *see* Koffsky Affidavit (ECF No. 121) and Mem. in Support of Helbrans Motion ("Helbrans Mem.") (ECF No. 122).) Helbrans also asked the Court to schedule his *Faretta* hearing. (ECF No. 124.)

Matityau Moshe Malka moved (1) to dismiss the IKPCA Conspiracy and 2019 IPKCA Counts of the Indictment; (2) to suppress statements he made to law enforcement pitot to his arrest, (3) for *in camera* review of Grand Jury minutes; (4) for an order directing various Government disclosures; and (5) for permission to join in any motions filed by his Co-Defendants. ("Matityau Mem." (ECF No. 123).)

Mordechay Malka moved (1) for an order directing various Government disclosures; and (2) for permission to join in any motions filed by his Co-Defendants. (ECF No. 125; *see* "Mordechay Mem." (ECF No. 126).)

On December 2, 2020, the Court issued an order confirming the extension of Defendants' deadline to file their motions to December 4, 2020, directing the Government to file its opposition by February 5, 2021, and directing Defendants to file any replies by February 19, 2021. (ECF No. 130.) The Court also indicated that the scheduling of *Faretta* hearings would be addressed at the upcoming status conference. (*Id.*)

On December 4, 2020, Jacob, Mayer, and Aron Rosner filed their motions. Jacob Rosner moved (1) to dismiss the Indictment; (2) for an order directing various Government disclosures; (3) for permission to join in any motions filed by his Co-Defendants; and (4) for permission to make any necessary subsequent motions. (ECF No. 131; *see* Lewis Decl. (ECF No. 132) and "Jacob Mem." (ECF No. 133).)

Mayer Rosner moved for (1) a *Faretta* hearing as soon as possible; (2) a bill of particulars; and (3) permission to join in the motions of his Co-Defendants. ("Mayer Mem." (ECF No. 134.)

Aron Rosner asked the Court for permission to join in the motions of Aron Rosner and Matityau Moshe Malka. (ECF No. 135.)

During a status conference on January 12, 2021, the Court directed that any additional pre-trial motions must be filed by January 22, 2021. On January 22, 2021 Jacob Rosner moved for a bill of particulars. (ECF No. 146; *see* Lewis Decl. (ECF No. 147) and Jacob BOP Mem. (ECF No. 148).)

At a status conference on January 29, 2021, Mayer Rosner and Helbrans renewed their requests for *Faretta* hearings to be scheduled as soon as possible.

On January 29, 2021 and February 5, 2021, the Court issued orders confirming the Government's disclosure obligations under *Brady v. Maryland*, 373 U.S. 83 (1963), and its progeny, which directed the Government to (1) disclose all *Brady* materials "to the defense promptly after its existence becomes known to the Government so that the Government may make effective use of the information," and (2) disclose any impeachment information under *Giglio v. United States*, 405 U.S. 150 (1972), "sufficiently in advance of trial in order for the defendant to make effective use of it at trial." (ECF Nos. 153 and 168.) On the same dates the Court issued the Rule 5(f) orders orally during status conferences. Also on February 5, 2021 the Government filed its memorandum in opposition to Defendants' motions. ("Opp'n Mem." (ECF No. 169).)

On February 26, 2021, Defendants Jacob Rosner, Matityau Moshe Malka, and Modechay Malka filed reply memoranda. (ECF Nos. 190, 191, 193.)

9. <u>**Additional Procedural History**</u>

During a status conference on March 4, 2021, the Government indicated that it would make an early production of 3500 materials but that it could not do so within the 30-day window *pro se* Defendants had requested.

Following *Faretta* hearings with Helbrans, Mayer Rosner, Matityau Moshe Malka, and Mordechay Malka, the Court granted their applications for *pro se* representation and appointed their CJA counsel to serve as standby counsel. (ECF Nos. 183, 194, 195, 198.)

On April 19, 2021, the Government filed a Superseding Indictment (S2). (ECF No. 229.) With respect to the IPKCA Conspiracy Count, the Superseding Indictment alleges the following overt acts: "on or about December 5, 2018, [Mordechay Malka] rented a car for the purpose of transporting the Minors" (S2 ¶ 25a); "on or about December 5, 2018, [Jacob Rosner, Mordechay Malka, and Shmiel Weingarten] drove to a retail store to purchase clothing that the Minors could

wear during the kidnapping to hide that they were ultra-Orthodox Jews" (S2 ¶ 25b); "on or about December 8, 2018, [Nachman Helbrans, Mayer Rosner, Shmiel Weingarten, Mordechay Malka, and Jacob Rosner] kidnapped the Minors from a residence in the Village of Woodridge, Sullivan County, New York, where they were staying with the Mother" (S2 ¶ 25c); "on or about December 8, 2018, [Nachman Helbrans] used his own children's identities to allow the Minors to enter a secure area of an airport, board an aircraft and—ultimately—to leave the United States" (S2 ¶ 25d); "on or about December 7, 8, 9, and 19, 2018, [Aron Rosner] sent money to co-conspirators via Google Pay in order to facilitate the removal and retention of the Minors" (S2 ¶ 25e); "on or about December 16, 2018, [Mayer Rosner] called a co-conspirator not named as a defendant herein ("CC-2") to convince him to come to Mexico to evade law enforcement" (S2 ¶ 25f); "on at least four occasions in or about March 2019, [Matityau Moshe Malka] provided Minor-1 with cellular telephones in order to facilitate her removal and retention" (S2 ¶ 25g); and "in or about March 2021, CC-1 approached the Minors and attempted to take them back to Guatemala (S2 ¶ 25h).

By Order dated May 10, 2021, the Court stated that to the extent *pro se* Defendants had requested early disclosure of Jencks Act/3500 materials, such materials shall be produced prior to trial and directed the Government to update the Court on, inter alia, the status of discovery and disclosures. (ECF No. 241.)

On May 12, 2021, the Government filed a letter indicating, inter alia, that it had made the following productions to all Defendants and that, as a convenience, the Government intended to pre-load all of the pro-se Defendants' laptops with the materials:

August 15, 2019 Production (USAO_000001-USAO_008288)
- Charging Instruments
- Communications with the Government's Cooperating Witness
- Documents Regarding Lev Tahor
- Images and Videos
- Jail Calls, Emails, and Records

- Audio Recordings
- Evidence Relating to Incident on Nov. 8, 2018 at Consulate in Mexico
- New York State Police Records
- Passport Records
- Airline Records
- Family Court Records
- Financial Records
- Medical Records
- Phone Records
- Rental Car Records
- Store Records
- Evidence Relating to Second Kidnapping Attempt
- Surveillance Reports
- Travel Summaries
- Search Warrants/Supporting Documents, and Search Warrant Returns
- Phone and Device Downloads

April 22, 2020 Production (USAO_008289 through USAO_009255)

- Case Reports
- Documents Regarding an MLAT with Mexico
- Miscellaneous Records
- Additional Translations
- Additional phone and device downloads

July 16, 2020 Production (USAO_009256 through USAO_009400)

- Rosner Letters
- Additional Translations

July 20, 2020 Production (USAO_009401 through USAO_009628)

- Additional Translations

July 28, 2020 Production (USAO_009642 through USAO_009849)

- Additional MLAT Documents
- Additional FBI Mexico Documents

August 6, 2020 Production (USAO_009850 through USAO_009932)

- Additional Yiddish and Spanish Translations

October 16, 2020 Production (USAO_009933 through USAO_012096)

- Additional Yiddish and Hebrew Translations
- WhatsApp Extractions for Several Previously Produced devices

January 27, 2021 Production (USAO_012097 through USAO_012113)

- Additional Documents recently Received from Mexico and the Corresponding Translations

April 26, 2021 Production (USAO_012114 through USAO_018536)

- Additional Financial Records (Card Connect, JPMC, RBC Bank and Santander Bank)
- Additional Documents Relating to Guatemala
- Additional Translations

(ECF No. 252).

