Exhibit A



**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

*United States Courthouse*
*300 Quarropas Street*
*White Plains, New York 10601*

February 3, 2021

**BY ECF**

The Honorable Judith C. McCarthy
United States Magistrate Judge
Southern District of New York
300 Quarropas Street
White Plains, New York 10601

    RE:    ***United States v. Matityau Malka*, 19 Cr. 497 (NSR)**

Dear Judge McCarthy:

    The Government respectfully submits this letter in opposition to defendant Matityau Malka's motion for bail, dated February 1, 2021 ("Mot."). The defendant, who is a Guatemalan resident that attempted to kidnap two children and bring them out of the country, is both a danger to the community and a flight risk.

## I.    Background and Procedural History

    The defendant is a member of an ultra-Orthodox Jewish sect called Lev Tahor (which means "pure heart" in Hebrew). The defendant and others conspired, from at least December 2018 up to and including March 2019, to kidnap children from New York and bring them back to the Lev Tahor community in Guatemala.

    As discussed further below, the co-conspirators successfully kidnapped two children (the "Victims") from New York in December 2018 (the "December Kidnapping"). After a weeks-long manhunt by law enforcement, the Victims were found in Mexico and returned to their mother (the "Mother"). Four of the defendant's co-conspirators were arrested in December 2018 as a result of the December Kidnapping.

    Unfortunately, the co-conspirators were undeterred. The co-conspirators continued their efforts to kidnap the Victims and, the defendant in particular, made another kidnapping attempt in March 2019 (the "March Attempted Kidnapping"). Thankfully, the efforts were thwarted by law enforcement and the defendant was subsequently arrested.

### a.    Lev Tahor

    Lev Tahor is currently based in Guatemala and is comprised of approximately 250 members. The sect was founded in the 1980s by Shlomo Helbrans, who led the group until his

death in 2017. Following his death, defendant Nachman Helbrans ("Helbrans"), the son of Shlomo Helbrans, became Lev Tahor's new leader. Helbrans and several other leaders managed the operational affairs of the community and controlled every aspect of the lives of Lev Tahor's adherents. In addition, Lev Tahor's leadership enlisted members of the community for specific tasks, including the kidnapping of the Victims in this case.

In approximately October 2018, the Mother, who is Helbrans' sister, determined that it was no longer safe for her children to remain under the authority of her brother. She escaped from the group's compound in Guatemala and—with the help of U.S. authorities—arrived in the United States in early November 2018. On or about November 14, 2018, a Temporary Order of Custody and a Temporary Order of Protection were issued in Kings County Family Court granting the Mother temporary custody of all six children, including a 14-year-old girl ("Victim-1") and her 12-year-old brother ("Victim-2"). Those orders also prohibited Aaron Teller, the children's father and a leader within Lev Tahor, from having any communication with the children.

## b. The December Kidnapping

After the Mother fled with her children and settled in New York, Helbrans and several of the defendant's co-conspirators devised a plan to return the Victims to Lev Tahor. In the days and weeks before the abduction, Helbrans and his co-conspirators took several preparatory steps to ensure its success including, among other things: (1) bringing Victim-1 a cellphone so that the kidnappers could communicate with her; (2) traveling to the United States and/or Mexico from Guatemala; (3) renting a car to use during the kidnapping; (4) purchasing secular clothing to use as disguises for themselves and the Victims; (5) purchasing cellphones to use only for kidnapping-related matters; (6) conducting multiple meetings and phone/text conversations about the logistics of the kidnapping; (7) transferring money amongst themselves to help fund the kidnapping; (8) purchasing flights for themselves and the Victims to be able to leave the country, and (9) obtaining Helbrans' children's passports for the Victims to use to get out of the United States undetected.

At approximately 3 a.m. on December 8, 2018, Helbrans and his co-conspirators executed on their plan: the defendants kidnapped the Victims from a home in Woodridge, New York (the "Residence"). After they had the Victims out of the Residence, the kidnappers gave the Victims a change of clothes and took them to an airport. Helbrans then flew with the Victims (fraudulently using his own children's passports) to Mexico. His co-conspirators in the December Kidnapping took a variety of different routes out of the United States to Mexico.

Once in Mexico, the kidnappers transported the Victims to several hotels and residences. During this period, the kidnappers sought and received logistical help from members of Lev Tahor in the United States, Mexico, and Guatemala. On or about December 18, 2018, Mexican law enforcement raided what appeared to be a Lev Tahor safe house in San Miguel Tlaixpan, Mexico and detained three of the defendants who participated in the December Kidnapping, along with the defendant, Matityau Malka. While they were not found by Mexican authorities at that time, the Victims were in the same residence at the time of the raid by Mexican authorities but were hiding in a closet. The defendant, a United States citizen, and the other detained individuals were subsequently deported to the United States. Upon arrival in the United States, three of the

defendant's co-defendants were taken into custody on charges relating to the December Kidnapping.[1]

Finally, on December 27, 2018, after a three-week search involving scores of local, federal, and international law enforcement entities, the Victims were recovered in a hotel in Mexico. At the time, they were accompanied by defendants Shmiel and Yoil Weingarten. Ultimately, it appears that Mexico was only a way station for a longer journey: the Government subsequently recovered a document from defendant Shmiel Weingarten's email account—sent two days after the kidnapping of the Victims—declaring the group's "loyalty and submission to the Supreme Leader and Government of the Islamic Republic of Iran" and seeking asylum for the entire Lev Tahor community in Iran.

### c. The March Attempted Kidnapping

In March 2019, approximately three months after the arrest of his co-conspirators for the December Kidnapping, the defendant—along with an incarcerated Helbrans and defendant Yakov Weingarten—attempted to kidnap Victim-1 a second time (the "March Attempted Kidnapping"). During this attempt, the defendant approached Victim-1, who was living with her Mother in Brooklyn, on at least four occasions. During these encounters, the defendant provided Victim-1 with cellular telephones so that she could communicate with the kidnappers. In addition, the defendant provided Victim-1 with nine pills of a mood-altering prescription drug.

Victim-1 used these phones to communicate with defendant Yakov Weingarten, the acting head of the community following Helbrans' incarceration in December 2018. Those discussions included plans to remove Victim-1 from New York in a similar manner as the December 2018 Kidnapping. Yakov Weingarten also spoke with the Mother about the co-conspirators' plans to kidnap Victim-1 again, and threatened her by insisting that their efforts to return the Victims to Lev Tahor would not end until they were successful. Additionally, during a call from Westchester County Jail in March 2019, Helbrans told the Mother that he would take the children away from her.

### d. The Defendant's Arrest

On March 26, 2019, in the midst of the March Kidnapping Attempt, the defendant was arrested in Brooklyn, New York. It was only after the defendant was arrested that the threat to Victim-1 appear to subside.

On July 8, 2019, the Government sought and obtained a four-count Indictment (the "Indictment") charging the defendant and eight co-defendants. The defendant was charged with conspiracy, in violation of 18 U.S.C. § 371, and international parental kidnapping, in violation of 18 U.S.C. § 1204.

---

[1] Although he was detained by Mexican authorities and deported to the United States in December 2018, the defendant was not charged by our Office until the attempted kidnapping of Victim-1 in March 2019, as described further below.

The defendant has been detained on consent since his arrest.

## II.    Applicable Law

Under the Bail Reform Act, 18 U.S.C. §§ 3141 et seq., federal courts may order a defendant's detention pending trial upon a determination that the defendant is either a danger to the community or a risk of flight. 18 U.S.C. § 3142(e). A finding of risk of flight must be supported by a preponderance of the evidence. *See, e.g., United States v. Patriarca*, 948 F.2d 789, 793 (1st Cir. 1991); *United States v. Jackson*, 823 F.2d 4, 5 (2d Cir. 1987); *United States v. Chimurenga*, 760 F.2d 400, 405 (2d Cir. 1985). A finding of dangerousness must be supported by clear and convincing evidence. *See, e.g., United States v. Ferranti*, 66 F.3d 540, 542 (2d Cir. 1995); *Patriarca*, 948 F.2d at 792; *Chimurenga*, 760 F.2d at 405.

The Bail Reform Act lists four factors to be considered in the detention analysis: (1) the nature and circumstances of the crimes charges; (2) the weight of the evidence against the person; (3) the history and characteristics of the defendant; and (4) the seriousness of the danger posed by the defendant's release. *See* 18 U.S.C. 3142(g). Evidentiary rules do not apply at detention hearings, and the Government is entitled to present evidence by way of proffer, among other means. *See* 18 U.S.C. § 3142(f)(2); *see also United States v. LaFontaine*, 210 F.3d 125, 130-31 (2d Cir. 2000) (Government entitled to proceed by proffer in detention hearings).

Where a judicial officer concludes after a hearing that "no condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of any other person and the community, such judicial officer shall order the detention of the person before trial." 18 U.S.C. § 3142(e)(1).

## III.    Discussion

### a.    The Defendant Should be Detained Because He Presents a Danger to the Community and He Is a Flight Risk

As set forth below, the defendant poses a danger to the community and an extreme risk of flight. As such, the Government respectfully requests that the Court continue his detention.

*First*, the nature and circumstances of the charged offenses favor detention. The defendant conspired with others to take two children away from their mother and out of the United States in direct contravention of a court order. The defendant primarily took part in the March Attempted Kidnapping, but the fact that he was found by Mexican authorties three months earlier in a house where the Victims were being harbored demonstrates that he was well aware of the earlier kidnapping and law enforcement's extensive efforts to return the Victims to their Mother. Nonetheless, after the Victims were returned to the Mother and several of his co-conspirators had been arrested for the kidnapping, the defendant, Nachman Helbrans and Yakov Weingarten tried again. The defendant, being the only one in the group who was not either incarcerated or in Guatemala, was the boots on the ground of the operation. He approached Victim-1 on at least four occasions, delivering her cellphones and mood-altering prescription pills. The defendant was the

operative working to execute the next kidnapping attempt, and it was only due to the efforts of law enforcement that his plan was thwarted.

The defendant's criminal actions pose great danger to the Victims and highlight his extreme risk of flight. For starters, the defendant's actions were in direct contravention of a Kings County Family Court order granting the Mother custody of the Victims. The defendant's willingness to ignore that order and brazenly attempt to kidnap Victim-1 demonstrates his lack of respect for court orders. Even more egregious, however, is that the defendant did this even after he had been deported from Mexico (where he was harboring the Victims), and even after his co-conspirators were arrested and charged with the Victims' prior kidnapping. Given the defendant's manifested determination to strip the Mother of her children, there is no set of conditions that can ensure that, if released, he would not try to kidnap the Victims a third time. *See, e.g.*, Exhibit A, Bail Hearing Transcript (May 28, 2020), at 21 (Judge Smith denying bail application of one of the defendant's co-conspirators, and noting that there "is a serious risk that [the co-conspirator] would potentially obstruct or attempt to obstruct justice in the manner that he has done already, by continuing to make efforts to whisk these children away from their mother in violation of a court order").

*Second*, the strength of the evidence in this case underscores the risk that the defendant will become a fugitive and highlights his dangerousness. The evidence of the conspiracy is robust and voluminous, and includes multiple witnesses (including a cooperating witness who participated in the December Kidnapping), surveillance footage, communications among the co-conspirators, and documentary evidence. In addition, the evidence with respect to the March Attempted Kidnapping is strong. This evidence includes, among other things, recorded phone calls, witness testimony, and physical evidence. Taken together, this will be compelling evidence of guilt at any trial in this case. This weighs heavily in favor of detention, primarily because the strength of the evidence, and the fact that the defendant has now had months to review the Government's discovery and see how compelling the evidence is, only furthers the defendant's incentive to flee if released.

*Third*, the history and characteristics of the defendant also strongly support detention. As noted above, the defendant's criminal conduct involved violating a court order. This proves that, for this defendant, court orders and pretrial supervision will not have meaning.

Further, based on the information currently available to the Government, it appears that the defendant has spent much of his recent life outside the United States and has no meaningful ties to the United States. He has primarily lived a transient life tied only to Lev Tahor, rather than to national allegiance. Since its inception, Lev Tahor has moved it members from Israel, to the United States, then to Canada, Guatemala, Mexico, and then back to Guatemala in approximately 2016. These moves often occurred after friction with local law enforcement and child welfare authorities. Lev Tahor also has a broad international presence, which includes operations and/or allies in the United States, Guatemala, Canada, Israel, Mexico, and Europe, meaning that the defendant has a vast network to call upon if he were to attempt to flee. In fact, Lev Tahor members, including the defendant's co-conspirators, have demonstrated an ability to cross boarders without a trace or record—including with the Victims in tow. This ability, and the transient nature of Lev Tahor, who, as a community, have been able to relocate countries essentially overnight, exacerbates the defendant's risk of flight. In fact, given the documented entreaties by the

defendant's co-conspirators seeking asylum for the entire community in Iran, the defendant may very well seek to travel there or to another destination beyond the reach of U.S. law enforcement.

For all the reasons previously discussed, the danger to the community is serious. The defendant's victims are currently safely living with the Mother again, but the defendant and his co-conspirators have twice attempted to disrupt that safety and kidnap the Victims. The defendant's demonstrated disregard for the law makes clear that no set of conditions can protect the Victims, and possibly others, from the defendant taking further action to bring them back to Lev Tahor.

### b. Responses to Defendant's Motion

#### i. The Defendant's Proposal is Inadequate

The defendant argues that he should "be released either on recognizance or a personal appearance bond, or in the alternative, on conditions as may be reasonably set by the Court." (Mot. at 4). But the defendant does not present any meaningful explanation for why he would not be a risk of flight. The defendant does not address where he would live if released, how he would earn money, or what would motivate him not to flee. Instead, the defendant merely notes that he has two brothers in New Jersey and some of his wife's relatives live in Monsey, New York (*id.*)—but does not suggest that he has any meaningful relationship with those individuals or that they would be willing to sign a bond on his behalf or provide any moral suasion. Similarly, the defendant claims that his marriage, family and religious community all weigh in favor of release, but fails to explain how that will deter him from fleeing when, as the Government believes, the family and religious community is in Guatemala, not the United States. If the defendant cannot even represent to the Court specifics of how it can be assured that the defendant will appear in Court and not pose a danger to the community, the bail application must fail. *See* Exhibit B, Bail Hearing Transcript (Mar. 24, 2020), at 15 (Judge Davison denying a bail package for one of the defendant's co-conspirators, which was consented to by the Government, after finding that the defendant was "really very resistant to [the package]" and given "the circumstances . . . [the] nature of the case[,] the fact that he has strong roots in a foreign country and the unique sensitivities" of the case).