Helbrans, Matityau Moshe Malka and Mordechay Malka, Aron Rosner, and Mayer Rosner were arraigned on the Superseding Indictment in May 2021. During these proceedings, the Government indicated that it had provided Defendants with a Proposed Protective Order and that once all Defendants had executed the Proposed Protective Order, which the Government provided to Defendants on or about May 12, 2021, the Government would produce the 3500 materials. (*See* Minute Entry dated May 20, 2021.)

On June 3, 2021, Jacob Rosner was arraigned on the Superseding Indictment and a *Faretta* hearing was held. The Court subsequently granted Jacob Rosner's request for pro se representation, relieved retained counsel, and appointed CJA counsel as stand-by counsel. (ECF Nos. 271 and 272.)

On July 6, 2021, the Government informed the Court that it had made one additional discovery production consisting of (i) recently obtained jail records and video visits from Westchester County Jail, and (ii) materials related to the alleged March 2021 kidnapping by a member of Lev Tahor. (ECF No. 283.) The Government further indicated that it had provided all Defendants with a Proposed Protective Order on or about May 12, 2021 and that while Aron Rosner, who is represented by counsel, has signed the Protective Order, none of the pro se Defendants have done so and requested that the Court enter the Proposed Protective Order. (ECF No. 283.)

On July 7, 2021, the Court entered the Protective Order. (ECF No. 285.)

A trial date has not been set.

**DISCUSSION**

I.      <u>Motions to Dismiss the Indictment</u>

Defendants have moved, in sum and substance, (1) to dismiss the IPKCA Counts of the Superseding Indictment because the IPKCA is unconstitutional as applied to Defendants because (A) the term "parental rights" is void for vagueness and (B) the term "has been in the United States" is void for vagueness as applied to Defendants; (2) to dismiss certain counts of the Superseding Indictment or counts against certain Defendants as follows (A) all claims against Helbrans who was allegedly removed from Mexico to the United States without lawful process, (B) the 2019 IPKCA Charge against Matityau Moshe Malka, and (C) the IPKCA Conspiracy Count as improperly duplicitous. As described below, the Court denies all of the motions to dismiss.

   **A.  Standard for a Motion to Dismiss an Indictment**

There are "two constitutional requirements for an indictment: first, that it contains the elements of the offense charged and fairly informs a defendant of the charge against which he must defend, and, second, that it enables him to plead an acquittal or conviction in bar of future prosecutions for the same offense." *United States v. Resendiz-Ponce*, 549 U.S. 102, 108 (2007) (internal quotation mark omitted). "[A]n indictment need do little more than to track the language of the statute charged and state the time and place (in approximate terms) of the alleged crime." *United States v. Vilar*, 729 F.3d 62, 80 (2d Cir. 2013). Although the language of the statute may be used in the description of the offense, the description "must be accompanied with such a statement of the facts and circumstances as will inform the accused of the specific offence, coming under the general description, with which he is charged." *Hamling v. United States,* 418 U.S. 87, 117-18 (1974). An indictment need only address the "core of criminality" of an offense, meaning,

the essence of a crime in general terms, and not the particulars of how a defendant effectuated the crime. *United States v. D'Amelia*, 683 F.3d 412, 418 (2d Cir. 2012).

Under Federal Rules of Criminal Procedure 12(b)(3)(B), a Court may dismiss an indictment if it suffers from deficiencies enumerated therein. Proving a defect, however, is a laborious task because of the low sufficiency threshold requirement, which requires only that an indictment contain a "plain, concise, and definite written statement[s] of the essential facts constituting the offense[s] charged." Fed. R. Crim. P. 7(c)(1).

In reviewing the sufficiency of an indictment, it is generally improper for the Court to consider evidentiary sufficiency or the merits of the case. *United States v. Alfonso*, 143 F.3d 772, 776-77 (2d Cir. 1998). Finally, when considering a motion to dismiss, the Court must assume the truth of the factual allegations in an indictment. *Boyce Motor Lines, Inc., v. United States*, 342 U.S. 337, 343 n.l6 (1952); *United States v. Clarke,* No. 05 CR. 017(DAB), 2006 WL 3615111, *1 (S.D.N.Y. Dec. 7, 2006).

### B. The International Parental Kidnapping Crime Act ("IPKCA")

The IPKCA provides that "Whoever removes a child from the United States, or attempts to do so, or retains a child (who has been in the United States) outside the United States with intent to obstruct the lawful exercise of parental rights shall be fined under this title or imprisoned not more than 3 years, or both." 18 U.S.C. § 1204(a). It defines the term "child" as "a person who has not attained the age of 16 years" and the term "parental rights" as "the right to physical custody of [a]child--(A) whether joint or sole (and includes visiting rights); and (B) whether arising by operation of law, court order, or legally binding agreement of the parties."[7] 18 U.S.C. § 1204(b). Finally, the IPKCA states that it does not "detract from The Hague Convention on the Civil

---

[7] The IPKCA also provides three affirmative defenses, none of which are applicable here. 18 U.S.C. § 1204(c).

Aspects of International Parental Child Abduction, done at The Hague on October 25, 1980." 18 U.S.C. § 1204(d).

Article 3 of the Hague Convention on the Civil Aspects of International Parental Child Abduction (the "Hague Convention") provides that removal or retention of a child is "wrongful where . . . it is in breach of rights of custody . . . under the law of the State in which the child was habitually resident immediately before the removal or retention; and at the time of removal or retention those rights were actually exercised . . . or would have been so exercised but for the removal or retention." Convention on the Civil Aspects of International Child Abduction, art. 3, Oct. 25, 1980, T.I.A.S. No. 11670. The Hague Convention does not define the term "habitual residence."

## C. Analysis

### 1. IPKCA Statutory Arguments

Defendants' statutory arguments are focused on the ambiguity or vagueness of the IPKCA's phrases "parental rights" and "has been in the United States" as applied to them.[8]

---

[8] Defendants further contend the IPKCA charges must be dismissed because the United States, Mexico, and Guatemala are all signatories to the Hague Convention and, therefore, civil proceedings under the Hague Convention are the preferred approach and this prosecution "detracts from" the Hague Convention in violation of the IPKCA. (Matityau Mem. at 14-18; Jacob Mem. at 10-11.) The Court disagrees. Unlike the Hague Convention, which "applies only if 'both the country to which the child is abducted and the country from which they are taken are parties to the convention,' . . . the IPKCA makes it a federal offense to remove or retain children abroad with the intent to obstruct parental rights, regardless of whether the destination country is a signatory to the Hague Convention." *Houtar*, 980 F.3d at 274 n.2 (quoting *United States v. Amer*, 110 F.3d 873, 881-82 (2d Cir. 1997) and citing H.R. Rep. No. 103–390 at 3 (1993)). The fact that all three countries are signatories and therefore that a Hague Convention proceeding could—and did— occur here does not preclude prosecution under the IPKCA. Courts have held that criminal prosecution of the IPKCA following the return of a child pursuant to civil Hague Convention proceedings in which the defendant participated does not detract from the Hague Convention, rather, such prosecution "furthers the goal of the IPKCA, to deter international kidnapping." *United States v. Ventre*, 338 F.3d 1047, 1054 (9th Cir. 2003); *see also Amer*, 110 F.3d at 882 (recognizing the possibility of parallel or ongoing civil proceeding under the Hague Convention

"A statute can be unconstitutionally vague if it either 'fails to provide a person of ordinary intelligence fair notice of what is prohibited,' or is 'so standardless that it authorizes or encourages seriously discriminatory enforcement.'" *Houtar*, 980 F.3d at 273 (quoting *United States v. Williams*, 553 U.S. 285, 304 (2008)). "Therefore, to survive a vagueness challenge, 'a penal statute [must] define the criminal offense with sufficient definiteness that ordinary people can understand what conduct is prohibited and in a manner that does not encourage arbitrary and discriminatory enforcement.'" *Id.* (quoting *Kolender v. Lawson*, 461 U.S. 352, 357 (1983).