Even assuming the strictest of bail conditions, the defendant's risk of flight and danger to the community is too strong. For example, in the defendant's case, even home confinement (assuming the defendant could identify a home where he could live) with electronic monitoring would be inadequate to mitigate the high risk that the defendant would flee, as he could easily remove a monitoring device. At best, home confinement with electronic monitoring would merely reduce his head start should he decide to flee. *See United States v. Zarger*, No. 00 Cr. 773, 2000 WL 1134364, at *1 (E.D.N.Y. Aug. 4, 2000) (Gleeson, J.) (rejecting defendant's application for bail in part because home detention with electronic monitoring "at best . . . limits a fleeing defendant's head start"); *see also, e.g.*, *United States v. Orena*, 986 F.2d 628, 632 (2d Cir. 1993) (recognizing that electronic monitoring systems fail to provide the security of detention because "electronic surveillance systems can be circumvented" and "monitoring equipment . . . rendered inoperative."); *United States v. Liebowitz*, 669 F. App'x 603, 605 (2d Cir. 2016) (same).

## ii. The Defendant's Pretrial Detention Does Not Violate Due Process

The remainder of the defendant's motion focuses on the length of his pretrial detention. The defendant argues that his continued detention violates due process. (Mot. at 5.)

Although "the Constitution imposes no bright-line limit on the length of pretrial detention," "very long detentions must be exceptional." *United States v. Briggs*, 697 F.3d 98, 103 (2d Cir. 2012). Pretrial detention satisfies due process "if its purpose is regulatory rather than punitive." *Id.* at 101. "Permissible regulatory purposes include 'preventing danger to the community,' and 'ensur[ing] [a defendant's] presence at trial.'" *Id.* (citations omitted). In making the assessment of whether pretrial detention violates due process, courts consider "the strength of the evidence justifying detention, the government's responsibility for the delay in proceeding to trial, and the length of the detention itself." *Id.* An analysis of these three factors demonstrates that the defendant's detention has not violated his due process rights.

*First*, as set forth above, the evidence is overwhelming that the defendant is a serious flight risk and a danger to the community. His residence outside the United States, lack of ties to the United States, and incentive to flee provide strong support for his detention to ensure his appearance. Additionally, his demonstrated record of ignoring court orders—and his charged crime of kidnapping children in contravention of such orders—further proves his risk of flight and dangerousness.

*Second*, notwithstanding the defendant's claim to the contrary (Mot. at 5), the delay in this case is not attributable to the Government. The delay is in part due to the complexity of the case, which involves nine defendants, conduct that occurred in multiple countries, and substantial evidence that is in Yiddish and Spanish. While the logistics of large and complex cases do not justify indefinite detention, delays resulting from abundant discovery and motion practice do not constitute due process violations. *United States v. Briggs*, 697 F.3d at 102-03. Moreover, an additional factor resulting in delay is the logistical challenges of proceeding with a multi-defendant case amid the COVID-19 pandemic. And finally, a significant portion of the delay has been caused by the defendants themselves. *See* Exhibit C, Excerpt of Conference Transcript (Jan. 29, 2021), at 23 (Judge Roman noting that "the attorneys in this case have delayed in filing the motions in this matter despite the urgings of the Court")*, see also* Dkt. No. 86 (letter in which all defense counsel in this case requested an extension of their deadline to file motions because, due to COVID-19, "it has been impossible for counsel to have meaningful meetings with our clients to confidentially discuss the evidence disclosed and what motions might be appropriate"). The defendant ignores each of these significant factors causing delay and instead holds the Government responsible based on the timing of its productions. (Mot. at 5.) With respect to the Government's production of discovery, the Government produced the vast majority of discovery in this case in August 2019, less than two months after the Indictment, and the comparatively small productions since that point have predominately contained translations and materials received pursuant to a Mexican MLAT after August 2019. Any delay in the case caused by the Government's productions after August 2019 is dwarfed by the delays caused by the defendants, the COVID-19 pandemic and the inherent nature of this complex case.

*Third,* while the defendant has been detained for approximately 22 months, the length of detention "will rarely by itself offend due process." *United States v. Millan*, 4 F.3d 1038, 1044 (2d Cir. 1933) (noting that the Court has upheld projected pretrial detention periods of up to 32 months). Moreover, the Second Circuit has found that longer detention periods do not constitute due process violations. *See United States v. Briggs*, 697 F.3d at 100, 104 (nearly 30 months); *United States v. Hill*, 462 F. App'x 125, 127 (2d Cir. 2012) (24 months); *United States v. El-Hage*, 213 F.3d 74, 76-80 (2d Cir. 2000) (30 to 33 months).

In contrast, the only case cited by the defendant in which the duration of pretrial detention was found to violate due process is *United States v. Gonzales Claudio*, 806 F.2d 334 (2d Cir. 1986), which is easily distinguished from the instant case. In *Gonzalez Claudio*, the defendants were facing an eighteen month-long pretrial detention before a trial that was expected to last eight months. Here, the defendant has not been detained as long as the anticipated detention period in *Gonzalez Claudio*. In addition, the Court in *Gonzalez Claudio* found that the Government bore responsibility for the delay, in part due to the extensive investigation that it conducted before charging, which included two years of wiretaps that needed to be translated, and resulted in a case involving twenty defendants. *See id.* at 342 (finding the "Government's delay in disclosing the existence of the videotapes . . . inexplicable"). In this case, the Government's investigation was primarily limited to the four month period over which the kidnapping took place, and two months after indicting the case, the overwhelming majority of discovery was produced. Additionally, in the instant case, a large portion of the delay is due to requests by defendants for additional time and complications arising from the highly unusual circumstances of the COVID-19 pandemic. *See* Exhibit C at 23-26 (Judge Roman discussing the impact of the defendants' delays and the COVID-19 pandemic on the schedule of the case). Finally, the strength of the detention argument is far stronger in this case than in *Gonzalez Claudio*. Here, both risk of flight and dangerousness are implicated, and the evidence of the defendant's risk of flight is far more particularized—the defendant lives outside of the United States, has no meaningful ties in New York, and is charged with kidnapping children *in violation of a court order*.

The length of the defendant's detention is the result of his lack of ties to the United States, the seriousness of the charges against him, his demonstrated lack of respect for court orders and the delays in the case that were not brought upon by the Government. Accordingly, the defendant's detention does not constitute punishment and does not violate due process.

## <u>**Conclusion**</u>

For the foregoing reasons, the Government respectfully requests the Court deny the defendant's motion for bail and continue his detention.

Respectfully submitted,

AUDREY STRAUSS
United States Attorney

By: ___/s/_____

Sam Adelsberg
Jamie Bagliebter
James Ligtenberg
Assistant United States Attorneys
(212) 637-2236

CC: Joseph Vita, Esq.
Howard Tanner, Esq.

20205shelbbhcf

1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ---------------------------------x

3   UNITED STATES OF AMERICA

4            v.                              19 CR 497(NSR)

5                                            BAIL HEARING

6   NACHMAN HELBRANS,

7              Defendant.

8   ---------------------------------x

9                                       United States Courthouse
                                        White Plains, N.Y.
10                                      May 28, 2020

11

12

13

    Before:  THE HONORABLE LISA MARGARET SMITH, Magistrate Judge
14

15

16

17                        APPEARANCES

18  GEOFFREY S. BERMAN
         United States Attorney for the
19       Southern District of New York
    SAMUEL ADELSBERG
20  JAMES LIGHTENBERG
         Assistant United States Attorneys
21

22  BRUCE KOFFSKY
    PETER JOEL SCHAFFER
23       Attorneys for Defendant

24

25  *Proceeding recorded via digital recording device.


            CHRISTINA M. ARENDS-DIECK, RPR, RMR, CRR
                       (914)390-4103

 1          THE DEPUTY CLERK:  In the matter of the United States

 2     of America v. Nachman Helbrans.

 3          Counsel, please note your appearance for the record.

 4          MR. ADELSBERG:  Good morning, your Honor.  Sam

 5     Adelsberg and Jim Ligtenberg on behalf of the United States.

 6          THE COURT:  Good morning.

 7          MR. KOFFSKY:  Good morning, your Honor.  Bruce

 8     Koffsky and Peter Schaffer on behalf of the defendant, Nachman

 9     Helbrans.

10          THE COURT:  Good morning.

11          Mr. Helbrans, have you had an opportunity to discuss

12     with Mr. Koffsky the process for you to consent to proceed by

13     telephone?

14          THE DEFENDANT:  Yes.

15          THE COURT:  And is it your wish that we proceed with

16     this bail hearing by telephone?

17          THE DEFENDANT:  Yes, your Honor.

18          THE COURT:  In the ordinary course, if it were not

19     for the COVID-19 coronavirus, we would be in my courtroom.  You

20     would be there with your attorneys, the prosecutors would be

21     there, my staff would be there, and there would be other court

22     personnel as well as members of the public would be entitled to

23     be there.  But, under these circumstances, I find that it would

24     not be safe or appropriate to proceed with an in-person

25     appearance.  We do not have reasonably available

20205shelbbhcf

1   video-conferencing services available for this proceeding

2   today.

3          So, Mr. Helbrans, I have in front of me a form which

4   says, and I'm going to read it to you, "The defendant Nachman

5   Helbrans hereby voluntarily consents to participate in the

6   following proceedings via telephone conferencing."  The

7   proceedings identified are bail and detention hearing.

8          Do you agree that you are consenting to that?

9          THE DEFENDANT:  Yes, your Honor.

10         THE COURT:  And have you reached that decision after

11  discussing it with your attorney?

12         THE DEFENDANT:  Again?  I not hear the question.  I'm

13  sorry, your Honor.

14         THE COURT:  That's all right.  Did you discuss this

15  issue with your attorney before deciding to consent?

16         THE DEFENDANT:  Yes, your Honor.

17         THE COURT:  And are you consenting of your own free

18  will?

19         THE DEFENDANT:  Yes, your Honor.

20         THE COURT:  There is a place on the form where you

21  would ordinarily sign.  Do I have your permission to place your

22  name as a signature on the form?

23         THE DEFENDANT:  Yes, your Honor.

24         THE COURT:  All right.  I'm going to do that right

25  now.  Bear with me for a moment.

1          (Pause)

2          THE COURT:  All right.  And I'm going to also sign

3    the document and I'm going to date it today.

4          All right.  We are here for a bail application.  This

5    is, to my understanding, a two-step process because, as of now,

6    the defendant has been detained without having had a detention

7    or bail hearing.  So, in the first instance, the Court must

8    determine whether bail is appropriate, whether there are

9    conditions and combinations of conditions that can assure both

10   the defendant's return to court and the safety of the

11   community.  If that part of the process is successful, then we

12   would go no further.  If, in fact, I find that there are no

13   such conditions or combinations of conditions, then I would

14   hear an application with regard to what would likely be

15   temporary release in light of the extraordinary circumstances

16   with which we are faced.

17          I have received letters from Mr. Koffsky and from the

18   government with regard to this application, including medical

19   records which were submitted in camera for the Court.  I also

20   have received, attached to the government's submission, the

21   medical form which I believe was completed when Mr. Helbrans

22   was first received at the Westchester County Jail.  I've

23   reviewed the indictment and the complaint.  I don't believe

24   I've seen a Pretrial Services report.

25          Mr. Pascual, do we have a Pretrial Services report?

1          MR. PASCUAL:  We do.  It has been sent over, but I

2     can e-mail it over to Eric now.

3          THE COURT:  Yes, if you would, I would appreciate it.

4          MR. PASCUAL:  Will do.

5          THE COURT:  And I will look at that before making any

6     decision.

7          But I think we could go ahead and, Mr. Koffsky, we

8     can hear from you your position -- well, no.  Actually, for the

9     initial bail determination, that would be the government's

10    burden to establish that there are no conditions or

11    combinations of conditions which could assure the defendant's

12    return to court and the safety of the community.

13         Mr. Adelsberg, will you be the speaker or will it be

14    Mr. Ligtenberg?

15         MR. ADELSBERG:  Your Honor, I will.  This is

16    Mr. Adelsberg.

17         THE COURT:  Go ahead.

18         MR. ADELSBERG:  Thank you, your Honor.

19         And just so I'm clear, so I'm just going to be

20    addressing at this point the defendant's risk of flight and

21    danger to the community, not the medical issues, right?

22         THE COURT:  Correct.

23         MR. ADELSBERG:  Okay.  Very well.

24         Your Honor, as laid out in our submission, the

25    defendant poses a substantial risk of flight and is a danger to

1    the community.

2              We submit the defendant poses a risk of flight that

3    far exceeds the preponderance of the evidence standard.  The

4    Court need look no further than the fact that the defendant

5    already fled the United States.  After kidnapping the victims,

6    the defendant and his co-conspirators followed meticulously

7    charted escape routes out of the country, and there's every

8    reason to believe that, if released, he would do the same and

9    flee again.

10             It's also worth noting the defendant has already

11   demonstrated the trade craft and sophistication to flee.  Along

12   with co-conspirators, he used various means of evading law

13   enforcement, including disguises, drop phones, multiple ways of

14   transferring funds, different modes of transportation; buses,

15   planes, cars, rental cars.  They used code names.  They used

16   safe houses.  They took it from routes to Mexico to further

17   stime law enforcement.  They used false IDs to facilitate

18   moving the victims from the United States, false passports, as

19   well, and they crossed over the Mexican border without any

20   record of exit from the country.  This is why it took so long

21   to actually apprehend the defendants and to actually locate the

22   victims.  It took over three weeks despite a local, federal and

23   international law enforcement effort.

24             It's also worth noting the defendant has no

25   connections here.  As Pretrial Services laid out in their

1    determination that the defendant should remain detained, he

2    has -- I'm quoting here -- the defendant lacks residential,

3    community, employment, property or financial ties to the United

4    States.  Indeed, as laid out in the Pretrial Services report,

5    even though his mother is in the United States, she is not

6    listed anywhere in his bail package.  He has no family here

7    other than perhaps members of his community that are detained.

8    Because of this, all his connections are actually beyond the

9    United States and are abroad.

10            Not only that, he has a broad network to call upon.

11   He has not lived in the United States since 2003 and the

12   at-large members of the kidnapping conspiracy, of which there

13   are three, and the scores of other Lev Tahor's followers, of

14   which the defendant is the head of Lev Tahor, they're all based

15   abroad, where they could be activated at a moment's notice.

16            Lev Tahor has an international presence and funds

17   around the world, including operations in our allies, in the

18   U.S., Guatemala, Canada, Israel, Mexico and Europe, and these

19   individuals would obviously help the defendant, as some of them

20   have already the first time he escaped.  Now, this is not a

21   hypothetical scenario.  As noted before, he's done this

22   already.  He's enlisted individuals across three countries, at

23   least, to help him escape with kids, with fake IDs.  It,

24   therefore, requires no leap of the imagination to think, oh, he

25   may do this again.  And as noted in our memo, the fact that

1   this community has made in treaties to Iran to seek asylum for

2   themselves suggests even more that the defendant is bent upon

3   trying to bring his community and himself to places beyond the

4   reach of U.S. law enforcement.