"In an as-applied vagueness challenge, the inquiry begins with the text of the statute." *Id.* at 275 (internal quotation marks and alterations omitted.) "Even if there is ambiguity as to the margins of what conduct is prohibited under the statute," a statute is nonetheless valid if an ordinary person in the defendant's position would understand it to cover his or her actions. *Id.* at 276. "[W]hen, as here, a vagueness challenge is as-applied (as opposed to facial), the challenge cannot succeed if *the defendant's* conduct is 'clearly proscribed by the statute." *Id.* at 273-74 (quoting *United States v. Rybicki*, 354 F.3d 124, 129 (2d Cir. 2003)); *see also United States v. Amer*, 110 F.3d 873, 878 (2d Cir. 1997) (noting that "a challenger 'who engages in some conduct that is clearly proscribed by the challenged statute cannot complain of the vagueness of the law as applied to the conduct of others'" (quoting *Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.,* 455 U.S. 489, 495 (1982)). If "after considering the text, structure, history, and purpose" a court "must simply guess as to what Congress intended," the rule of lenity can be invoked to bar a law's application. *Barber v. Thomas*, 560 U.S. 474, 488 (2010).

---

and criminal prosecution under the IPKCA and questioning whether, under that circumstance, a defendant would be limited to the three specified affirmative defenses in the IPKCA or permitted to also invoke the Hague Convention defenses).

a. "Parental Rights"

Defendants aver that the IPKCA charges must be dismissed because the term "parental rights"[9] under the IPKCA is either ambiguous, vague, or does not apply to the instant case. (Jacob Mem. at 7-13.) Emphasizing the plain language of the IPKCA, the Government avers that the Mother's parental rights existed pursuant to court order, regardless of the Minors' habitual residence, and therefore, that Defendants' removal of the Minors from the Mother's custody violated the IPKCA. The Government further avers that the Mother also had parental rights due to the operation of law in both New York and Guatemala. The Court agrees with the Government that the IPKCA applies to the alleged removal of the Minors from the custody of their Mother, who at the time of the kidnapping, undoubtedly possessed some parental rights.

The plain language of the IPKCA provides that "parental rights" can "aris[e] by operation of law, court order, or legally binding agreement of the parties." 18 U.S.C. § 1204(b). This conjunctive phrasing alone is enough to reject Defendants' erroneous interpretation of *Amer* that the only parental rights cognizable under the IPKCA are those conferred by the country of habitual residence. The Second Circuit has confirmed that "nothing in *Amer* can reasonably be read to hold that parental rights under the IPKCA are always defined by the state of the child's habitual residence." *United States v. Zodhiates*, 901 F.3d 137, 145 (2d Cir. 2018) (distinguishing *Amer*, in

---

[9] To the extent the Defendants emphasize the IPKCA's use of the language "*lawful exercise* of parental rights" in an attempt to justify their removal of the Minors from the custody of their Mother based on some alleged misconduct of the mother, their arguments are unavailing. The Second Circuit has previously rejected such affirmative defenses and justifications. *See Amer*, 110 F.3d at 880-81 (rejecting defendant's argument that he was justified in removing and retaining his children because, among other things, their mother "was a poor parent or because Egyptian human rights laws protected the right of Islamic children to a proper religious education," defenses arguably inferred from the Hague Convention, because "the IPKCA's listing of three, and only three, affirmative defenses is a strong indication that the defenses arguable inferred from the Hague Convention are not available in an IPKCA prosecution").

which, "in the absence of a court order or legally binding agreement [the Court] looked to Article 3 of the Hague Convention . . . to define parental rights").

As the district court explained in *Zodhiates*, where a court order confers custody rights, an IPKCA prosecution can be premised upon those rights without any habitual residence inquiry:

> The IPKCA first defines the term "parental rights" to include rights that "aris[e] by operation of law." 18 U.S.C. § 1204(b)(2)(B). That definition captures a situation, such as the one in *Amer*, in which the *only* possible source of parental rights is the law of the state in which a child lived before his or her removal. In other words, where a custody dispute has not been resolved by court order or by settlement, the law of the state of the child's habitual residence provides a default source of parental rights governing liability under the IPKCA. But the IPKCA's definition of "parental rights" also includes sources of law that can supplant the default custody arrangement provided by state family law. Specifically, the IPKCA defines "parental rights" to include rights that arise by "court order" or by "legally binding agreement of the parties." 18 U.S.C. § 1204(b)(2)(B).
>
> In each of the cases on which Zodhiates relies, there was no way to define "parental rights" *other* than by looking to the operation of state law—in other words, there was neither a "court order" nor a "legally binding agreement of the parties." *Id. See Amer*, 110 F.3d at 876 (noting that the defendant and his wife "did not ... divorce or become legally separated" and that "[n]o formal custody arrangement was made"); *Fazal-Ur-Raheman-Fazal*, 355 F.3d at 43 (noting that, at the time the defendant kidnapped his children, "there existed no court order or other agreement between them affecting custody of the children"); *United States v. Homaune*, 898 F.Supp.2d 153, 157 (D.D.C. 2012) (noting that, at the time the defendant kidnapped his child, he and his separated wife "never made formal legal arrangements to settle custody"). Thus, in each of those cases, it made sense to look to the law of the state of the child's habitual residence to determine what "parental rights" were at issue because there was simply nowhere else to look. Here, by contrast, at the time of Isabella's removal, parental rights were governed by "court order." 18 U.S.C. § 1204(b)(2)(B). As a result, *Amer*'s language concerning the state of a child's "habitual residence" is irrelevant in this case.

*United States v. Zodhiates*, 235 F. Supp. 3d 439, 454-55 (W.D.N.Y. 2017), *aff'd,* 901 F.3d at 145 ("Nothing in *Amer* can reasonably be read to hold that parental rights under the IPKCA are always defined by the state of the child's habitual residence.")[10]

---

[10] Defendants are mistaken that under *Houtar* parental rights must always be determined based on the law in the country of the child's habitual residence. Because Houtar waived the right

Defendants do not dispute that the Kings County Family Court issued an order granting sole custody to the Mother. They merely contend that the Kings County Family Court should not have done so. However,

> all orders and judgments of courts must be complied with promptly [and, i]f a person . . . believes that order is incorrect the remedy is to appeal, but, absent a stay, he must comply promptly with the order pending appeal. Persons who make private determinations of the law and refuse to obey an order generally risk criminal contempt even if the order is ultimately ruled incorrect.