5           Now, we talked a lot about, so far, the fact that he

6   escaped already once and did so under deep disguise, but now

7   we're even in a different position because now he's been

8   charged with serious federal crimes and his incentive to flee,

9   therefore, has only increased since then for two reasons.  One,

10  the evidence of his involvement in the kidnapping is

11  overwhelming.  Within hours of the kids being kidnapped, the

12  defendant is seen in surveillance photos that were placed in

13  our memo, that were submitted with our memo, with the children

14  in disguises at an airport.  Second, beyond the evidence, he's

15  facing substantial prison time, and the government's

16  calculation is that he would be facing 70 to 87 months

17  imprisonment.  This combination, obviously, in our minds,

18  creates a powerful incentive for him to flee again.

19          Notably, his memo doesn't even talk about this.  His

20  memo doesn't deal with anything relating to his risk of flight

21  other than a summary statement about electronic monitoring.  We

22  have no information about the people he's supposed to be

23  staying with and why they have any sway over him.  The same is

24  true for the financially responsible persons within his

25  submission.  Beyond that, he doesn't address the nature of his

1    crime, the fact that he's already fled the country, his lack of

2    connections in the U.S., his many connections outside the U.S.

3    that can facilitate his fleeing, his strong incentive to flee.

4    And those points is quite deafening.  For those reasons, the

5    government submits that we agree with Pretrial Services that

6    there's no condition or combination of conditions that will

7    reasonably assure his appearance as required.

8            Now, your Honor, I've had the opportunity to argue a

9    number of bail applications before you that involved a possible

10   risk of flight.  Some of those cases were close calls.  I

11   respectfully submit that this is not a close call; that this

12   defendant, if given the opportunity, will flee.  He has every

13   incentive and he has every means to do so.

14           Beyond the danger of risk of flight, we submit that

15   the defendant poses a continuing danger to the community.  The

16   nature of the offense conduct illustrates that.  The initial

17   kidnapping of the victims occurred after a judicial order

18   granting the mother custody of the victims, the Family Court.

19   So that's the first time the defendant decided to defy a court

20   order and kidnap kids in the middle of night and take them to

21   another country.  Then, after being arrested and deported back

22   to the United States from Mexico, he's charged with this

23   federal crime.  He's sitting in jail for three months and what

24   does he do next?  He goes and tries to kidnap the victims

25   again.  There is no set of conditions that can assure that, if

1   released, he'll not try to do it a third time, especially

2   since, in a March 28th, '19 recorded call, he indicated as

3   much.  And his bail package proposes that he stay in a

4   residence located not far off from where the victims are

5   residing, and our understanding is that he knows where the

6   victims are residing.

7               UNIDENTIFIED SPEAKER:  (INDISCERNIBLE)

8               THE COURT:  Whoever is speaking, I'm going to mute

9   you.

10              Go ahead, Mr. Adelsberg.

11              MR. ADELSBERG:  Notably, the danger posed by the

12  defendant to the community is not limited to his flouting of

13  the law with respect to the kidnapping.  Our investigation has

14  revealed that the defendant oversaw the physical, psychological

15  and sexual abuse of Lev Tahor's most vulnerable members over a

16  period of time.  Since taking over the reigns of the group in

17  2017, Mr. Helbrans instituted increasingly severe practices in

18  the community, including child marriages for girls as young as

19  12 years old, including one of the victims in our case.  These

20  individuals are instructed through intermediary, but with the

21  consent of the leaders of the community, to have sex with their

22  adult husbands.  Put simply, the defendant has created a system

23  where statutory rape in his community is common and encouraged.

24              Beyond that, the defendant and his leadership team

25  have engaged in acts of violence and coercion against members

1  of the community in order to maintain their absolute control

2  and to enforce their severe practices.  These include hitting

3  children and using belts and steel wire hangers until they're

4  bleeding, and doing this publicly; physical isolation or

5  confinement; removing children from the homes of their parents;

6  banning individuals from the community; forcing individuals to

7  sleep in areas infested with snakes and Scorpions; and

8  requiring disobedient members to travel around the world

9  raising money for Lev Tahor to regain admittance to the

10  community.

11          Given the ongoing threat that the defendant poses to

12  the victims, their family and to the Lev Tahor community, those

13  that have not been a part of these decisions and of these

14  actions, and because the defendant poses a serious risk of

15  flight, the defendant's pretrial detention should remain in

16  effect.  Therefore, the government agrees with Pretrial

17  Services that the defendant should remain detained.

18          Pending any questions from the Court, I could talk

19  about the medical issues thereafter, if we get to that.

20          THE COURT:  All right.  Thank you, Mr. Adelsberg.

21          Mr. Koffsky, are you going to be speaking or

22  Mr. Schaffer?

23          (Pause)

24          THE COURT:  Mr. Koffsky, do we have you?

25          MR. KOFFSKY:  Sorry, sorry, your Honor.  I was on

20205shelbbhcf

1    mute.

2               I will be speaking, your Honor.

3               THE COURT:  Okay.  Good.  Thank you.

4               MR. KOFFSKY:  Your Honor, may I proceed?

5               THE COURT:  Yes.  Of course.

6               MR. KOFFSKY:  I probably won't be as fluid as the

7    government because I haven't written down my argument, except

8    for some notes, and so you'll excuse me if I wander a little

9    bit.  But I want to let the Court know that I've had an

10   opportunity to review the government's submission and listen to

11   their claims, and I will suggest two things to the Court.

12               One, that it's nothing but hyperbole stacked upon

13   hyperbole.  And their claims about the religious practices of a

14   particular organization runs almost afoul of the -- excuse me.

15   Let me get -- the establishment clause, your Honor.  Lev Tahor

16   is no more an extremist religious organization than those the

17   Court might find in Brooklyn, Monsey, Levittown or Kiryas Joel,

18   where religious practices are followed on a 24-hour schedule.

19   Men and women dress as if they're in the 1800s.  Children are

20   not sent to secular education.  Money is requested from around

21   the world to support religious education.  These are not

22   extremist organizations.  Neither is Lev Tahor in South

23   America.  Your Honor, two billion people in the world wear head

24   coverings.  Women throughout the world and young girls are

25   relegated to certain religious and social practices, none of

which are illegal and none of which have resulted in criminal

charges in America.  The children of Lev Tahor are not provided

secular education, but they are steep in the books of the

Bible.

                  UNIDENTIFIED SPEAKER:  (INDISCERNIBLE)

                  THE COURT:  The person who is --

                  MR. KOFFSKY:  Mr. Lefkovitz, would you please put

your phone on mute.

                  THE COURT:  Whoever was just speaking, I have muted

that person.

                  Go ahead, Mr. Koffsky.

                  MR. KOFFSKY:  Thank you, your Honor.

                  The government's letter claims that Lev Tahor engages

in militant practices.  There's no survival skills taught to

members of Lev Tahor.  There's no firearms training.  There's

no hand-to-hand combat.  They spend their days reading and

studying ancient books.  There are no beatings.  They follow

dietary restrictions that are the same dietary restrictions as

found in religious organizations throughout the world.  And

there aren't any forced marriages.

                  Let me give the Court just a little bit of the

background of how this -- the government charges a kidnapping.

Some might claim that it's a rescue.  The religious leader of

this Lev Tahor organization was a Rabbi Shlomo Helbrans, who

died in a drowning accident in mid 2017.  Rabbi Helbrans had

1    two principal followers; his son, the defendant, and a

2    Mr. Teller, who was his right-hand man.  Mr. Teller, his

3    right-hand man, was married to Rabbi Helbrans' daughter, the

4    mother of the victim in this case.  And I suggest that the

5    evidence at trial will show that Mr. Teller didn't get to be

6    the Rabbi of Lev Tahor and his wife, the mother of the victim,

7    was infuriated and took two children and left the organization.

8    Now, she didn't leave because of violence.  She didn't leave

9    because of trauma.  She left because her husband was passed

10   over for Rabbi Shlomo Nachman's son -- excuse me -- Shlomo

11   Helbrans' son Nachman.

12            The government goes to great lengths to suggest that

13   these child marriages are a common practice.  Well, the Court

14   should know that the marriage of the victim in this case and

15   one of the defendants was overseen by the victim's mother.  The

16   bridal shower and the bridal meal was prepared by the victim's

17   mother, one of the government's principal witnesses.

18            The government's submission reads more like a John le

19   Carré novel than what happened in reality.

20            The defendant, a 35-year-old individual who has never

21   been arrested, has sat for 17 months in the Westchester County

22   Correctional Center and, I suggest, is fast approaching a time

23   when he would be released if he entered a plea of guilty to the

24   charge in this case, which is international parental

25   kidnapping, a nonviolent crime, with a maximum sentence of

 1   three years.  He's also charged with a 371 count, which has a

 2   maximum of five years.  But the government's suggestion that a

 3   70-month sentence is what this defendant is going to get is

 4   just more hyperbole, your Honor.

 5          I suggest that the Court can fashion a combination of

 6   conditions.  And, of course, I don't need to refer the Court to

 7   Section 3142(f), where the Court needs to simply find that no

 8   combination of conditions will reasonably assure the safety of

 9   the community.  This is not, and I repeat, not a presumption

10   case.  The defendant is charged with crimes that have a maximum

11   exposure of five years, not ten or fifteen or twenty.

12          Again, the hyperbole of the government should be left

13   to those charges where the defendant stands before the Court a

14   multiple felon, an individual who's subject to decades in

15   prison.

16          The defendant will comply with the terms and

17   conditions as set forth notwithstanding the count that was

18   added to the indictment from March of 2019.  Fifteen months

19   have transpired since that claimed criminal activity.  And I

20   suggest to the Court that the Court can fashion a combination

21   of conditions that will reasonably assure the Court both of the

22   appearance of the defendant, the fact that the defendant will

23   not pose a danger to the community nor a risk of flight.

24          The fact of the matter is it would make no sense for

25   the defendant to flee because flight would necessitate a

1      sentence of double what the defendant is looking at right now.

2              I suggest to the Court that the Court absolutely can

3      fashion a combination of conditions, as I submitted to the

4      Court in my letter.  If the Court believes that the location as

5      offered by Mr. Lefkovitz is inappropriate for one reason or

6      another, we will find another location, but the fact of the

7      matter is that the defendant, as a first-time offender, having

8      no violence in his background, not being charged with a crime

9      of violence, can be released on conditions.  And that's our

10     position, your Honor.

11             THE COURT:  You haven't said anything about the

12     proffered surety or custodian.

13             MR. KOFFSKY:  I apologize, your Honor.

14             I have had an opportunity to talk to Mr. Sam

15     Lefkovitz and Mr. Leventhal.  I think that's his name.  Hold

16     on.  I apologize.  They have indicated to me that they will --

17     that they know -- Mr. Lefkovitz knew my client's father, knows

18     my client.  Avram Leventhal has visited my client at the

19     Westchester County Correctional Center.  They've indicated that

20     they know he's not going to leave the community.  Mr. Lefkovitz

21     has offered an empty apartment in Brooklyn in a house that he

22     owns.  We certainly didn't go looking for a house in any

23     particular neighborhood.  Mr. Lefkovitz approached us and

24     indicated that he had an open apartment in a building in

25     Brooklyn, a place where our client would be welcome to pray and

20205shelbbhcf

welcome to live.  They both indicated they understand the

nature of the charges, they understand the nature of the

government's claims, and they would be willing to cosign a bond

in the amount of $50,000, understanding full well that if the

defendant violated the terms of his conditions, of his release,

violated the law, failed to return to court, they would risk

losing the amount of the bond.  They're on the phone and would

be welcome -- and they would welcome the Court's questions,

your Honor.

THE COURT:  Mr. Koffsky, what concerns me, among

other things, is how is it that Mr. Lefkovitz could act as a

third-party custodian and keep a watchful eye on Mr. Helbrans,

as you've said in your letter, if he's not even in the same

place, if Mr. Helbrans is in an apartment all by himself?

MR. KOFFSKY:  Well, if he's in an apartment all by --

first of all, to suggest that Mr. -- well, if the Court says

that the Court would be more comfortable allowing Mr. Helbrans

to live with a family, then I would suggest to the Court that I

would attempt to find a family.  But the families that would

put up Mr. Helbrans, your Honor, married families -- married

families.  Families in this community might have between three

and fifteen children, and, in this environment, it would be

inappropriate, it would be improper for a married man not only

to live with a family, but would be in contact with children

during a pandemic, and we don't think that that would be a

20205shelbbhcf

1    proper offering to the Court.

2            One of the reasons we've made this application is

3    because of Mr. Helbrans', the defendant's, physical condition.

4    We have submitted to the Court a ten-year history of pneumonia

5    and other conditions -- I apologize -- I'm reaching for the

6    word -- that makes him a compromised individual.  Why, then,

7    would we put him in an environment where he could either pass

8    it on, COVID-19, or get it from somebody he has daily contact

9    with?  We submit that it would make no sense to put him in an

10   environment where he could either get COVID-19 or give it.

11           Now, if the Court wants more than daily contact with

12   Pretrial Services, if the Court would want Mr. Lefkovitz to

13   look in on the defendant, we can certainly ask Mr. Lefkovitz,

14   if he would be willing to take on that responsibility.  I don't

15   think that would be a problem.

16           Your Honor, this community prays as a group three

17   times a day seven days a week.  Now, we would not request

18   Mr. Helbrans be permitted to pray publicly three times a day

19   seven days a week.  Why?  Well, if that was the kind of social

20   activity the defendant was demanding, he would probably be

21   safer in the facility.  We're not.  We're asking for a single

22   religious observance during the week.  And I apologize if my

23   letter wasn't clear on this.  He would like to be able to read

24   from the Torah at least once a week, which he's deprived of at

25   the Westchester Correctional Center.  And he would appreciate

1    being able to pray with a minyan, or a group of ten men, during

2    the week.  But we make no claim that he would be safe in a

3    group of Hasidic men and, therefore, we think that the safest

4    course of action would be to allow him to remain isolated but

5    for some required human contact with his lawyers, with his

6    rabbi, with medical providers.  And that's the reason that we

7    didn't offer him a community placement, your Honor.

8             THE COURT:  All right.  Mr. Adelsberg, anything you

9    want to say in response?

10            MR. ADELSBERG:  Yes, your Honor.  If I could just

11   briefly respond to a few of those points.

12            The first point is that this is not hyperbole.  The

13   government's arguments -- I think the Court knows this.  The

14   government say things that we read in the newspapers.  The

15   government doesn't say things that it hears through the

16   grapevine.  The government says things that are documented

17   through evidence, through interviews, through research with

18   sources.  We have to track this down.  We can't just say things

19   that are hyperbole.  That's just not -- we're not in the

20   business of doing that.