*Maness v. Meyers*, 419 U.S. 449, 458 (1975); *see also United States v. Miller*, 626 F.3d 682, 689 (2d Cir. 2010) (affirming district court's exclusion of certain evidence proffered by IPKCA defendant because there was no evidence that the operative custody order in effect at the time the alleged kidnapping occurred because there was no evidence the original order was ever appealed or stayed and therefore, at the time defendant took the child, defendant was "required to comply with the Vermont court order which gave [the other parent] lawful parental rights to full custody, rights [the defendant] frustrated by keeping [the child] outside the United States; *see also McDonald v. Head Crim. Ct. Supervisor Officer*, 850 F.2d 121, 124 (2d Cir. 1988) ("An order issued by a court must be obeyed, even if it is later shown to be erroneous."); *cf United States v. Mercado*, 478 F.2d 1108, 1111 (2d Cir. 1973) ("Upholding the conviction of a registrant who claims to have relied on the preexisting case law would appear to be no more than an application of the settled rule that an erroneous belief that an induction order is invalid, even if based on the advice of counsel, is not a defense to a prosecution for refusing induction, and that one who refuses induction on the basis of such a belief acts at his peril."). Defendants' contention that the Kings

---

to appeal his guilty plea, the Second Circuit was required to assume that the mother had the requisite parental rights and merely mused in dicta whether, since the children who had been retained outside the United States were not habitually resident in the United States, the mother's rights should be determined according to Yemeni law. 980 F.3d at 274 n.3. In other words, whether the mother had the requisite parental rights was not in issue in *Houtar*.

County Family Court should not have granted sole custody to the Mother did not entitle them to disobey it.[11] The IPKCA by its terms contemplates the possibility of "parental rights" arising from court orders, and the Superseding Indictment alleges that the Mother had parental rights at least pursuant to a Court order.

While the Superseding Indictment indicates that the Mother had sole custody due to the Kings County Family Court order, sole custody is not required to trigger the IPKCA. Rather, the IPKCA defines "parental rights" to include "the right to physical custody of [a]child--(A) whether joint or sole (and includes visiting rights)." 18 U.S.C. § 1204(b). In other words, an individual can violate the IPKCA if he or she frustrates parental rights that are less than sole physical custody. *See, e.g.*, *United States v. Alahmad*, 28 F. Supp. 2d 1273, 1275 (D. Colo. 1998) (holding that visitation rights conferred to grandparent by Colorado law sufficed as "parental rights" frustration of which could be the basis of an IPKCA prosecution).

Defendants do not contend that any operation of law, agreement, or court order stripped the Mother of all parental rights.[12] Accordingly, Defendants' alleged conduct could violate the

---

[11] No party has indicated to this Court whether the temporary custody and restraining orders issued by the Kings County Family Court on November 14, 2018 have been appealed or otherwise modified. In any event, this Court lacks jurisdiction to review the propriety of those orders.

[12] Even assuming arguendo that the Kings County Family Court Order was insufficient to grant Mother sole custody, the Mother, at the very least, held joint custody with Teller, to whom she was married during the relevant period. Defendants do not dispute that the Mother is married to Teller and the biological mother of the Minors and they do not allege that her parental rights were ever stripped. This is dispositive because under the law of both Guatemala and New York, a biological mother retains custody of her children unless and until that custody is terminated. *See, e.g. Amer*, 110 F.3d at 878 (noting that under New York law a biological mother "enjoys the right to physical custody of her children unless and until this right is terminated by law"); *Palencia v. Perez*, 921 F.3d 1333, 1340 (11th Cir. 2019) (holding that under Guatemala law, when a couple is married, custody rights are "exercised jointly by the father and mother over minor children" (citing Article 252 of the Guatemalan Civil Code)); *Ischui v. Gomez Garcia*, 274 F. Supp. 3d 339, 346 (D. Md. 2017) ("[I]n Guatemala, biological parents have parental rights under the doctrine of *patria potestas*," which "generally refers to the rights of both biological parents to exercise authority over their children.").

IPKCA by interfering with Mother's parental rights regardless of whether she shared custody with Teller or held sole custody pursuant to the Kings County Family Court Order.[13] Since Defendants cannot credibly claim that the Mother had *no* parental rights at all, their conduct was clearly covered by the IPKCA, defeating their as-applied vagueness challenge.

b. "has been in the United States"

Defendants further aver that the phrase "has been in the United States" is unconstitutionally vague as applied to them. (Jacob Mem. at 13-15.) In *Amer*, the Second Circuit rejected the defendant's claim that the parenthetical term "has been in the United States" was vague because "the IPKCA does not specify the length of time that a child must have been in the United States before the IPKCA will be triggered by the child's removal or retention." 110 F.3d at 878. The Second Circuit held that by removing from the United States his three children, two of whom had spent their whole lives in the United States and the third of whom had been in the United States from the age of two, defendant had engaged in clearly proscribed conduct, and therefore, "there [could] be no doubt that [defendant's] retention of the three children . . . was covered by the act." *Id.*

While the Second Circuit acknowledged in *Amer* that "the phrase 'has been in the United States' might reflect some uncertainty as applied to extreme situations," and that "there might be room for argument as to whether foreign children who were merely visiting the United States on a week-long vacation would be protected by the Act," 110 F.3d 878, it has rejected similar

---

[13] Similarly, the issue of whether the Mother interfered with Teller's parental rights by leaving Guatemala with the Minors is not before the Court. Teller could—and did—file a Hague Convention petition seeking expedited return of his children to Guatemala. Despite repeated opportunities to litigate his case, the Hague Case was dismissed with prejudice and the Second Circuit denied the appeal for procedural defects. This Court lacks jurisdiction to review the Hague Case or to relitigate Teller's petition.

vagueness challenges on two subsequent occasions and has yet to find a circumstance in which the phrase "has been in the United States" was unconstitutionally vague as applied. First, in *United States v. Saliba*, the Second Circuit held that the defendant's conduct was "clearly covered by the Act" where the abducted child had been in the United States for nearly four months prior to the abduction and spent the first four months of her life in the United States. 489 F. App'x 501, 502 (2d Cir. 2012). Second, in *United States v. Houtar*, the Second Circuit held that the statute clearly proscribed the defendant's conduct where the defendant's two daughters "had been in the United States for extended periods of time: one resided here for the first two years and seven months of her life, and the other the first five months." 980 F.3d at 274-75. In addressing the same arguments raised in *Amer*, the *Houtar* Court suggested that the statute might not cover children "set[ting] foot in the United States [during] a minutes-long layover." *Id.* at 276.

Here, the Government alleges that (1) the Mother fled to the United States intending to relocate, (2) the Minors were in the United States for nearly a month before the 2018 kidnapping; and (3) the Minors have remained in the United States since they were recovered in early 2019. Accordingly, this case is akin to *Saliba* and *Houtar*, in which the Second Circuit held that periods of "nearly four months," *Saliba*, 489 F. App'x at 502, and "five months," *Houtar*, 980 F.3d at 275, easily fell within IPKCA's reach. Even though Minors only resided in the United States for one-month prior to the 2018 kidnapping, the Mother's intention to relocate the Minors to the United States makes this case distinguishable from the extreme circumstances posited by the Second Circuit such as a "minutes-long layover" or a "week-long vacation" in which the statute might not apply.

Accordingly, the Court rejects Defendants' as-applied statutory challenge based on the phrase "has been in the United States."

## 2. Challenges to Specific Counts or Defendants

### a. Helbrans's Removal Without Lawful Process

Helbrans moves for dismissal of the charges against him on the basis that he was removed from Mexico to the United States without lawful process. Helbrans admits that this argument is foreclosed by *United States v. Alvarez-Machain*, 504 U.S. 655, 670 (1992) ("The fact of respondent's forcible abduction [by foreign authorities] does not . . . prohibit his trial in a court in the United States for violations of the criminal laws of the United States"), *Frisbie v. Collins*, 342 U.S. 519, 522 (1952) ("[T]he power of a court to try a person for crime is not impaired by the fact that he had been brought within the court's jurisdiction by reason of a forcible abduction . . . . There is nothing in the Constitution that requires a court to permit a guilty person rightfully convicted to escape justice because he was brought to trial against his will." (internal quotation marks omitted)), and *United States v. Lira*, 515 F.2d 68, 72 (2d Cir. 1975) ("[A] court's power to bring a person to trial upon criminal charges is not impaired by the forcible abduction of the defendant into the jurisdiction.") (Helbrans Mem. at 10.) Accordingly, the Court denies Helbrans' motion to dismiss the indictment based on removal from Mexico to the United States without lawful process.