21            Now, Mr. Koffsky also brings in freedom of religion.

22   It goes without saying that freedom of religion is absolutely

23   critical, but, like any other right, it has limits.  Religion

24   is not a license to kidnap, and that's why we're allowed to

25   bring our current charges.  This is well established legally,

1    including, for example, in cases where Mormons challenge

2    convictions for bigamy on religious grounds.  Religion is also

3    not a license to defy court orders and kidnap kids.  It's not a

4    license to use disguises to sneak kids out of a country in the

5    middle of the night.  It's not a license to beat young kids.

6    It's not a license to lock kids in freezers or place kids in

7    places infested with snakes and Scorpions.  And it's not a

8    license to rape.  And that's what these defendants -- that's

9    what this defendant has done and will continue to do if he's

10   released and if he's able to go back to Guatemala.

11          And as submitted earlier, I don't believe that

12   there's anything that defense counsel has said that minimizes

13   that this defendant will, indeed, flee.  The guidelines are

14   clear here.  I challenge Mr. Koffsky to tell me why any of the

15   enhancements listed in our submission wouldn't apply to the

16   defendant.  I challenge Mr. Koffsky to say why he said that the

17   statutory maximum is three years.  It's a four-count

18   indictment.  You add up the statutory max of all four counts

19   and it's 14 years.  So I think if anyone's engaging in

20   hyperbole here, it's not the government, your Honor.

21          Unless the Court has any other questions, the

22   government would go back to the Court.

23          THE COURT:  Mr. Koffsky, very, very briefly, please.

24          MR. KOFFSKY:  Nothing, your Honor.  I'll stand on my

25   argument.

20205shelbbhcf

1          THE COURT:  All right.  In the first instance, with
2     regard to a determination under Title 18, United States Code,
3     Section 3142, I'm satisfied that there is, indeed, a very
4     serious risk that this defendant would flee and that there are
5     no conditions or combinations of conditions that can assure
6     that he would not do so.  His home, his connections, his
7     relationships are in Guatemala.  Based on all of the evidence
8     that I've seen and that I'm familiar with, he participated in
9     obtaining and using his own children's passports falsely to
10     assist the children in this case to be whisked out of the
11     country and did so not as a rescue, but in violation of a court
12     order.  And having violated a court order, that tells me that
13     there's nothing that I could say that would assure that the
14     defendant would comply with any conditions that I might set to
15     try to assure his return to court as required.  The
16     preponderance of the evidence standard is more than met in this
17     circumstance.

18          In addition, it appears to me that there is a serious
19     risk that he would potentially obstruct or attempt to obstruct
20     justice in the manner that he has done already, by continuing
21     to make efforts to whisk these children away from their mother
22     in violation of a court order.  This has nothing to do with
23     religion.  It has to do with the justice system of which I am a
24     part and in which Mr. Helbrans is now facing consequences for
25     his alleged actions.

1         The Court recognizes that there is a presumption of

2    innocence and of course that is important, but it is taken into

3    account in the way that the detention statute, the bail reform

4    statute, is established, and I'm satisfied, based on all of the

5    circumstances in this case, that there are no conditions or

6    combinations of conditions which can both assure the

7    defendant's return to court and the safety of the community.

8         With regard to the safety of the community, in light

9    of the allegations here, the very serious claims that have been

10   presented, I'm satisfied that the government has established

11   that there are no conditions that could assure the safety of

12   another person and the community and that that has been

13   established by clear and convincing evidence.

14        That having been determined and the bail application

15   being denied in the first instance, I believe we now move to

16   Section 3142 is it (h)?  Remind me, Mr. Koffsky.

17            MR. KOFFSKY:  Your Honor, it's Section (i).

18            THE COURT:  Section (i), yes.  I have it in front of

19   me.

20        All right.  So, under Section (i) of 3142 of Title

21   18, the judicial officer may, by subsequent order -- that means

22   ordered subsequent to the initial detention order -- permit the

23   temporary release of the person in the custody of the United

24   States Marshal or another appropriate person to the extent that

25   the judicial officer determines such release be necessary for

1    preparation of the person's defense or for another compelling

2    reason.

3              Mr. Koffsky, I think the application is yours and I

4    think the burden is also yours in proffering this application,

5    so I will hear you.

6              MR. KOFFSKY:  Thank you, your Honor.

7              Your Honor, as part of our submission, we offered --

8    well, first of all, I know -- I can't imagine how many bail

9    hearings the Court has engaged in since the pandemic hit in mid

10   March.

11             If the Court will excuse me for just one second.  I

12   just --

13             (Pause)

14             MR. KOFFSKY:  I can't imagine how many bail hearings

15   the Court has had, but I know the Court is familiar.  I just

16   want to read some of the information that is in front of me as

17   of today.  And this was made part of my submission, your Honor.

18             The United States is currently in the midst of the

19   worst global public health crisis in over a hundred years.  The

20   United States Secretary of Health and Human Services declared

21   COVID a public health emergency in January of 2020.  Since that

22   time, over 3 million people have been infected in the United

23   States and over 100,000 people have died.  The Federal

24   Emergency Management Agency forecasts 200,000 new cases each

25   day by the end of May.

1          Your Honor, today's New York Times article said that

2     over 50,000 people in the New York region had tested positive

3     for the coronavirus in just the last two weeks.  It reads --

4     the article is titled Ten Weeks Into New York's Lockdown - Who

5     Is Still Getting Sick.  Over the last two weeks, more than

6     47,000 people in New York, New Jersey and Connecticut has

7     tested positive.  Over 2,800 with virus-like symptoms have been

8     admitted to the hospital in just the last week.

9          Your Honor is well aware of the pandemic that has a

10    stranglehold on not only the United States, but particularly

11    the New York City area.  Nachman Helbrans is a compromised

12    individual in a jail, a jail which has been -- jails which have

13    been deemed the petri dishes of the coronavirus.

14         Nachman Helbrans has a documented history of

15    bronchial problems, lung problems, that go back to an X-ray

16    finding from a hospital in Quebec from 2012.  During a period

17    of time in Guatemala, Mr. Helbrans has been seen by a doctor

18    David Rosalis for respiratory issues and most recently had a

19    chest X-ray which identified a chronic condition in his lungs.

20         The government makes much of a document they found in

21    the medical records wherein Nachman Helbrans, the defendant,

22    was interviewed and indicated that there were no problems in

23    his health and he had no claims that he had an asthma

24    condition, but, of course, the Court knows differently than

25    that one sheet of paper.  And I will -- let me just offer to

1    the Court that the Court shouldn't rely on that document that

2    the government attached to their filing.  What I didn't do is I

3    didn't provide all 500 pages of the defendant's medical records

4    that I received from Valhalla because none of -- because, by

5    and large, most of them were of no consequence for the Court's

6    determination.  But I will provide, if the Court wants, a

7    document on page 105 of the materials that I received and that

8    I made available to the government where another individual

9    interviewed Nachman Helbrans and, in his physical exam of the

10   defendant, indicated everything about Nachman Helbrans was

11   abnormal.  And if the Court believes that it should rely on the

12   government's filings, then I would want the Court to have page

13   105, and the Court can rely on the fact that the record keepers

14   at Westchester Health Center may not be the best of record

15   keepers.

16          I would suggest to the Court that Nachman Helbrans is

17   a compromised individual.  He cannot get appropriate medical

18   care at the Valhalla Correctional Center.  As a result of the

19   pandemic -- you know, and the fact is that this is not just

20   about deaths, your Honor.  This is not just about the number of

21   people who have died.  I would suggest to the Court that the

22   numbers that the Court has been given by the government

23   misstates the number of people who either have had the

24   coronavirus at Valhalla or could be subject to getting it.  And

25   I don't believe -- I would suggest to the Court that the Court

20205shelbbhcf

1    shouldn't make a condition on the number of people who have

2    died, because it's my understanding, based upon the readings

3    that I've made, that the coronavirus is going to be with us for

4    the next 18 months and, as the Court knows, there are people

5    who come and go from Valhalla.

6            I had an opportunity to talk to another lawyer just

7    yesterday about the conditions at Valhalla, your Honor, and I

8    was told that, as of yesterday, a client was introduced into

9    the Westchester Correctional Center, one inmate, and as a

10   result of that one inmate coming in and testing positive, three

11   units -- Unit 1K, 1E and 3 Northwest -- all had to be locked

12   down.  Because there's nothing that the government or the

13   Bureau of Prisons can do to stop somebody from coming into the

14   facility and infecting everyone.  And if Nachman Helbrans, with

15   his identified, pre-existing condition gets it, I would submit

16   to the Court that he is more likely than most to suffer some of

17   the grievous effects of the coronavirus.

18           I would suggest that the Court permit him to shelter

19   at the place in Brooklyn or at another location that the Court

20   deems appropriate because we have made out compelling reasons

21   for the defendant's release.

22           If the Court has any questions of me, I would be more

23   than happy to try to address particular questions.

24           THE COURT:  No, I don't think so.

25           Mr. Adelsberg.

CHRISTINA M. ARENDS-DIECK, RPR, RMR, CRR
(914)390-4103

1              MR. ADELSBERG:  Yes, your Honor.

2              So I would like to first address Mr. Koffsky's claims

3    about Mr. Helbrans' medical history.

4              First, the document speaks for itself that, with

5    respect to his asthma claim -- well, first, the defendant has

6    access to all the medical records and nothing was submitted to

7    suggest that Mr. Helbrans actually has asthma.  And, in fact,

8    the only document in the record now suggests that he does not

9    have asthma.  Now, beyond that, there are many ways to treat

10   asthma, as we talk about in our letter, and it is unclear why

11   he would not be able to be effectively treated for asthma while

12   in Westchester prison.

13             In addition, the other points raised by Mr. Helbrans

14   in his letter about his medical history, while they suggest

15   that he might be more exposed than the average person, they

16   don't look like the cases where courts have actually found this

17   to meet the standard to release the defendant.  The fact that

18   he had pneumonia in 2012 doesn't say anything to the fact that

19   he needs to be released now.  The fact that he has pleural

20   thickening is a common finding on routine X-rays.  There's no

21   support that any of it -- that his chest X-ray or any of this

22   should actually -- he would be unable to be treated at

23   Westchester Medical Center and that it should actually warrant

24   his release.

25             In addition, Mr. Koffsky eloquently notes that

20205shelbbhcf

thousands of people in New York have been diagnosed with COVID
and, as your Honor knows, yes, it's incredibly serious and
something that we've all been dealing with in our own ways.  As
noted in our letter, there are currently two inmates that we
understand have COVID within the prison.  And those are new
entrants, and our understanding is that they're being
quarantined separately.  It's beyond my understanding why
Mr. Koffsky would, therefore, want to introduce his client,
especially given his stated conditions, to an unknown location
in New York City, where there's thousands and thousands of
people have been diagnosed with COVID, as documented by the New
York Times, and not the Westchester County Jail, where they are
taking this seriously.  Mr. Koffsky knows a lockdown.  Yes,
that is a serious -- we're all in a lockdown.  They're taking
this seriously.  And so they should do that in the way that we
would want any facility to protect our loved ones.

          And I should say that I know firsthand how the virus
has ransacked the Orthodox Jewish community in Brooklyn, and to
release Mr. Helbrans to a home which we know nothing about in
the middle of that community seems like a wanton risk as
compared to keeping him in a facility that, while not perfect,
is really doing it best to try to manage an unprecedented
situation.

          Now, it's true that Westchester County Jail is a
fairly densely populated facility, but it's also isolated from

1   the outside world, and that relative isolation can only

2   increase because of the outbreak.  Again, the defense proffered

3   no facts about the home where he would be going, the relative

4   isolation of that home, who else is present, how he would be

5   able to get food, whether any of those residents have tested

6   positive for COVID-19 or manifested symptoms related to it.  We

7   basically have no information about how his access to medical

8   care outside, in Brooklyn, would be any better than having the

9   Westchester Medical Center right nearby, at Valhalla.

10          Finally, your Honor, I won't go through the many

11   lengths Westchester is going through to try to keep their

12   inmates safe.  As I said before, they're not doing a perfect

13   job, but they're trying their best and they're doing, in my

14   opinion, a really good job.  There's nothing that suggests that

15   Mr. Helbrans' health situation will actually be somewhat

16   improved by being outside of a facility where they're taking

17   such care.  And the fact is that the defendant's extensive

18   medical records show that his conditions are being

19   appropriately managed.  He is being given medication in the

20   facility.  There's no understanding how he would get that care,

21   that oversight and that medication outside that facility.

22          So, for that reason, the government submits that this

23   case is like the many other cases where courts have found that

24   even individuals with potentially underlying medical conditions

25   do not meet the high standard to warrant release.

20205shelbbhcf

```
1          THE COURT:  Mr. Koffsky.

2          MR. KOFFSKY:  Nothing further, your Honor.

3          THE COURT:  While it is true that the information
```

that defense counsel has submitted does support that there is

something of a history of lung issues, bronchitis and

pneumonia, the emphasis there is on history.

```
7          UNIDENTIFIED SPEAKER:  (INDISCERNIBLE)

8          THE COURT:  Counsel had an opportunity (INAUDIBLE)
```

circumstances of necessary treatment at the Westchester County

Jail and none have been provided other than saying in fairly

summary fashion that he has been prescribed a daily regimen of

Loratadine, an antihistamine that is not an inhaler for asthma,

and that he regularly -- regularly doesn't really tell me

anything -- experiences shortness of breath and significant

chest pressure.  That standing alone as a claim that

Mr. Helbrans' health is so severely compromised that he should

be allowed to be released when there would otherwise be no

conditions that would allow such release is not adequate in my

view.

Mr. Adelsberg mentioned and I will confirm that the

Court receives communications from the Westchester County Jail

on a weekly basis and, as of Friday at 1:00, there were two

inmates who were positive.  There had been 53 inmates that had

either recovered from COVID-19 or had been released.  All of

the staff who have, over the course of this time, tested

1    positive have recovered.  While, of course, it would be better

2    if everyone were tested so that we knew how many undiscovered

3    episodes of the virus exists, it is, nevertheless, as

4    Mr. Adelsberg pointed out, a circumstance where Mr. Helbrans

5    has immediate access to medical care should it be required.

6    And I have no doubt, Mr. Koffsky, that if Mr. Helbrans was not

7    getting the appropriate medical care that he needed, that you

8    would immediately seek an order of the Court to make sure that

9    such care was provided.

10           I can't find that the proposed release conditions

11   would be either appropriate or necessary.  I don't find that

12   Mr. Helbrans' health conditions are so severe that it compels

13   me to a temporary release.  So, for those reasons, the

14   application is denied.

15           Mr. Koffsky, you are, of course, aware of the right

16   to appeal.  You could contact Judge Román's chambers with

17   regard to any wish to appeal this ruling.