### b. Matityau Moshe Malka's Challenge to the March 2019 IKPCA Charge

Matityau Moshe Malka contends that his provision of phones to Minor-1, even if true, does not amount to attempted kidnapping as alleged in the 2019 IKPCA Charge and therefore the 2019 IKPCA Charge must be dismissed as to him. This argument fails for three reasons.

First, the 2019 IKPCA Charge against Matityau Moshe Malka is sufficient because it provides a "plain, concise, and definite written statement[s] of the essential facts constituting the offense[s] charged." Fed. R. Crim. P. 7(c)(1). It "contains the elements" of IPKCA and "fairly

informs" Matityau Moshe Malka "of the charge against which he must defend*." Hamling*, 418 U.S. at 117.

Second, contrary to Matityau Moshe Malka's assertion, an attempt under the IPKCA does not require physical seizure or removal. The IPKCA provides that whoever, with the requisite intent, "removes a child from the United States, or attempts to do so" is guilty of a crime. 18 U.S.C. § 1204(a). The term "attempt" is used throughout the criminal code. Because there is no generally applicable federal attempt statute, Congress proscribes attempt on a case-by-case basis by including an attempt provision (e.g., "or attempts to do so") within the specific federal offense at issue. And the term "attempt" has a settled meaning: "A conviction for attempt requires proof that a defendant (a) had the intent to commit the object crime and (b) engaged in conduct amounting to a substantial step towards its commission." *United States v. Farhane*, 634 F.3d 127, 145 (2d Cir. 2011). Nothing about the normal usage of "attempt" or the IPKCA requires actual seizure or removal.

Finally, to the extent Matityau Moshe Malka challenges the sufficiency or the quality of the Government's evidence that he performed (or aided and abetted) a substantial step toward Minor-1's removal, that challenge is premature. *See, e.g.*, *United States v. Perez*, 575 F.3d 164, 166-67 (2d Cir. 2009) ("Unless the government has made what can fairly be described as a full proffer of the evidence it intends to present at trial . . . the sufficiency of the evidence is not appropriately addressed on a pretrial motion to dismiss an indictment."); *United States v. Elie*, No. 10 Cr. 336 (LAK), 2012 WL 383403, at *1 (S.D.N.Y. Feb. 7, 2012) ("[A] pretrial motion to dismiss an indictment is not a permissible vehicle for addressing the sufficiency of the government's evidence."). Accordingly, the Court denies Matityau Moshe Malka's challenge to the March 2019 IPKCA Count.

c. Challenge to IPKCA Conspiracy Count as Duplicitous

Matityau Moshe Malka and Jacob Rosner both seek dismissal of the IPKCA Conspiracy Charge as improperly duplicitous because it joins (a) separate conspiracies for international parental kidnapping, unlawful use of a means of identification, and entering by false pretenses the secure area of an airport, and (b) separate kidnapping attempts. However, a single conspiracy count charging a multi-object conspiracy is not improper unless it is prejudicial and Defendants have alleged no prejudice here. (Matityau Mem. at 21-23.)

"An indictment is impermissibly duplicitous where: (1) it combines two or more distinct crimes into one count in contravention of Fed. R. Crim. P. 8(a)'s requirement that there be a 'separate count for each offense,' and (2) the defendant is prejudiced thereby." *United States v. Sturdivant*, 244 F.3d 71, 75 (2d Cir. 2001) (quoting *United States v. Murray*, 618 F.2d 892, 896 (2d Cir. 1980)). Even if more than one crime is charged in a single count, it only prejudices a defendant if there is: (1) a potential lack of notice of the crime charged and its maximum penalty; (2) the potential that a second trial on the same offense would not be barred by the Double Jeopardy Clause; and (3) the potential uncertainty with respect to the crime of which the jury convicted the defendant, and the attendant sentencing implications of the verdict. *Sturdivant*, 244 F.3d at 77; *accord United States v. Olmeda*, 461 F.3d at 281. Duplicity is "only a pleading rule and would in no event be fatal to the count." *United States v. Droms*, 566 F.2d 361, 363 n.1 (2d Cir. 1977).

"[I]t is well established that 'the allegation in a single count of a conspiracy to commit several crimes is not duplicitous, for the conspiracy is the crime and that is one, however, diverse its objects.'" *United States v. Murray*, 618 F.2d at 892, 896 (2d Cir. 1980) (quoting *Braverman v. United States*, 317 U.S. 49, 54 (1942)) (internal quotation marks omitted); *see also United States v. Hughes*, 310 F.3d 557, 560-51 (7th Cir. 2002) (holding a conspiracy with two illicit objectives

was not duplicitous). Additionally, a multi-object conspiracy is not duplicitous because, "[w]hether the object of a single agreement is to commit one or many crimes, it is in either case the agreement which constitutes the conspiracy which the statute punishes." *Braverman*, 317 U.S. at 53. "Simply put, a conspiracy is a single violation. It is an illegal agreement that may, and often does, encompass any array of substantive illegal acts carried out in furtherance of the overall scheme." *United States v. Pressley*, 469 F.3d 63, 65 (2d Cir. 2006); *see also United States v. Aracri*, 968 F.2d 1512, 1518 (2d Cir. 1992) ("[A]cts that could be charged as separate counts of an indictment may instead be charged in a single count if those acts could be characterized as part of a single continuing scheme.")

Here, the IPKCA Conspiracy Count charges a multi-object conspiracy: that the Defendants (1) agreed to remove the Minors—two individuals—from their Mother, (2) undertook other actions as part of that scheme and that, and (3) after the December 2018 kidnapping resulted in the return of the Minors to their Mother, the Defendants tried again. This Charge is not duplicitous but, even if it were, Defendants have failed to concretely allege any prejudice.

To the extent Jacob Rosner claims that the IPKCA Conspiracy Charge must be dismissed as to him because there is no allegation that he agreed to join the latter two objects of the conspiracy and he is only alleged to have traveled to purchase clothing, he is mistaken. "Where a conspiracy has multiple objectives, a conviction will be upheld so long as evidence is sufficient to show that [the defendant] agreed to accomplish at least one of the criminal objectives." *United States v. Papadakis*, 510 F.2d 287, 297 (2d Cir. 1975). Additionally, the Government does not need to allege that Jacob Rosner engaged in any particular overt acts in order to be a member of the conspiracy, because an overt act may be made by "only a single one of the conspirators." *Braverman*, 317 U.S. at 53.

Accordingly, the Court rejects the challenge to the IPKCA Conspiracy Charge as duplicitous.

## II.  Bill of Particulars

Mayer Rosner and Jacob Rosner separately move for a bill of particulars.

### A.  Legal Standard

Federal Rule of Criminal Procedure 7(f) allows a defendant to request a bill of particulars to obtain information relevant to "the nature of the charge against him [or her]," to enable him or her "to prepare for trial, to prevent surprise, and to interpose a plea of double jeopardy should he [or she] be prosecuted a second time for the same offense." *United States v. Bortnovsky*, 820 F.2d 572, 574 (2d Cir. 1987) (citing *Wong Tai v. United States*, 273 U.S. 77, 82 (1927)). The decision to grant a bill of particulars is within the sole province of the district court. *United States v. Davidoff*, 845 F.2d 1151, 1154 (2d Cir. 1988).