18           MR. KOFFSKY:  Thank you, your Honor.

19           THE COURT:  Sure.

20           Is there anything further, Mr. Adelsberg?

21           MR. ADELSBERG:  No, your Honor.  Thank you.

22           THE COURT:  Mr. Koffsky, anything else?

23           MR. KOFFSKY:  No, nothing.  Thank you for your time,

24   your Honor.

25           THE COURT:  Thank ~~you~~, everyone.  We are adjourned.

1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   -----------------------------------x

3   UNITED STATES of AMERICA,

4           -against-                        19 Cr. 497
                                             Bail Hearing
5
    JACOB ROSNER,
6
                    Defendant.
7
    -----------------------------------x
8

9                               United States Courthouse
                                White Plains, New York
10
                                March 24, 2020
11

12

13                  THE HONORABLE PAUL E. DAVISON,
                        United States Magistrate Judge
14

15
    GEOFFREY S. BERMAN
16        United States Attorney for
          the Southern District of New York
17   BY:  JAMES LIGTENBERG (by phone)
          Assistant United States Attorney
18

19
    CARTER LEDYARD & MILBURN LLP
20            Attorneys for Jacob Rosner
    BY:  ALAN S. LEWIS (by phone)
21

22
    Also present:
23   VINCENT ADAMS, Pretrial Services

24

25

                ANGELA A. O'DONNELL, Official Court Reporter
                            914-390-4025

```
 1            THE CLERK:  In the matter of the United States of
 2   America versus Jacob Rosner.  Will counsel on the telephone
 3   appearing for the government please state your appearance for
 4   the record.
 5            MR. LIGTENBERG:  Good morning, your Honor.  Jim
 6   Ligtenberg for the government.
 7            THE COURT:  Good morning, Mr. Ligtenberg.
 8            THE CLERK:  And will counsel on the telephone for the
 9   defendant please state your appearance.
10            MR. LEWIS:  Good morning, your Honor.  This is Alan
11   Lewis for Mr. Rosner.
12            THE COURT:  Good morning, Mr. Lewis.  All right.
13   Mr. Rosner is under indictment in a case assigned to Judge
14   Román.  Mr. Rosner appeared before me back in late 2018 for a
15   presentment and was detained on consent without prejudice.  I
16   understand that there was a subsequent detention hearing
17   conducted in March 2019 and at that time Judge Smith detained
18   this defendant based on risk of flight and danger to the
19   community.  Now scroll ahead to March 2019, and Mr. Lewis wrote
20   to Judge Romàn indicating that there was an agreed bail package
21   upon which this defendant could be released based on changed
22   circumstances.  Judge Romàn, in essence, referred that
23   application to me and so here we are.
24            Mr. Rosner is here in the courtroom and counsel for
25   both the government and Mr. Rosner are participating
```

```
 1   telephonically as I understand it to eliminate the need for
 2   unnecessary travel from New York City in light of the current
 3   health emergency.  Have I got all that correct so far?
 4            MR. LEWIS:  Yes, your Honor.
 5            THE COURT:  All right.  And Ms. Lee, can you confirm
 6   that we are making a record here.
 7            THE CLERK:  We are, Judge.
 8            THE COURT:  Good.  All right.  I am told that there
 9   is an agreed set of conditions on which this defendant can be
10   released.  Is that still true?
11            MR. LIGTENBERG:  Yes, your Honor.
12            MR. LEWIS:  Yes, your Honor.
13            THE COURT:  And I am further told, and again this
14   comes from Mr. Lewis' letter dated March 19, 2020 which appears
15   on the docket, that this change of position is a result of
16   changed circumstances, including the availability of family
17   members in the community who have renewed their relationship
18   with this defendant as well as in recognition of the extended
19   confinement that Mr. Rosner has undergone; is that correct?
20            MR. LIGTENBERG:  Yes, Judge.
21            MR. LEWIS:  It is, your Honor.
22            THE COURT:  All right.  Mr. Ligtenberg, this is
23   addressed to you.  Are you agreeing to the conditions set forth
24   in Mr. Lewis' March 19 letter?
25            MR. LIGTENBERG:  Yes, your Honor.
```

```
 1              THE COURT:  Is there anything you want to add or
 2    modify about that?
 3              MR. LIGTENBERG:  No, your Honor.
 4              THE COURT:  And Mr. Ligtenberg, the Court is
 5    conscious that this is a defendant who was apprehended in a
 6    foreign country and extradited or brought back to the United
 7    States through what I can only describe as herculean efforts by
 8    some of your colleagues and during a period when there was
 9    around-the-clock efforts to round up these defendants and
10    rescue the victims.  Can you confirm to me that your office,
11    including up the chain of command, are fully in support of your
12    position here?
13              MR. LIGTENBERG:  Yes, your Honor.
14              THE COURT:  Very well.
15              Mr. Lewis, do you want to be heard about this at all?
16              MR. LEWIS:  Only one more aspect of the bail
17    condition, and I think that this is as much for the benefit of
18    my client as it is for the others who are attending.
19              After Mr. Rosner's release, we will propose phone
20    numbers that he will be permitted to call.  We're not going to
21    resolve those phone numbers today, but Mr. Rosner should know
22    that I will be having discussions with the government to ask
23    them to approve allowing him to speak with his mother.  Again,
24    we understand the Court is not going to rule on that one way or
25    the other today, nor are we going to agree upon it today, but
```

1   he should know that after today I will be discussing that

2   subject with the government.

3           THE COURT:  I have a couple of questions about the

4   proposal.  I am not sure I understand the proposed condition,

5   access to one telephone that will be approved by Pretrial

6   Services.  What is contemplated there?

7           MR. LIGTENBERG:  I think this was done with a

8   different defendant in this case.  Basically he had sent a list

9   of numbers to the government and to Pretrial, we would agree on

10  the list and that would be the list of people that he's allowed

11  to call, and my understanding is that Pretrial would monitor

12  that those are the numbers he is, in fact, calling.

13          THE COURT:  So there would be some specified

14  telephone that he's allowed to use.

15          MR. LIGTENBERG:  Exactly.

16          THE COURT:  Has that been agreed on?

17          MR. LIGTENBERG:  No.

18          THE COURT:  But Pretrial Services would make a

19  determination as to what telephone he was permitted to use and

20  then he would only use that phone which would facilitate

21  verification that he was only calling specified numbers?

22          MR. LIGTENBERG:  Exactly.

23          THE COURT:  Now the proposal is that this defendant

24  would be released today upon the co-signatures and then have

25  three weeks to perfect the real estate interests; is that

                ANGELA A. O'DONNELL, Official Court Reporter
                            914-390-4025

```
 1   right?

 2              MR. LIGTENBERG:  Yes, your Honor.

 3              MR. LEWIS:  I think the proposal was that he would be

 4   released today with his signature and the co-signature of the

 5   person who's in the courtroom, who is Ezriel Rosner, and we

 6   would ask for a couple of days to get the other people there

 7   who will also cosign.

 8              THE COURT:  Mr. Ligtenberg.

 9              MR. LIGTENBERG:  That's fine.

10              THE COURT:  Ezriel Rosner is here?  Gentleman's

11   raising his hand in the back.  Thank you, sir.

12              All right.  Mr. Jacob Rosner, why don't you stand up.

13              Mr. Rosner, this is really an extraordinary --

14              THE CLERK:  I'm sorry, Mr. Adams has --

15              PRETRIAL OFFICER ADAMS:  Your Honor, I understand

16   that you want Pretrial should monitor the phone.  I don't know

17   if we have that capability to monitor some phone the way they

18   (inaudible).

19              THE COURT:  Mr. Ligtenberg, could you hear that?

20              MR. LIGTENBERG:  No, I'm sorry.

21              THE COURT:  Mr. Adams, who is here in the courtroom,

22   indicated that he's not aware of any capability that Pretrial

23   has to monitor a telephone in a remote location.  In other

24   words, he's suggesting they might not be able to implement that

25   particular condition.
```

1          MR. LIGTENBERG:  My understanding is that with one of

2     the defendant's co-defendants, Aaron Rosner, it had the same

3     condition.  (Indiscernible) understanding that (indiscernible).

4     But I think the condition was lifted from the conditions that

5     were approved in that case.

6          THE COURT:  Mr. Lewis, in light of the interest in

7     getting this defendant released, I'm inclined to release him

8     today without any provision for him to make phone calls until

9     some mutually agreeable method can be worked out between the

10     government, defense counsel and Pretrial Services.

11          Would there be any objection to that?

12          MR. LEWIS:  No, your Honor.  I'll be able to speak to

13     Mr. Rosner by calling the phone where he will be living and I

14     will work with Mr. Litenberg and his colleagues to implement

15     this condition after his release.

16          THE COURT:  Mr. Ezriel Rosner, is there a landline

17     telephone in your residence?

18          MR. ESRIEL ROSNER:  Yes.

19          THE COURT:  I think we would all be more comfortable

20     with that.  So I will authorize defense counsel to call the

21     residence where this defendant is living and speak to his

22     client on that telephone until some more expanded protocol is

23     agreed upon.  That will be the extent of telephonic

24     communication by this defendant.  All right.

25          Anything else, Mr. Adams, before I jump into my --

```
 1              PRETRIAL OFFICER ADAMS:  Where he'll be living.

 2              THE COURT:  He's going to be living at 2 Rhonda Lane

 3    in Airmont, New York, which is in Rockland County, if memory

 4    serves.

 5              It's in Rockland, is that right?  Rockland County?

 6              MR. ESRIEL ROSNER:  Yes.

 7              THE COURT:  Having considered the joint proposal of

 8    defense counsel and the government and satisfied that the

 9    government has fully vetted this proposal and considered the

10    equities set forth in Mr. Lewis' letter, I am going to set

11    release conditions under which this defendant can be released.

12              Mr. Rosner, before I do that, I want you to

13    understand this is an extraordinary opportunity that you're

14    being granted here; do you understand that?

15              THE DEFENDANT:  Yeah, I understand, but I got

16    something for discussion, Judge, because what I see there's

17    something wrong before because I have to send a letter to my

18    lawyer and to the judge which I saw last time and that we don't

19    want to do anything in the case, just wait, and we want to see

20    the judge, we all five with the letters, and we want talking

21    about presentation, we want to defend ourself.  And I sent

22    email to my lawyer Friday that I don't want he should make --

23              THE COURT:  You know, Mr. Rosner, I don't mean to cut

24    you off, but there is a public health emergency going on in the

25    United States, and the Court is really only open for very
```

1   limited purposes and one of those purposes is bail proceedings

2   like this one.  Okay?  We are gathered here together through

3   extraordinary efforts of a number people, really everybody

4   that's in the courtroom as well as counsel here on the phone to

5   try to get you out of jail.  Okay?  I'm not interested -- it's

6   not that I'm not interested, I have no authority to grant any

7   other applications on your behalf, so I'm cutting you off.  You

8   have a right to be heard, but not here and not today.  Do you

9   understand?

10          THE DEFENDANT:  I understand.  But this condition was

11  not discussed with me before, and I would like to discuss with

12  him.  This bail hearing here was a surprise for me because I

13  say my lawyer to not do that --

14          THE COURT:  Mr. Rosner, if you don't want to get out,

15  we can just send you back to jail.  That would frankly be

16  easier for me.  Your attorney and members of your family have

17  worked hard to put this together in order to enable you to be

18  released.  This is not a negotiation.  Are you prepared to

19  comply with these bail conditions that I'm about to lay down?

20  I'll tell you what they are first, and then you can tell me

21  whether you're prepared to comply with them or not.  Okay?

22          THE DEFENDANT:  Okay.

23          THE COURT:  Okay.  The conditions that have been

24  agreed to by counsel, as I understand it and subject to today's

25  discussion here on the record, is that Mr. Rosner can be

1    released on a $1 million personal recognizance bond which is to

2    be cosigned by four individuals, Ezriel Rosner, Naftoli

3    Ilovitz, Motel Tetitelbaum and Aaron Goldberger, forgive

4    mispronunciation.  The defendant to be released today upon his

5    own signature and the signature of Mr. Ezriel Rosner, who is

6    present in court.  The other three signators to present at the

7    courthouse to sign the bond within three business days.  The

8    bond is to be further secured by the equity in two pieces of

9    real property, one of them located at 2 Rhonda Lane in Airmont,

10   New York, owned by Ezriel and Chana Rosner, the other real

11   property located at 31 Jackson Avenue, Spring Valley, New York,

12   that property owned by this defendant's great grandparents.

13   The real property security to be perfected within three weeks

14   time.

15          While at liberty, Mr. Rosner will reside at 2 Rhonda

16   Lane in Airmont, New York, the residence of Mr. Ezriel and

17   Chana Rosner, shall be subject to home confinement at that

18   location.  The authorized absences subject to approval by

19   Pretrial Services will be for medical appointments, to meet

20   with his counsel, to attend court appearances and to attend

21   religious services at a synagogue located at 1 Larissa Court in

22   Airmont, New York, only to the extent that the synagogue is

23   able to convene services in light of current public health

24   directives which limit large gathers of people.  The home

25   confinement is to be enforced by electronic monitoring.  The

```
 1    defendant, upon release, will be given the equipment to

 2    self-install.

 3            It shall be a further condition of his release that

 4    he shall not communicate with any person currently or formerly

 5    employed by or associated with the Lev Tahor religious group.

 6    He shall not communicate with any of his co-defendants defined

 7    as the individuals named in the indictment in which he is named

 8    as well as any alleged co-conspirators such as may be

 9    identified by the government.

10            It is further a condition that Mr. Rosner shall have

11    no contact whatsoever with the two individuals who have been

12    identified as victims in this case.

13            Do you know who those individuals are, Mr. Rosner?

14            THE DEFENDANT:  Yes, I know.

15            THE COURT:  You're not permitted to have any contact

16    with them any form whatsoever.

17            I am authorizing Mr. Rosner to communicate with his

18    attorney on the landline telephone located at that Rhonda Lane

19    address.  I will consider an application to modify conditions

20    if a protocol for additional telephone use can be worked out

21    and practically imposed by Pretrial Services and agreed to by

22    both sides, but for present purposes, the defendant is

23    prohibited from using cellphones or any internet connected

24    devices except to the extent that he may email and review case

25    related documents on a computer at that residence.
```

1          The government is granted authority to enter that

2     residence upon reasonable suspicion to search for prohibited

3     electronic devices or electronic uses.

4          Do you understand that, Mr. Ezriel Rosner?

5          MR. ESRIEL ROSNER:  Yes.

6          THE COURT:  That the government, if they think that

7     Mr. -- defendant Rosner has been violating any of these

8     conditions, they have the right to come into your home to

9     investigate.

10         You understand?

11         MR. ESRIEL ROSNER:  Yes.

12         THE COURT:  You're agreeing to that?

13         MR. ESRIEL ROSNER:  Yes.

14         THE COURT:  Okay.  Can somebody tell me where

15    Mr. Rosner's passport is, if he has one?

16         MR. LIGTENBERG:  I'm not sure, your Honor.

17         THE COURT:  Pretrial Services report indicates that

18    he stated that when he was arrested in Mexico the Mexican

19    authorities seized his American passport; does the government

20    have any information about that?