A bill of particulars is only necessary "where the charges of the indictment are so general that they do not advise the defendant of the specific acts of which he is accused." *United States v. Walsh*, 194 F.3d 37, 47 (2d Cir. 1999). The central question is whether the "information sought is necessary, not whether it is helpful." *United States v. Facciolo*, 753 F. Supp. 449, 451 (S.D.N.Y. 1990). Typically, where the information sought is "provided in the indictment or in some acceptable alternate form," such as through discovery, "no bill of particular is required." *Bortnovsky*, 820 F.2d at 574; *see also United States v. Walsh*, 194 F.3d 37, 47 (2d Cir. 1999) (affirming denial of request for a bill of particulars where the Government adequately informed the defendant of the nature of the charges against him through discovery).

Demands for information "with respect to where, when, and with whom the Government will charge the defendant with conspiring are routinely denied." *United States v. Guerrero*, 669 F.

Supp. 2d 417, 426 (S.D.N. Y 2009). Nor are defendants entitled to (1) "information regarding how the Government alleges the defendant performed acts in furtherance of the conspiracy," *see Minaya*, 395 F. Supp. 2d at 36 (citing *United States v. Santiago*, 174 F. Supp. 2d 16, 35 (S.D.N.Y. 2001)), or (2) more specific dates on which the alleged illegal conduct occurred, *see id.* at 35 (citing *United States v. Lorenzano*, No. S6 03CR1256, 2005 WL 975980, at *3 (S.D.N.Y. Apr. 26, 2005)).

**B.    Application**

**1.    Mayer Rosner**

Mayer Rosner seeks a bill of particulars itemizing: (1) "[a]ny and all documents which identify [Rosner's] involvement in the overall conspiracy including but not limited to documents which indicate or suggest he participated in the planning or execution of the rescue of the children," (2) "[a]ny and all documents which identify [Rosner's] involvement in transporting the children from New York to Mexico," and (3) "any and all documents which the government would seek to introduce at trial that reflect [Rosner's] participation in the conspiracy." (Mayer Mem. at 8.)

Mayer Rosner has been provided with significant discovery, production of which is ongoing, and the Superseding Indictment and Complaint outline the particular steps that he allegedly took to facilitate the 2018 kidnapping. For example, the Complaint alleges that ihe engaged in planning conversations about the kidnapping and sought to convince a co-conspirator (who later became a Government cooperating witness) to flee the United States. (18 MJ 10939, ECF No. 1.) The Government also detailed its allegations against Mayer during bail hearings before this Court (*e.g.* Minute Entry dated March 4, 2021), providing further information to allow Mayer Rosner to adequately defend himself at trial. Finally, the "the Government has made itself available to defense counsel in this matter on several occasions and has answered various factual questions . . . regarding particular aspects of the evidence produced in discovery." (Opp'n Mem.

at 87). Accordingly, the Court denies Mayer Rosner's request for a bill of particulars. *See, e.g.,* *United States v. Reinhold*, 994 F. Supp. 194, 201 (S.D.N.Y. 1998) (denying request for bill of particulars where "[t]he . . . indictment is detailed in its allegations and "[the] defendants have had extensive discovery"); United States v. Conesa, 899 F. Supp. 172, 176 (S.D.N.Y. 1995) (denying request for bill of particulars because "[t]he Indictment sufficiently advises defendants of the specific acts of which they are accused" and "the Government . . . has made available to defense counsel extensive discovery that supplements the information provided in the . . . Indictment").

### 2. Jacob Rosner

Jacob Rosner moves to compel the Government to provide a bill of particulars so that he can obtain information about (1) "what Jacob said or did that constitutes his alleged agreement with others to violate the latter two objects" of the conspiracy charged in Count One; (2) "set[ting] forth any acts by any defendants, other than defendant Helbrans, that were intended to further" the same two objects of the conspiracy, and (3) to identify any acts he took in furtherance of December 2018 IPKCA Counts, which charge substantive violations. (Jacob BOP Mem.)

Jacob Rosner has been provided with significant discovery, production of which is ongoing, and the Complaint and the Indictment detail specific steps Jacob Rosner took to further the IPKCA Conspiracy, including attending planning meetings and purchasing disguises to assist the Minors to use false papers at airport security to leave the United States without detection. (18 MJ 10939, ECF No. 1.) This information is sufficient to enable him "to prepare for trial, to prevent surprise, and to interpose a plea of double jeopardy should he be prosecuted a second time for the same offense." *Bortnovsky*, 820 F.2d at 574.

To the extent Jacob Rosner seeks a bill of particulars with respect to the allegations against other Defendants, "[t]he Government need not . . . set out with precision each and every act

committed by the conspirators in the furtherance of the conspiracy." *United States v. Cohen*, 518 F.2d 727, 733 (2d Cir. 1975) (citing *Wong Tai*, 273 U.S. at 81); *see also United States v. Bin Laden*, 92 F. Supp. 2d 225, 242 (S.D.N.Y. 2000) ("[R]equests, such as those made by the Defendants here, for particulars as to when, where, how, and with whom each individual defendant joined an alleged conspiracy have 'almost uniformly been denied.'" (quotation omitted)).

Accordingly, Jacob Rosner's request for a bill of particulars is denied.

### III.  Motion for *In Camera* Review of Grand Jury Minutes

Matityau Moshe Malka moves the Court to review *in camera* the Grand Jury minutes in this case. In support of his request, he alleges that the prosecution may have presented "misleading and inaccurate evidence" such as (1) illegally obtained recordings between Victim-1 and Yakov Weingarten, (2) Yiddish recordings, which were not formally translated, (3) "inflammatory allegations" regarding Lev Tahor's physical, sexual, and emotional abuse of its adherents, (4) incorrect instructions regarding the elements of Count One and Count Four, and (5) failure to inform the jury about an ongoing civil proceeding under the Hague Convention in the Eastern District of New York. (Matityau Mem. at 30-34.) The Court finds that these speculative allegations fall far short of the "grossly prejudicial irregularity or some other particularized need or compelling necessity" required to breach the secrecy of grand jury proceedings.

#### A.  Legal Standard

It is settled law that "grand jury proceeding[s] [are] accorded a presumption of regularity." *United States v. R. Enterprises, Inc.*, 498 U.S. 292, 301 (1991) (internal quotation marks omitted). To promote regularity, there has been a "long-established policy that maintains the secrecy of grand jury proceedings in the federal courts." *Dennis v. United States*, 384 U.S. 855, 869 (1966) (internal quotation marks omitted). Breaking grand jury secrecy constitutes "extraordinary relief."

*United States v. Shaw*, No. S1 06 CR 41 (CM), 2007 WL 4208365, at *6 (S.D.N.Y. Nov. 20, 2007) (internal quotation marks omitted).

Rule 6(3)(E)(ii) of the Federal Rules of Criminal Procedure allows for disclosure "at the request of the defendant who shows that a ground may exist to dismiss the indictment because of a matter that occurred before the grand jury." Fed. R. Crim. P. 6(3)(E)(ii). In order to invoke disclosure under this Rule, "a defendant must demonstrate some grossly prejudicial irregularity or some other particularized need or compelling necessity" that outweighs the Government's and the Grand Jury's substantial interest in secrecy. *United States v. Gibson*, 175 F. Supp. 2d 532, 534 (S.D.N.Y. 2001); *see also United States v. Sells Eng'g, Inc.*, 463 U.S. 418, 443 (1983). "This standard applies both to in camera review and disclosure to the parties of grand jury minutes." *United States v. Dunn*, No. 05-CR-127 (KMK), 2005 WL 1705303, at *1 (S.D.N.Y. July 19, 2005).