21         MR. LIGTENBERG:  That's possible, I can't say for

22    sure, I apologize.

23         THE COURT:  Mr. Rosner, do you have a United States

24    passport?

25         THE DEFENDANT:  I don't know, they just -- they just

                ANGELA A. O'DONNELL, Official Court Reporter
                            914-390-4025

```
 1   make a new passport for me before they took me from Mexico it

 2   was just for one (indiscernible), it was in my hand.

 3            THE COURT:  Do you have it in your possession?

 4            THE DEFENDANT:  No.

 5            THE COURT:  All right, Mr. Rosner, I am going to

 6   direct you not to apply for any type of passport or other

 7   travel document while you're at liberty on bail conditions in

 8   this case and if that -- either your US passport or any

 9   temporary travel document that you may have received comes into

10   your possession, you need to immediately notify your attorney

11   who is directed to make arrangements to surrender that to the

12   government.  Do you understand?

13            THE DEFENDANT:  I understand, and I agree with that,

14   but I agree to get release bail, but I disagree to observe all

15   conditions which I have know before.

16            THE COURT:  Once again, Mr. Rosner, this is not a

17   negotiation.  If you don't want to be released on these terms,

18   you're not going to be released.

19            THE DEFENDANT:  That was not discussed with me before

20   so --

21            THE COURT:  Mr. Lewis.

22            MR. LEWIS:  Yes, your Honor.

23            THE COURT:  Your client is indicating that he's not

24   agreeable to all these conditions.  I think under the

25   circumstances, I can't release him.
```

```
 1                MR. LEWIS:  I would ask your Honor to give me one
 2   moment.  I did speak to my client about these conditions.  I
 3   think what he does not understand is that some of the ones that
 4   concern him would be the subject of future conversation.  There
 5   are no promises, but I discussed who he can call and when he
 6   can call other people like his mother.  I know that that
 7   concerns him.  I would just ask him to understand that these
 8   other conditions for now, when he is out, he and I will be able
 9   to talk privately and reach out to the government to discuss
10   the things -- other things that are of concern to him.  He
11   should go ahead and proceed in that way.
12                THE DEFENDANT:  I --
13                THE COURT:  Mr. Rosner, I really can't release you if
14   you are objecting to the conditions.  Your attorney has worked
15   very hard to put this together.  He's telling you that he will
16   continue to try to work out some way that you can make
17   additional telephone calls, but you need to comply with these
18   conditions while they're in effect.  Are you prepared to do
19   that?
20                THE DEFENDANT:  Still disagree.
21                THE COURT:  I'm sorry?
22                THE DEFENDANT:  I still disagree with that.
23                THE COURT:  You still disagree.  All right.
24                Mr. Lewis, your client is indicating a disinclination
25   to comply with these conditions, and frankly, under the
```

1    circumstances, I do not think that bodes well for compliance if

2    he's already telling us that he's not going to comply.  So

3    unless someone has another or different idea, I'm going to

4    order Mr. Rosner's continued detention.

5            Mr. Ligtenberg, is there anything else from the

6    government?

7            MR. LIGTENBERG:  No, I agree with your assessment

8    your Honor.  Thank you.

9            THE COURT:  Mr. Lewis, thank you for your efforts.

10   Is there anything else you want to say?

11           MR. LEWIS:  Might we give Mr. Rosner one more chance

12   to agree to these conditions and --

13           THE COURT:  You know, I -- his affect here in the

14   courtroom suggests to me that he is really very resistant to

15   this, and under the circumstances and given nature of the case

16   the fact that he has strong roots in a foreign country and the

17   unique sensitivities here, I'm going to deny the application

18   for release and order Mr. Rosner's continued detention.

19           Thank you all.  We'll stand in recess.

20           THE CLERK:  All rise.  Court is in recess.

21           MR. LIGTENBERG:  Thank you, Judge.

22           (Proceedings concluded)

23   Certified to be a true and accurate transcript of the digital

24   electronic recording to the best of my ability.

25   U.S. District Court, Official Court Reporter

                  ANGELA A. O'DONNELL, Official Court Reporter
                              914-390-4025

```
 1              THE DEPUTY CLERK:  Docket number 19CR497.  United
 2   States of America versus Helbrans, et al.
 3              Will counsel please state their appearance for the
 4   record, beginning with the government.
 5              MS. BAGLIEBTER:  Good morning, your Honor.  This is
 6   Jamie Bagliebter for the government, and with me on the line
 7   are my colleagues, AUSA Sam Adelsberg and Jim Litenberg.
 8              THE DEPUTY CLERK:  On behalf of defendant one.
 9              MR. KOFFSKY:  Good morning, your Honor.  Attorney
10   Bruce Koffsky.  I'm joined on the phone by Peter Schaffer, and
11   we together represent Nachman Helbrans, defendant number one.
12              THE DEPUTY CLERK:  On behalf of defendant two.
13              MS. BRODY:  Susanne Brody for Mayer Rosner.  Good
14   morning, Judge.
15              THE DEPUTY CLERK:  On behalf of defendant three.
16              MR. LIPTON:  Good morning, Judge.  Evan Lipton for
17   Aaron Rosner, and Aaron Rosner is on the line as well.
18              THE COURT:  All right, good morning everyone.  This
19   is a proceeding in the matter of United States versus Helbrans,
20   19CR496, and three defendants will be appearing before the
21   Court today:  Nachman Helbrans, defendant number one; Mayer
22   Rosner, defendant number two; and Aaron Rosner, defendant
23   number three.
24              This matter is scheduled today for the purpose of
25   conducting a status conference, and in addition, defendant
```

1   number one and defendant number two have requested a *de novo*

2   bail review.

3            All right, the record should reflect that we are

4   still in the midst of the COVID-19 pandemic and in the interest

5   of public health concerns and to comply with social distancing

6   protocols, this proceeding will not be taking place in person,

7   and given the current logistical and technological constraint,

8   the Court finds that video teleconferencing is not reasonably

9   available for this proceeding.  Accordingly, this proceeding

10  will be conducted telephonically.

11           Let me first start off by indicating to the

12  defendants that I'm going to ask a set of questions.  It's

13  important that they pay attention to the question and that they

14  answer truthfully.

15           The record should also reflect that the Court

16  received a letter from defendants Nachman Helbrans, Mayer

17  Rosner indicating that that they do not require a translator

18  for this conference.  We do have a translator that is currently

19  on the line, and am I correct that she will be serving as an

20  interpreter for defendant number three, Aaron Rosner?

21           MR. LIPTON:  No, Judge, Aaron Rosner speaks English

22  and understands English.

23           THE COURT:  Okay, so he will not be using the

24  translator.  All right.  But we do have the translator on the

25  line; is that correct?

```
 1                Gina, can you verify?

 2                THE DEPUTY CLERK:  Ruth, take yourself off mute.

 3                THE INTERPRETER:  Your Honor, Ruth Kohn, the

 4    interpreter on standby.  Yes, good morning.

 5                THE COURT:  Okay, so you're on the line, and you are

 6    available; however, as I indicated, defendants Nachman Helbrans

 7    and Mayer Rosner have indicated that they do not need a

 8    translator.

 9                All right, let's begin.  I have a set of questions

10    for defendant number one, Nachman Helbrans.

11                Can you please state your full name?

12                DEFENDANT HELBRANS:  Nachman Helbrans, N-A-C-H-M-A-N,

13    Helbrans, H-E-L-B-R-A-N-S.  I have a middle name, Simon.

14                THE COURT:  How old are you?

15                DEFENDANT HELBRANS:  Almost 39.  I'm 38 now.

16    February 18 I became 39.

17                THE COURT:  Do you have any difficulty reading,

18    writing, speaking, or understanding the English language?

19                DEFENDANT HELBRANS:  Your Honor, to speak English I

20    speak -- I mean usual, I understand English.  I have only a

21    problem sometimes pronouncing some words, but I understand the

22    content of the speech.  Read, I can read most of the text,

23    including notes, et cetera.  Writing I have much difficulty,

24    cannot writing without help.

25                THE COURT:  Okay, how far did you go in your
```

```
 1  schooling?
 2           DEFENDANT HELBRANS:  I go on the Yeshiva.  I study
 3  from when I was three all the religious classes up to 18 years
 4  on the Yeshiva, and I continue study in the Yeshiva, I mean,
 5  for all the way along.
 6           THE COURT:  Would that be the equivalent of high
 7  school?  Is that fair to say?
 8           DEFENDANT HELBRANS:  Yes.  But the subject was only
 9  religious subject.  I never have any course in English, only
10  like learning from the area, from the surrounding area.
11           THE COURT:  Okay.  Have you ever been hospitalized or
12  treated for narcotic or alcohol addiction?
13           DEFENDANT HELBRANS:  No, your Honor.
14           THE COURT:  In the past 24 hours, have you taken or
15  used any drugs, marijuana, alcohol, or medication?
16           DEFENDANT HELBRANS:  No, your Honor.
17           THE COURT:  Mr. Koffsky, my understanding is that you
18  submitted an affidavit indicating that your client's consented
19  to participate telephonically at this conference and at this
20  bail hearing; is that correct?
21           MR. KOFFSKY:  That's correct, your Honor.
22           THE COURT:  And the affidavit also indicates that
23  your client knowingly waives his right to have an interpreter
24  used for today's conference; is that correct?
25           MR. KOFFSKY:  That's correct, your Honor.
```

```
 1                THE COURT:  All right, did you consult with your
 2    client about his right to physically appear before the Court at
 3    this proceeding?
 4                MR. KOFFSKY:  Yes, your Honor.
 5                THE COURT:  And did you consult with your client
 6    about any potential waiver of his right to physically appear
 7    before the Court in this matter?
 8                MR. KOFFSKY:  Yes, your Honor.
 9                THE COURT:  Are you satisfied that your client has
10    knowingly, intentionally, and voluntarily waived his right to
11    physically appear before the Court at this proceeding?
12                MR. KOFFSKY:  I am.
13                THE COURT:  And did you consult with your client
14    about this proceeding taking place telephonically with all
15    participants appearing telephonically?
16                MR. KOFFSKY:  I have, your Honor.
17                THE COURT:  Are you satisfied that your client has
18    knowingly, intentionally, and voluntarily consented to appear
19    telephonically with all participants appearing telephonically?
20                MR. KOFFSKY:  Yes, your Honor.
21                THE COURT:  All right.  Mr. Helbrans, it's my
22    understanding that you consulted with your attorney regarding
23    your right to physically appear in this matter; is that
24    correct?
25                DEFENDANT HELBRANS:  Yes, your Honor.
```

Angela O'Donnell - Official Court Reporter
914-390-4025

```
 1              THE COURT:  All right.

 2              DEFENDANT HELBRANS:  That's been say --

 3              THE COURT:  All right.

 4              DEFENDANT HELBRANS:  I mean only because of the

 5    pandemic.  Because of the pandemic I need to appear

 6    telephonically.

 7              THE COURT:  Okay.  After such consultation, do you

 8    now knowingly, intentionally, and voluntarily waive your right

 9    to physically appear before the Court at this proceeding?

10              DEFENDANT HELBRANS:  Yes, your Honor.

11              THE COURT:  All right, my understanding is that you

12    also consulted with your attorney regarding this proceeding

13    taking place telephonically with all parties appearing

14    telephonically; is that correct?

15              DEFENDANT HELBRANS:  Yes, your Honor.

16              THE COURT:  And as you indicated, this is as a result

17    of the pandemic.  Do you now knowingly, intentionally, and

18    voluntarily consent to appear telephonically with all

19    participants appearing telephonically?

20              DEFENDANT HELBRANS:  Yes, your Honor.

21              THE COURT:  All right.  The record should reflect

22    that the Court determines that the defendant, Nachman Helbrans,

23    has knowingly, intentionally, and voluntarily waived his

24    physical appearance for this conference and de novo bail

25    hearing and consents to all parties appearing telephonically at
```

1   this proceeding.  All right, give me a second.

2          All right, I'm now going to move on to Mr. Mayer

3   Rosner.

4          Mr. Rosner, again, I'm going to ask you a set of

5   questions similar to those that I asked Nachman Helbrans.  So I

6   need you to listen very carefully.

7          Can you please state your full name.

8          DEFENDANT MAYER ROSNER:  Mayer Rosner.

9          THE COURT:  All right, how old are you, sir?

10          DEFENDANT MAYER ROSNER:  What?

11          THE COURT:  How old are you?

12          DEFENDANT MAYER ROSNER:  Forty-four.

13          THE COURT:  Mr. Rosner, do you have any difficulty

14   reading, writing, speaking, or understanding the English

15   language?

16          DEFENDANT MAYER ROSNER:  I can read English well.  I

17   understand English.  I cannot write English.

18          THE COURT:  Okay.  How far did you go in your

19   schooling?

20          DEFENDANT MAYER ROSNER:  I go to school all the way

21   up since I'm three years old to 18 years old in the Yeshiva.

22          THE COURT:  Okay, is that fair to say that would be

23   the equivalent of a high school education?

24          DEFENDANT MAYER ROSNER:  Yes.

25          THE COURT:  All right, and much like Mr. Helbrans, is

1    it fair to say though you did not study secular -- basically

2    your schooling was in religious education.

3              DEFENDANT MAYER ROSNER:  Exactly.

4              THE COURT:  Did you send a correspondence to the

5    Court indicating that you do not wish to use an interpreter for

6    today's proceeding?

7              DEFENDANT MAYER ROSNER:  That's correct, your Honor.

8              THE COURT:  All right.  Mr. Rosner, have you ever

9    been hospitalized or treated for narcotic or alcohol addiction?

10             DEFENDANT MAYER ROSNER:  No.

11             THE COURT:  In the last 24 hours, in the past 24

12   hours, have you taken or used any drugs, marijuana, alcohol, or

13   medication?

14             DEFENDANT MAYER ROSNER:  No, your Honor.

15             THE COURT:  Ms. Brody forwarded to the Court a

16   correspondence indicating that you voluntarily consent to

17   participate at today's proceeding via videoconferencing or

18   teleconferencing and that you're also going to be -- you're

19   voluntarily consenting to participate in the bail *de novo*

20   hearing by same means, meaning at a videoconference or

21   teleconferencing; is that correct?

22             DEFENDANT MAYER ROSNER:  Yes, your Honor.

23             THE COURT:  Okay.  I'm going to ask your attorney a

24   set of questions first.  Bear with me.

25             Ms. Brody.

 1           MS. BRODY:  Yes.

 2           THE COURT:  Did you talk with your client about his

 3  right to physically appear before the Court in this proceeding?