### B. Application

Matityau Moshe Malka claims that "based on the indictment language": (1) certain information "may" have been presented to the Grand Jury "based on the indictment language" including recordings of conversations in Yiddish between the Minor(s) and co-conspirators that may have been improperly translated; (2) a "prejudicial description" of Lev Tahor based on news reports may have been presented to the Grand Jury; (3) information including the status of the then ongoing Hague Case may not have been presented to the Grant jury; and (4) the Grand Jury may not have been properly instructed as to the elements of a parental kidnapping conspiracy.

Though defendants are, by design, not in possession of material to carefully scrutinize the presentation of evidence to a grand jury, the claims by Matityau Moshe Malka strike this Court as unduly speculative insofar as he presents no tangible basis to conclude that any of alleged impropriety occurred. These speculative arguments are precisely the type that courts in this district

have routinely rejected as basis for vitiating grand jury secrecy. *See, e.g., United States v. Scali*, No. 16 Cr. 466 (NSR), 2018 WL 369195 (S.D.N.Y. Jan. 9, 2018), (rejecting claim that inspection of Grant Jury minutes was required to determine, inter alia, whether the grand jury "may not have been properly instructed" as to two counts in the indictment because the defendant "failed to make specific factual allegations, and instead bases his allegations upon his own conjectures and suspicions of what may have transpired during the Grand Jury proceedings") *aff'd*, 820 F. App'x 23 (2d Cir. 2020); *United States v. Silver*, 103 F. Supp. 3d 370, 382 (S.D.N.Y. 2015) ("In short, the Court finds that the Defendant's speculative claim that the grand jurors may have been prejudiced . . . falls short of establishing a particularized need that outweighs the presumption of secrecy." (internal quotation marks omitted)); *United States v. Ordaz-Gallardo*, 520 F. Supp. 2d 516, 519-20 (S.D.N.Y. 2007) (rejecting motion for inspection of grand jury minutes where "[d]efendants offer little more than speculation that some impropriety may have occurred before the grand jury that would require this case to be dismissed"); *United States v. Trochelmann*, No. 98 Cr. 1276 (JFK), 1999 WL 294992, at *3 (S.D.N.Y. May 11, 1999) ("Allegations based on belief, such as Defendants' allegations here, provide no reason to disregard the presumption of regularity of grand jury proceedings, and do not even warrant an in camera review of the grand jury minutes." (internal quotation marks omitted)); *United States v. Kalevas*, 622 F. Supp. 1523, 1524-25 (S.D.N.Y. 1985) (rejecting motion for in camera review of grand jury minutes where defendant's grounds included "that the grand jury may have been improperly instructed on the applicable laws"). Matityau Moshe Malka's allegations are not sufficiently particular or fact-based to warrant in camera review of the Grand Jury minutes; accordingly his motion is denied.

## IV. Disclosure Motions

Throughout their motions, Defendants ask the Court to order that the Government disclose certain materials. The Court notes that no trial date has been set in this matter and addresses each request in turn. As explained below, the motions for orders directing pretrial disclosures of *Brady*, *Giglio*, 3500, and Rule 404(b) materials, and trial exhibits, demonstratives, and summary charts are denied without prejudice as moot and/or premature and the motion for an order directing the Government to disclose the identities and statements of co-conspirators is denied with prejudice because such information must only be disclosed if and when the Government chooses to call such individuals as witnesses at trial.

### A. *Brady* Exculpatory Materials

Defendants ask the Court to compel production of *Brady* materials. (Helbrans Mem. at 13-14.) The Second Circuit requires *Brady* disclosures "no later than point at which a reasonable probability will exist that the outcome would have been different if an earlier disclosure had been made." *In re United States (U.S. v. Coppa),* 267 F.3d 132, 142 (2d Cir. 2001). In other words, "as long as a defendant possesses *Brady* evidence in time for its effective use, the government has not deprived the defendant of due process of law simply because it did not produce the evidence sooner." *Id.*

The Court previously issued orders pursuant to Federal Rule of Criminal Procedure 5(f) confirming the Government's disclosure obligations under *Brady*. (ECF Nos. 153 and 168.) The Government "recognizes its continuing obligation to disclose any *Brady* material, and to make a diligent search for any relevant material that may be in the possession of the 'prosecution team,' including investigating agents and officers" and has committed to "provide timely disclosure of any additional *Brady* material if any such material comes to light." (Opp'n Mem. at 77.) At this

juncture, where trial has not yet been scheduled, the Court accepts the Government's good-faith representations and denies Defendants' motions concerning *Brady* materials without prejudice as premature. *See, e.g., United States v. Gallo*, 98 Cr. 338 (JGK), 1999 WL 9848, at *8 (S.D.N.Y. Jan. 11, 1999) (denying defendant's motion to compel production of purported *Brady* material based on Government's representations that "it is aware of its obligations under *Brady* . . . and will produce any *Brady* material to the defense well before trial"); *United States v. Perez*, 940 F. Supp. 540, 553 (S.D.N.Y. 1996) (same); *United States v. Campo Flores*, 15-CR-765 (PAC), 2016 WL 5946472, at *11 (S.D.N.Y. Oct. 12, 2016) ("The Government represents that it is aware of its obligation under *Brady*; that it has complied; and will continue to comply. That is sufficient to deny the defendants' motion for *Brady* relief." (internal citations omitted)).

### B. *Giglio* Impeachment Materials

Defendants seek an order directing the Government to produce all impeachment or *Gilgio* material, specifically enumerating 10 items. (Helbrans Mem. at 14-17.) The Court previously issued orders confirming the Government's disclosure obligations under *Giglio*. (ECF Nos. 153 and 168.)

There is no general right of pre-trial discovery of impeachment or *Giglio* materials because such material "ripen[s] into evidentiary material for purposes of impeachment only if and when the witness testifies at trial." *United States v. Cuthbertson*, 630 F.2d 139, 144 (3d Cir. 1980); *see United States v. Nixon*, 418 U.S. 683, 701 (1974) ("Generally, the need for evidence to impeach witnesses is insufficient to require its production in advance of trial").

While Defendants' motion is vague as to the timing of when it seeks to obtain *Giglio* impeachment material, courts in this Circuit have refused to compel disclosure of impeachment or *Giglio* material well in advance of trial, and the Defendants have provided no particularized basis for early disclosure here. *See United States v. Nixon*, 418 U.S. 683, 701 (1974) ("Generally, the

need for evidence to impeach witnesses is insufficient to require its production in advance of trial."); *Gallo*, 1999 WL 9848, at *7-8 (denying defendants' motions to require the early production of Giglio and 3500 material); *United States v. Mejia*, No. 98 Cr. 4 (JGK), 1998 WL 456257 at *1 (S.D.N.Y. Aug. 5, 1998); *Campo Flores*, 2016 WL 5946472, at *11 ("The Government has represented that it will make impeachment material relating to its anticipated witnesses available . . . ten days before trial. There is no need to depart from the customary rule in this district of disclosure shortly before trial.").

Since trial has not yet been scheduled, the request for early production of *Giglio* materials is denied without prejudice as premature.

### C. Rule 16(a) and Jencks Act/3500 Materials

The Defendants also seek an order directing the Government to produce all Rule 16(a) and Jencks Act/3500 materials no less than thirty days prior to trial. (Helbrans Mem. at 14.) By Order dated May 10, 2021, the Court denied a subsequent pro se motion for early disclosure of 3500 materials, indicating that such materials shall be produced prior to trial. (ECF No. 241.)