 4           MS. BRODY:  Yes, Judge.

 5           THE COURT:  And after such consultation -- rather,

 6  before that, did you consult with your attorney about any

 7  potential waiver of his right to physically appear before the

 8  Court in this matter?

 9           MS. BRODY:  Yes, Judge.

10           THE COURT:  Are you satisfied that your client has

11  knowingly, intentionally, and voluntarily waived his right to

12  physically appear before the Court at this proceeding?

13           MS. BRODY:  Yes, Judge.

14           THE COURT:  Did you also consult with your client

15  about this proceeding taking place telephonically with all

16  participants appearing telephonically?

17           MS. BRODY:  Yes, Judge.

18           THE COURT:  Are you satisfied that your client has

19  knowingly, intentionally, and voluntarily consented to appear

20  telephonically with all participants appearing telephonically?

21           MS. BRODY:  Yes, Judge.

22           THE COURT:  Thank you.

23           Mr. Mayer Rosner, my understanding is that you

24  consulted with your client, with your attorney rather, about

25  your right to physically appear in this matter; is that

 1   correct?

 2            DEFENDANT MAYER ROSNER:  Yes, your Honor.

 3            THE COURT:  Do you now knowingly, intentionally, and

 4   voluntarily waive your right to physically appear before the

 5   Court at this proceeding?

 6            DEFENDANT MAYER ROSNER:  Yes, your Honor.

 7            THE COURT:  All right, Mr. Rosner, it's also my

 8   understanding you consulted with your attorney about this

 9   proceeding taking place telephonically with all participants

10   appearing telephonically; is that correct?

11            DEFENDANT MAYER ROSNER:  Yes, your Honor.

12            THE COURT:  Do you now knowingly, intentionally, and

13   voluntarily consent to participate at this proceeding

14   telephonically with all participants appearing telephonically?

15            DEFENDANT MAYER ROSNER:  Yes, your Honor.

16            THE COURT:  All right, the record should reflect that

17   the Court finds that the defendant, Mayer Rosner, has

18   knowingly, intentionally, voluntarily waived his physical

19   appearance for this conference and consents to appear at this

20   proceeding telephonically with all participants appearing

21   telephonically.

22            All right, I'm now going to ask a similar set of

23   questions to Mr. Aaron Rosner.

24            Mr. Aaron Rosner, can you please state your full

25   name.

                 Angela O'Donnell - Official Court Reporter
                              914-390-4025

 1             DEFENDANT AARON ROSNER:  Aaron Rosner.

 2             THE COURT:  Mr. Rosner, do you have any difficulty

 3   reading, writing, or speaking, or understanding the English

 4   language?

 5             DEFENDANT AARON ROSNER:  Only with writing.

 6             THE COURT:  You have some difficulty, a lot of

 7   difficulty?  Can you explain the difficulty that you have with

 8   writing?

 9             DEFENDANT AARON ROSNER:  By writing I need help.  I

10   mean, with help, I can.

11             THE COURT:  Okay.  How far did you go in your

12   schooling?

13             DEFENDANT AARON ROSNER:  I was till I was 18 years

14   from I was a small kid, and I went all the classes that

15   whatever they deliver.

16             THE COURT:  Okay.  Is it fair to say that would be

17   the equivalent of going to school up to the high school,

18   through high school?

19             DEFENDANT AARON ROSNER:  Right.  Yes.

20             THE COURT:  Okay.  And that was for the most part in

21   religious education; is that correct?

22             MS. BRODY:  Yes.

23             THE COURT:  All right, have you ever been treated,

24   hospitalized or treated for narcotic or alcohol addiction?

25             DEFENDANT AARON ROSNER:  No.

```
 1              THE COURT:  In the past 24 hours, have you taken or
 2   used any drugs, marijuana, alcohol, or medication?
 3              DEFENDANT AARON ROSNER:  No, your Honor.
 4              THE COURT:  All right, I'm going to ask a set of
 5   questions to your attorney.
 6              Mr. Lipton, did you consult with your client about
 7   his right to physically appear before the Court in this
 8   proceeding?
 9              MR. LIPTON:  Yes, Judge.
10              THE COURT:  And did you consult with your client
11   about any potential waiver of his right to physically appear --
12              MR. LIPTON:  Yes, Judge.
13              THE COURT:  -- in this matter?
14              MR. LIPTON:  Yes, Judge.
15              THE COURT:  Are you satisfied that your client has
16   knowingly, intentionally, and voluntarily waived his right to
17   physically appear before the Court at this conference?
18              MR. LIPTON:  Yes, Judge.
19              THE COURT:  And did you consult with your client
20   about this proceeding taking place telephonically with all
21   participants appearing telephonically?
22              MR. LIPTON:  Yes, Judge.
23              THE COURT:  After such consultation, are you
24   satisfied that your client has knowingly, intentionally, and
25   voluntarily consented to appear telephonically at this
```

```
 1   proceeding with all participants appearing telephonically?
 2             MR. LIPTON:  I am.
 3             THE COURT:  All right, thank you, counselor.
 4             Mr. Aaron Rosner, it's my understanding that you
 5   consulted with your attorney regarding your right to physically
 6   appear before the Court in this matter; is that correct?
 7             DEFENDANT AARON ROSNER:  Yes.
 8             THE COURT:  After so doing, do you now knowingly,
 9   intentionally, and voluntarily waive the right to physically
10   appear before the Court at this conference?
11             DEFENDANT ARON ROSNER:  Yes, your Honor.
12             THE COURT:  All right.  It's also my understanding
13   that you consulted with your attorney about this proceeding
14   taking place telephonically with all participants appearing
15   telephonically; is that correct?
16             THE DEFENDANT:  Correct.
17             THE COURT:  Do you now knowingly, intentionally, and
18   voluntarily consent to appear in this proceeding telephonically
19   with all participants appearing telephonically?
20             DEFENDANT AARON ROSNER:  Yes.
21             THE COURT:  The record should reflect that the Court
22   finds that the defendant, Aaron Rosner, has knowingly,
23   intentionally, and voluntarily waived his right to physically
24   appear before the Court at this conference and consents to this
25   proceeding taking place telephonically.
```

 1              All right, and just to be sure because I'm not sure

 2      if I did this the last time, I'm going to read into the minutes

 3      an oral order pursuant to Federal Rules of Criminal Procedure

 4      5(f) and criminal -- I'm sorry, Federal Rules of Criminal

 5      Procedure 5(f) provides, basically this is to confirm

 6      disclosure obligations under *Brady* v Maryland 373 U.S. 83, 1963

 7      and its progeny and to summarize the possible consequences of

 8      violating those obligations.  The government must disclose to

 9      the defense all information favorable to an accused that is

10      material either to guilt or to punishment and is known to the

11      government.  This obligation applies regardless of whether the

12      information would itself constitute admissible evidence.  The

13      government shall disclose such information to the defense

14      promptly after existence becomes known to the government so the

15      defense may make effective use of the information in the

16      preparation of its case.

17              As part of these obligations, the government must

18      disclose any information that can be used to impeach the trial

19      testimony of a government witness within the meaning of *Giglio*

20      *versus the United States*, 405 U.S. 150, 1972 and its progeny.

21      Such information must be disclosed sufficiently in advance of

22      trial in order for the defendant to make effective use of it at

23      trial or at such other time as the Court may order.  The

24      foregoing obligations are continuing ones and apply to

25      materials that become known to the government in the future.

 1          Additionally, if the information is otherwise subject

 2  to disclosure, it must be disclosed regardless of whether the

 3  government credits it.  In the event that the government

 4  believes that a disclosure under this rule will compromise

 5  witness safety, victim rights, national security, and sensitive

 6  law enforcement technique, or any other substantial government

 7  interest, it may apply to the Court for a modification of its

 8  obligations, which may include an *in camera* review or

 9  withholding or subjecting to a protective order all or part of

10  the information otherwise subject to disclosure.

11          All right, for purposes of this order, the government

12  includes all current or former federal, state, and local

13  prosecutors, law enforcement officers, and other officials who

14  have participated in the investigation that led to, or

15  prosecution of, the offense or offenses with which the

16  defendant is charged.  The government has an affirmative

17  obligation to seek from such sources all information subject to

18  disclosure under this order.

19          And if the government fails to comply with this

20  order, the Court, in addition to ordering production of the

21  information may:

22          One, specify the terms and conditions of such

23  production;

24          Two, grant a continuance;

25          Three, impose evidentiary sanctions;

1          Four, impose sanctions upon any responsible lawyer

2    for the government;

3          Five, by dismissing charges before trial, vacate a

4    conviction after trial or guilty plea; or

5          Six, enter any other order that is just under the

6    circumstances.

7          The record shall reflect that a written order will be

8    filed on the docket on this matter.

9          Okay.  So there are two bail hearings that need to be

10   addressed.  Before we get to that, let's just have a status

11   conference.

12         Where are we as far as discovery in this matter, and

13   is there any discovery that is outstanding?

14         MS. BAGLIEBTER:  Your Honor, the government has

15   completed its Rule 16 discovery.  There are a few caveats which

16   we have discussed with your Honor before.  These are not really

17   Rule 16 caveats, just things to make the defense counsel and

18   Court aware of.

19         We previously have sent a MLAT request to Mexico.  To

20   the extent we get additional records from that MLAT request, we

21   would need to produce those records, but we don't have anything

22   now in our possession that we can produce.

23         And then the government is also continuing to make

24   translations of some Yiddish materials that have all been

25   produced in full in their original format, but as we make

1     additional translations, we will produce those translations to

2     the defense.

3            We did recently produce a few documents responsive to

4     the Mexican MLAT request.  We produced those on January 27th,

5     2021, and it consisted of approximately eight pages of

6     documents that we received and produced them both in Spanish

7     and in their Spanish translation.

8            THE COURT:  Okay.  It's my understanding that motions

9     have been filed in this matter; is that correct?

10           MR. KOFFSKY:  Yes, your Honor.

11           THE COURT:  Are the motions fully submitted or do we

12     still have some submissions on the motions?

13           MS. BAGLIEBTER:  I believe the motions, the

14     defendants have all filed their motions at this point, and the

15     government, the government's opposition is due on February 5th,

16     and the defendant's reply is due February 19.

17           THE COURT:  Okay, so the motions are not fully

18     submitted yet.

19           MR. KOFFSKY:  Correct, your Honor.

20           THE COURT:  Is there anything that any of the defense

21     attorneys would like to put on the record regarding discovery

22     and/or the motions?

23           MR. KOFFSKY:  Yes, your Honor, for Nachman Helbrans,

24     if the Court would hear me.  I have two matters that I'd like

25     to bring to the attention of the Court, and they're somewhat

1     linked.   The second has to do with the motions that the

2     government has just referenced, but first I'm going to talk

3     about the defendant's request, really a demand to proceed

4     *pro se*.

5              I submitted a request for a *Faretta* hearing in

6     writing on June 18 of last year, your Honor.  As a result of

7     the Court's scheduling the *Faretta* hearing on a Jewish holiday,

8     I requested by letter not waiving the *Faretta* hearing or

9     withdrawing the application but simply that the *Faretta* hearing

10    be rescheduled.  Seven months have now passed since the

11    defendant demanded to represent himself.  He has the right

12    under the Sixth Amendment to do so.  He wishes to represent

13    himself in the filing of motions, in arguments to the Court,

14    and in arguing bond.  He wishes to address the Court regarding

15    why he poses no danger to the community and why he's not a risk

16    of flight and if the Court finds why there are combinations of

17    conditions which will ameliorate any of the Court's concern.

18             The defendant now again asks the Court to immediately

19    hold a *Faretta* hearing so the Court might be convinced that the

20    defendant is competent to act as his own counsel, and we waive

21    any requirement that he be presented before the Court as a

22    result of the Court's inability to have him standing in front

23    of your Honor.  So that's my first request, your Honor, as part

24    of this status conference that the Court hold an immediate

25    *Faretta* hearing.

1          Second, your Honor, my client has indicated to the

2     Court for probably going on 12 months that once he becomes his

3     own counsel, he intends to file his own motions, and I would

4     request of the Court an understanding that even though the

5     Court may find that defense counsel for Mr. Nachman Helbrans

6     has filed motions on his behalf, that he be given an

7     opportunity to file motions if and when he becomes counsel to

8     himself.

9          THE COURT:  All right, so let me just address some of

10    the issues that you raise.

11         Number one, I indicated that I thought it would be

12    more prudent to have a trained lawyer file motions on behalf of

13    the defendant, and that has caused some of the delay.

14         In addition, the *Faretta* hearing must be held in

15    person, it cannot be held telephonically because part of what

16    needs to take place is that the Court is going to have to

17    assess credibility, and it cannot do that alone by listening to

18    someone speak over the phone.  So we're going to try to

19    schedule the *Faretta* hearing sooner rather than later.  And as

20    I've previously indicated with respect to motion practice, I

21    wanted the trained lawyer to file the motions in advance of the

22    *Faretta* hearing so that they were on the docket, and many of

23    the lawyers in this case tried to get the *Faretta* hearing done

24    before the filing of the motions, the substantive motions, and

25    I thought that that was bad practice.  So that also caused some

1   of the delay.

2            He'll get his *Faretta* hearing.  We're going to

3   discuss that later on, and your client is not going to be

4   denied the opportunity to file supplemental motions, and if

5   needed, to renew a prior application if necessary, one that's

6   previously addressed in any of your motions, Mr. Koffsky.  So

7   your client is not going to be denied any substantive rights in

8   the event, in the event he is granted his application to

9   represent himself.

10           MR. KOFFSKY:  Thank you, your Honor.

11           THE COURT:  Any other defense attorney want to

12   address the Court at this time?

13           MS. BRODY:  Yes, I do, Judge.  Judge, the issue of

14   the *Faretta* hearing came up last spring, and I said at the

15   request of both Rabbi Helbrans and my client, Mayer Rosner, the

16   clients requested when we had a -- when we had a what? -- when

17   we had a motion schedule that we were supposed to file last

18   spring, the clients began insisting that they be allowed to

19   file their own motions.  I sent a letter to the Court on

20   March 5th because my client requested me to do so, requesting

21   they be allowed to file *pro se* motions.  The Court's response

22   was, you've got a lawyer, let your lawyer speak for you, we'll

23   have a *Faretta* hearing.

24           On April 2nd I sent a letter specifically requesting

25   a *Faretta* hearing.  It was an unequivocal request for a *Faretta*

1    hearing.  At that time, my client's right to both the Sixth

2    Amendment and the Fourteenth Amendment under due process he was

3    exercising his right.  He wanted a *Faretta* hearing then and

4    now.

5            I totally understand the Court wanting counsel to

6    submit legal documents.  I totally understand that, and it does

7    make sense on the one hand.  On the other hand, my client has

8    an absolute right to have the *Faretta* hearing in a timely

9    fashion.