The Government has no obligation to produce prior statements of its witnesses until after each has testified on direct examination, 18 U.S.C. § 3500(a), and courts have found that providing this information as little as one day in advance of a witness's testimony is sufficient to avoid unnecessary delay, *e.g., United States v. Ruiz*, 702 F. Supp. 1066, 1069-70 (S.D.N.Y. 1989) (approving Government agreement to provide impeachment material along with 3500 material on day before witness testifies), *aff'd*, 894 F.2d 501 (2d Cir. 1990). Nonetheless, the Government has repeatedly indicated that it will turn over 3500 materials as soon as the Defendants sign the Proposed Protective Order provided to Defendants through counsel and standby-counsel on or about May 12, 2021 or the Court enters such an order. (*E.g.* ECF No. 283.) The Court entered a Protective Order on July 7, 2021. (ECF No. 285.)

Defendants' request for an order compelling production of Rule 16(a) and Jencks Act/3500 materials no less than thirty days prior to trial is premature where, as here, no trial date has been set. Accordingly, the request is denied without prejudice as moot and/or premature. *See, e.g.*, *United States v. Rodriguez-Perez*, No. 10 Cr. 905 (LTS), 2012 WL 3578721, at *10-11 (S.D.N.Y. Aug. 16, 2012) (declining to order early disclosures under the Jencks Act where the Government intended to make such material available to defense counsel one week before trial).

### D. Rule 404(b)

Defendants also ask the Court to compel early disclosure of Rule 404(b) material and are particularly concerned that the Government may attempt to introduce evidence of alleged conduct and practices of the Lev Tahor community including alleged physical, sexual, and emotional abuse of children, which is alleged to have occurred outside of the United States, most recently in Guatemala. (Helbrans Mem. at 18 (seeking 404(b) disclosure immediately); Matityau Malka Mem. at 24-28 (seeking 404(b) disclosure at least 45 days before trial); Mordechay Malka Mem. at 1-12 (seeking 404(b) disclosure in time for defendants to mount a defense).)

Rule 404(b) requires that the Government provide "reasonable notice in advance of trial, or during trial if the court excuses pretrial notice on good cause shown" of its intent to use evidence of other crimes, wrongs, or bad acts. Fed. R. Evid. 404(b). The Rule specifies that the Government need only provide "the general nature of any such evidence." *Id.* Rule 404(b), however, sets no minimum time for action by the Government, nor would any time limit be appropriate, because the evidence the Government wishes to offer may change as the proof and potential defenses crystallize. *See United States v. Allums*, 97 Cr. 267 (HS), 1997 WL 599562, at *1 (S.D.N.Y. Sept. 25, 1997) ("The Government has agreed to produce this material in time so that the defense may have an opportunity to challenge their admission; this is all that is required with respect to Rule

404(b) evidence."); *United States v. Matos-Peralta*, 691 F. Supp. 780, 790 (S.D.N.Y. 1988); *United States v. Davis*, 05-CR-0694, 2006 WL 20493, at *1 (S.D.N.Y. Jan. 3, 2006) ("The Government has asserted that it intends to make a motion in limine for the admission of Rule 404(b) evidence approximately two weeks before trial. In the absence of any showing that the evidence is required earlier, the Court denies Davis' request for immediate disclosure."); *United States v. Al-Marri*, 230 F. Supp. 2d 535, 541-42 (S.D.N.Y. 2002) (noting that "[o]bviously, every criminal defendant would find early production of Rule 404(b) materials to be of great assistance in preparing for trial," and denying request for production of Rule 404(b) materials earlier than two weeks before trial).

The Government indicated that it "will provide notice to the defense of its intent to use any such evidence well in advance of trial, and consistent with any schedule set by the Court, so that the defendants may file any motions in limine to be considered at the final pretrial conference." (Opp'n Mem. at 82.) Since no trial date has yet been set and Defendants have provided no reason to disbelieve the Government's stated intention to comply, the Court denies this request without prejudice as moot and/or premature. *See Tranquillo*, 606 F. Supp. 2d at 383 ("The Government has indicated that it will make the required disclosure two weeks prior to trail, a practice that typically comports with Rule 404(b)."); *United States v. Fennell*, 496 F. Supp. 2d 279, 284 (S.D.N.Y. 2007) ("The government has in good faith noted its obligations under Rule 404(b), and indicated that it intends to provide notice of the 404(b) evidence it intends to introduce two weeks before the beginning of trial. There is therefore no need to issue the order Defendant seeks.").

### E.  Trial Exhibits, Demonstratives, and Summary Charts

Finally, Defendants request early disclosure of the Government's trial exhibits, demonstratives, and summary charts. (Helbrans Mem. at 19-20.) Rule 16 does not require

designation of trial exhibits within any particular timeframe. *See United States v. Nachamie,* 91 F.Supp.2d 565, 570 (S.D.N.Y.2000). While the Second Circuit has recognized the benefit of making demonstrative evidence available to the defense within a "reasonable time before trial," *United States v. Dioguardi*, 428 F.2d 1033, 1038 (2d Cir. 1970), given that no trial date has yet been set, this request is denied without prejudice as premature.

### F.  Statements and Identities of Co-Conspirators

Helbrans requests the Government disclose the substance of statements it intends to introduce at trial pursuant to Federal Rule of Evidence 801(d)(2)(E). (Helbrans Mem. at 20-21.) In addition, Mordechay Malka requests a Court order directing disclosure of co-conspirator identities. (Mordechay Malka Mem. at 17-21.) The Government has indicated that "[c]onsistent with its intention to produce Jencks Act material in advance of trial . . . the defendants will receive notice of any co-conspirators' identities and statements that the Government may seek to introduce either in the form of exhibits or through witness testimony with sufficient time to raise any objections with the Court." (Opp'n Mem at 83.)

It is well-established that the Government is not required to disclose the identities or statements of co-conspirators. *See, e.g.*, *In re United States*, 834 F.2d 283, 284 (2d Cir. 1987) (reversing order directing the government "to produce all oral statements made by the defendants and coconspirators that the Government planned to offer at trial as admissions of a defendant" under Fed. R. Evid. 801); *United States v. Percevault*, 490 F.2d 126, 131 (2d Cir. 1974) ("Rule 16(a) simply does not encompass [statements of a co-conspirator], nor does the Jencks Act permit their disclosure over the objection of the government . . . . Fear of intimidation of witnesses and concern over efforts to suborn perjury were not flights of fantasy by those who drafted Rule 16.")

Accordingly, to the extent that Defendants request disclosure of co-conspirator identities or statements separate and apart from the trial exhibits, witness lists, or 3500 materials, the request is denied.

**CONCLUSION**

For the foregoing reasons, Defendants' (1) motions to dismiss, (2) for a bill of particulars, (3) for *in camera* review of the grand jury minutes, and (4) for disclosure of the identities and statements of co-conspirators are denied with prejudice. The motions for orders directing pretrial disclosures of *Brady, Giglio*, 3500, and Rule 404(b) materials, and trial exhibits, demonstratives, and summary charts are denied without prejudice as moot and/or premature.

The Clerk of the Court is respectfully directed to terminate the motions at ECF Nos. 120, 123, 125, 131, 135, and 146.

Standby counsel are directed to serve a copy of this opinion and order on their respective *pro se* Defendants and to file proof of service on the docket.

Dated:   July 8, 2021                                             SO ORDERED:
        White Plains, New York

_____
NELSON S. ROMÁN
United States District Judge