10           The filing of motions is part of the prosecution, and

11   what the client chooses to file or not file is part of his

12   right under the Sixth Amendment.  In having counsel file

13   motions, which I don't want to use the word approved because

14   it's really the wrong word, but in having counsel file motions

15   when our clients have -- and particularly my client, I have on

16   numerous occasions requested this *Faretta* hearing and have done

17   so at a time when it could have been an in-person *Faretta*

18   hearing.

19           Again, I understand the Court did want legal motions

20   from the attorneys, but that does not trump my client's right

21   to a *Faretta* hearing at a point in time when he could have been

22   in Court, certainly, and when a decision could have been made

23   whether or not the Court was going to allow him to proceed

24   *pro se*, in which case the motions he wanted to file would have

25   been filed to date.  And I strongly object to putting off these

 1  *Faretta* hearings until such time as we can all get back to

 2  Court.  You know, none of us can do anything about the COVID,

 3  but my request was sent at a time when we could have had an

 4  in-face hearing on this, Judge.

 5          THE COURT:  Ms. Brody, I'm going to interrupt you

 6  because that's not totally true and accurate because they have

 7  been -- although there were some limited, in-person proceedings

 8  that were taking place, there required a host of logistical

 9  issues or hurdles that we had to go through.  So for you or

10  Mr. Koffsky or any other attorney to say that the hearings, the

11  in-person hearings could have been done sooner, is not

12  necessarily accurate.

13          And number two, I'll say this for the record that the

14  attorneys in this case have delayed in filing the motions in

15  this matter despite the urgings of the Court.

16          And you, Ms. Brody, you yourself have delayed.  You

17  have tried to put off filing the motions in advance of the

18  *Faretta* hearing, despite my urging.  And you could disagree

19  with me, and that's fine, but that's my take on what's happened

20  in this case.

21          MS. BRODY:  If I may just clarify, Judge.  Our

22  motions were due a year ago, April.  We did ask, we did ask,

23  absolutely, for an adjournment.  In the meantime, the day after

24  our motions were initially due in April, we got a massive dump

25  of discovery from the government.  A massive dump.

 1              THE COURT:  Right.  And that's what happens in these

 2    types of cases, with all due respect.

 3              MS. BRODY:  Well, I know, but certainly we couldn't

 4    file motions until we've got all the discovery, and then the

 5    summer we got additional discovery.  Certainly, these eight

 6    pages we got this week would not have held up motions because

 7    they really -- we appreciate getting them, we thank the

 8    government, but they couldn't have held up motions.  But we

 9    have gotten a lot of discovery over an extended period of time,

10    and back in November of 2019, the government represented at

11    that time that discovery was almost complete.  It clearly was

12    not complete because in April we got a -- April 2019 we got a

13    massive dump.

14              So, yes, Judge, we have requested delays.

15    Absolutely.  And we take full responsibility.  But a lot of

16    this, or some of this, is on the government as well in the

17    delay.

18              THE COURT:  If I'm not mistaken, a lot of those

19    documents had to be translated.

20              MS. BRODY:  I'm not saying --

21              THE COURT:  And by the way, Ms. Brody, your clients

22    have also made two different types of representations with

23    regards to their proficiency with the English language.

24    Initially, they indicated that they wanted everything

25    translated because they had very limited knowledge and

1   proficiency with the English language, so much so that they

2   required a translator.  That has now changed.

3         MS. BRODY:  I understand that.  Additionally, over

4   the past two years having been at Valhalla they picked up a

5   great deal of English that they didn't have before.

6         THE COURT:  Ms. Brody, I'm sure that they were just

7   as proficient when this case started as they claim to be today.

8   You don't pick up the nuances in a correctional facility, with

9   all due respect.

10        MS. BRODY:  No, I understand that, Judge, but whether

11   or not they have an interpreter, don't have an interpreter,

12   doesn't address the delay in having the *Faretta* hearing.

13        THE COURT:  Okay, and in addition, Ms. Brody, in

14   addition, the fact that you're telling me there has been this

15   voluminous production of documents made highlights, highlights

16   the complexity of this case and the need to have a trained

17   professional review the material to determine the relevancy and

18   to raise any and all appropriate motions so that the rights of

19   your clients are protected, which is what I've been trying to

20   do from the very beginning.  Your clients are not going to be

21   given -- are not going to be denied a *Faretta* hearing.

22        And by the way, along with those logistical issues

23   with scheduling an in-person hearing, there are also rises in

24   the spread of the pandemic which required the Court to shut

25   down and not be able to have in-person proceedings.  You forgot

1    to mention that on the record, Ms. Brody, that that has

2    happened on more than one occasion, so much so that we had

3    certain proceedings scheduled to take place in January,

4    in-person proceedings to take place in January and February,

5    and we were unable to do so because of issues with the spread

6    of the pandemic.

7              MS. BRODY:  I don't dispute that, Judge.

8              THE COURT:  But you did not put that on -- you're

9    making references to the delay, but you do not include that in

10   your comments with respect to the delays.  So it wasn't just

11   that production of discovery has been somewhat slow.  It wasn't

12   so much that it had to be translated.  It wasn't so much that

13   not only do you require a copy but your clients require a copy

14   and need access to it.  All right, but there's a host of other

15   issues that are taking place.  Right?  And the fact that your

16   office delayed in filing a motion sooner rather than later

17   because of the production of discovery that you've received in

18   the interim only highlights the complexity of the issues in

19   this case.

20             MS. BRODY:  I appreciate that, and I understand my

21   client's problems with the English language, I certainly do.  I

22   as much as anybody appreciate the closure of the courts because

23   of the pandemic for reasons known to the Court.  And I

24   understand that.  All I'm suggesting, Judge, is that under

25   *Faretta* they want to file their own motions.

1            THE COURT:  They're not going to be denied that

2    right.  And I indicated, as I indicated to Mr. Koffsky when he

3    spoke, that they will be given an opportunity to supplement the

4    motions in the event that they're granted, their applications

5    to represent themselves, or I will also give them an

6    opportunity to renew any prior applications that may have been

7    made by their current attorneys.

8            MS. BRODY:  On the issue of my client's -- and I hate

9    to do this, but I'm also speaking for Reb Helbrans here, but

10   today we are having a bail hearing, and my client, as has Reb

11   Helbrans, has expressed their desire to speak to the Court on

12   their own behalf.  And under 3142(f)(2)(B), the statute reads

13   that the person shall be afforded an opportunity to testify, to

14   present witnesses, to cross examine witnesses, to appear at the

15   hearing, and to present information by proffer or otherwise.

16           COMPUTER VOICE:  You have one minute remaining.

17           MS. BRODY:  I have one minute remaining?

18           THE COURT:  I'm not sure where that was from.

19           MS. BRODY:  Was that from the Court?

20           THE COURT:  That was not from the Court.

21           MS. BRODY:  The higher power?

22           THE COURT:  Perhaps, perhaps, because I'm always

23   looking for a higher power for inspiration.

24           MS. BRODY:  Aren't we all.  Aren't we all.  Higher

25   inspiration to get out of this apartment is what I'm looking

1    for higher inspiration for.

2            In any event, I had discussed yesterday with the

3    attorneys for the government that our clients -- and

4    Mr. Koffsky -- the letter, that our clients wish to speak on

5    their behalf at the detention hearing.

6            COMPUTER VOICE:  Thank you for using Global Tel Link.

7            THE COURT:  This is what I'm going to suggest, and

8    I'm addressing this both to both the government and to defense

9    counsel.  Scheduling an in-person proceeding for the purposes

10   of a *Faretta* hearing may be somewhat difficult.  What I'm going

11   to suggest, if you want to expedite this, and this is something

12   that I think you need to discuss with your attorney -- with

13   your clients, rather.  Perhaps counsel for the respective

14   defendants who want a *Faretta* hearing and the government can

15   put together some type of order where the defendants waive any

16   issue on appeal with respect to having the *Faretta* hearing take

17   place by videoconference, and assuming that the facility is

18   able to accommodate such a videoconference, we can begin to

19   have those *Faretta* hearings sooner rather than later.

20           MS. BRODY:  That is --

21           THE COURT:  My concern is that by not having the

22   *Faretta* hearing in person, that there may be appealable issues

23   there.  But perhaps, after a long discussion with your clients,

24   a document can be drafted and the government can review the

25   document beforehand wherein, since your clients are in such a

1    rush, and I understand that they have a legal right to a

2    *Faretta* hearing, I'm not denying that right, what I'm saying

3    there's been a host of logistical issues that have prevented

4    that from taking place to date, that perhaps such a document

5    can be prepared and reviewed by the government so that the

6    *Faretta* hearing can take place by videoconferencing and

7    possibly on your advice.  I don't know if that's something that

8    you would advise, but they may waive any appealable issues with

9    the fact that the *Faretta* hearings are going to be taking place

10   with videoconferencing.

11          The only question that I would then have is whether

12   or not the facility where the defendants are being detained

13   have videoconference capabilities such that we can do so.

14          MS. BRODY:  I thank the Court.  And as to the

15   question of whether under 3142 the Court will allow our clients

16   to address the Court as we believe they can outside of the

17   *Faretta* hearing but under the statute of the detention hearing.

18          THE COURT:  They can address the Court provided that

19   you put on the record that you've advised your client of all

20   his legal rights, and that he does so after such consultation.

21   I'm not sure whether or not it's going to be with your consent

22   or without your consent.  I would ask you to make that

23   representation on the record before he speaks.

24          MS. BRODY:  Yes, Mr. Koffsky can speak on behalf of

25   his client.  I have explained to my client, having had numerous

1    discussions with him over the past 25 months, it is not a good
2    idea for him to speak on the record because certainly anything
3    he says can be held against him.  He opens himself up for
4    additional charges if he goes off the rail.
5         THE COURT:  When we get to that, when we get to that
6    point -- before he decides to address the Court, if he's going
7    to address the Court at the hearing, you can make that
8    representation.
9         MS. BRODY:  We thank the Court.  I believe
10   Mr. Koffsky has item number two.
11        MR. KOFFSKY:  I'm not sure what item number two is,
12   your Honor.
13        MS. BRODY:  Oh, I thought you said you had two things
14   to say to the Court.
15        MR. KOFFSKY:  I did.
16        MS. BRODY:  Okay.
17        MR. KOFFSKY:  Let me go back to my notes.  Oh, it had
18   to -- item number two had to do with the government's
19   suggestion that motions had been filed when, in fact, if the
20   defendants act as their own counsel in the case, as the Court
21   has already said, the Court will consider allowing the
22   defendants as *pro se* to file motions on their own behalf.  So,
23   yes, I handled both number one, the *Faretta* hearing, and number
24   two, the motions, your Honor.
25        THE COURT:  Does your client wish to address the

1    Court as well at the hearing, at the *de novo* bail hearing?

2              MR. KOFFSKY:  Yes, your Honor.  Nachman Helbrans

3    indicated to me he would like to address the Court.  Much like

4    my sister counsel, Ms. Brody, I indicated to my client that

5    it's not a good idea, but I will put that on the record at the

6    appropriate time.

7              THE COURT:  Okay, just to be clear, your younger

8    sister.

9              MR. KOFFSKY:  Much younger sister.

10             MS. BRODY:  In my dreams.  In my dreams.

11             THE COURT:  All right, is there anything else any

12   defense counsel would like to put on the record?

13             I haven't heard from --

14             MR. LIPTON:  We have nothing to address today.  We're

15   not making a *Faretta* motion and we're not having a bail

16   hearing.  The scheduling issues are all that apply to us.

17             THE COURT:  Okay, so your client's not seeking a

18   *Faretta* hearing.  All right, Mr. Lipton, I'm sorry, Mr. Lipton,

19   we're going to be moving on to the bail hearing.

20             So I guess, Gina, let's put this down for a status

21   conference if possible within 30 days.

22             With respect to scheduling the *Faretta* hearing, I'm

23   going to ask that the government and defense counsels that they

24   have a conference.  The Court doesn't have to be involved in

25   that, but if there's a possibility of holding the *Faretta*

```
 1    hearings by videoconferencing --

 2              Can the government tell me whether or not the

 3    facility where the defendants are being held whether or not

 4    they have the capability for videoconferencing?

 5              OFFICER AMENDOLA:  Yes, we do, your Honor.

 6              MS. BAGLIEBTER:  Your Honor, I do not have the answer

 7    to that --

 8              THE COURT:  I heard --

 9              MS. BAGLIEBTER:  -- right now.  I can get it.

10              THE COURT:  Someone in the background.  I heard

11    someone indicate that yes they do.

12              Is there an officer at the facility?

13              OFFICER AMENDOLA:  Yes, your Honor, Officer Amendola.

14    Yes, we do videoconferences.

15              THE COURT:  I don't know if you want to have this on

16    the record.  Are there particular days and time constraints for

17    videoconferencing at the facility?

18              OFFICER AMENDOLA:  No, it runs with the schedule for

19    the proceedings.

20              THE COURT:  Is there a time limit on the length of

21    those videoconferences?

22              OFFICER AMENDOLA:  There really isn't a time limit.

23    The schedule, you know, is from like 9, 11, 1 and 3.  So

24    there's two hours for each conference.

25              THE COURT:  Thank you, Officer.
```

1          OFFICER AMENDOLA:  You're welcome.

2          THE COURT:  I'm going to ask defense counsel to speak

3   to the government to see whether or not it could be done by

4   videoconferencing.  I think that the government may want some

5   type of waiver signed that the fact that it's taking place by

6   videoconferencing does not raise an appealable issue, that if

7   it did, it's being waived.  I mean, that's the only basis upon

8   which I would hold an videoconference *Faretta* hearing.  And if

9   not, we're going to try and schedule it as soon as possible.  I

10  think it has to take place in person because I have to assess

11  the demeanor of the defendant.  So we'll move on from that.

12          Is there anything the government would like to say?

13          MS. BAGLIEBTER:  Yes, your Honor, just briefly.

14  First, with respect to the scheduling of the *Faretta* hearing.

15  We do agree with the Court that the hearing should be in

16  person, but given the extraordinary circumstances, we're happy

17  to work with defense to see if we can get to an agreement where

18  the necessary waivers are in place that we can proceed by

19  videoconferencing.  I'm not sure what our position will be on

20  that yet, but we will work with defense counsel and inform the

21  Court.

22          The other request that I would have is that I would

23  just also make an application to the Court that the Court

24  exclude time between now and the next status conference, which

25  I believe will be scheduled within approximately 30 days, and

1   this would give time -- for motions are pending, and so time

2   should be excluded through that, but in an excess of caution,

3   this will give time for the parties to continue to review the

4   voluminous discovery and to discuss any pretrial dispositions,

5   if those are happening, and to work on their motions.

6              THE COURT:  So, Gina --

7              MR. KOFFSKY:  Your Honor, if I can just speak to a

8   couple of things.

9              THE COURT:  Yes.

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25