Exhibit C

**UNITED STATES DISTRICT COURT**
SOUTHERN DISTRICT OF NEW YORK
------------------------------x
UNITED STATES OF AMERICA

             v.                S-3 19 CR. 497 (NSR)

**MATITYAU MOSHE MALKA,**

              **Defendant.**
------------------------------x
               U.S. Courthouse
               White Plains, N.Y.
               October 12, 2021
               11:30 a.m.


Before:    HON. NELSON S. ROMÁN,
             United States District Judge


APPEARANCES

**UNITED STATES ATTORNEY'S OFFICE**
**SOUTHERN DISTRICT OF NEW YORK**
**300 Quarropas Street**
**White Plains, N.Y.  10601**
BY:  JAMIE BAGLIEBTER
**Assistant United States Attorney**

**JOSEPH A. VITA, Esq.**
**HOWARD E. TANNER, Esq.**
**Standby Attorneys for**
**Defendant Matityau Malka**

**Also Present:  Ruth Kohn**
               **Yiddish Interpreter**



**Sue Ghorayeb, R.P.R., C.S.R.**
Official Court Reporter

1              THE CLERK:  Docket Number S —— as in superseding ——

2   ——3 19—CR—497 Defendant 5, United States of America v. Matityau

3   Moshe Malka.  Will the parties please state their appearance

4   for the record beginning with the Government.

5              MS. BAGLIEBTER:  Good morning, Your Honor.  Jamie

6   Bagliebter for the Government.

7              THE DEFENDANT:  Good morning, Your Honor.  Matityau

8   Moshe Malka.

9              MR. VITA:  Your Honor, good morning.  Joseph Vita as

10  standby counsel for Mr. Malka and Howard Tanner is also

11  present as second standby counsel.

12             YIDDISH INTERPRETER:  Ruth Kohn, standby Yiddish

13  interpreter.

14             THE COURT:  All right.  Good morning everyone.

15             This is a conference in the matter of the United

16  States v. Matityau Moshe Malka, 19—CR—497, Defendant No. 5.

17             My understanding is that we are here to hold an

18  arraignment on Superseding Indictment S3, which was filed

19  some time after our last conference, and also to conduct a

20  de novo bail review.

21             Are there any other items that the parties wish to

22  add to the agenda for today's conference?

23             MS. BAGLIEBTER:  Not from the Government.

24             THE COURT:  Mr. Malka, any other issues that you

25  want to bring to the Court's attention at today's conference?

1            THE DEFENDANT:  Your Honor, just in reviewing the

2    new Superseding Indictment, I saw that the Government took out

3    the language about, about the pills.  I also saw they took out

4    the penal codes from the —— from the Guatemalan reference on

5    Page ——

6            THE COURT:  Okay.  So, what we're —— Mr. Malka, I

7    don't mean to interrupt you, but I'm going to —— we're going

8    to —— we are conducting two proceedings today, all right.  One

9    is that you're going to be arraigned on a Superseding

10   Indictment, and then, thereafter, we're going to have what's

11   called a bail hearing.  All right.

12           THE DEFENDANT:  Yes.

13           THE COURT:  You are discussing differences between

14   the Superseding Indictment and the prior document that you

15   were indicted on.  All right.  Is there anything else that you

16   want to discuss, that you want to —— you want to discuss

17   before the Court before we conduct the Superseding

18   Indictment —— I will arraign you rather on it and before we

19   move on to the bail hearing?

20           THE DEFENDANT:  Not at this moment.

21           THE COURT:  Okay.  So, let's move forward.  All

22   right.  I'm going to begin with the arraignment.

23           Mr. Malka, I want to advise you that this is not a

24   trial.  This proceeding is called an arraignment and it is

25   being held because the Government has just filed a

1    Superseding Indictment S3, which is docketed under ECF Number
2    358 in this matter.

3          Mr. Malka, during this proceeding, it is my job to
4    advise you of your rights.  You have an absolute right to
5    remain silent at this and every other stage of the
6    proceedings.  Any statement that you do make may be used
7    against you.  You have the right to remain silent even if you
8    have already made statements to law enforcement officers, and
9    you are not required to answer any questions that law
10   enforcement officers ask you from this moment on.

11         You also have the right to consult with an
12   attorney.  The Court has previously granted the application
13   to represent yourself in this matter.  Do you wish to
14   represent yourself at this time at this arraignment?

15         THE DEFENDANT:  Yes, Your Honor.

16         THE COURT:  Okay.  All right.  Do you understand
17   that if you continue to represent yourself, you will be
18   responsible for speaking for yourself in court and at all
19   proceedings?  Do you understand this?

20         THE DEFENDANT:  Yes, Your Honor.

21         THE COURT:  All right.  I want to remind you that I
22   have assigned Mr. Vita and Mr. Tanner to assist you as standby
23   counsel.  They are available, for example, to answer any
24   questions, help you with logistics, and to help you conduct
25   research.  All right.  However, they cannot speak on your

1    behalf.  Do you understand this?

2                 THE DEFENDANT:  Yes.

3                 THE COURT:  All right.  Did you discuss the

4    Superseding Indictment —— well, did you review the Superseding

5    Indictment and have you had an opportunity to discuss it with

6    standby counsel, either Mr. Vita and/or Mr. Tanner?

7                 THE DEFENDANT:  I was discuss it with them just very

8    little.

9                 THE COURT:  Okay.  Do you need another moment to

10   discuss it with them?

11                THE DEFENDANT:  We can try a minute.

12                THE COURT:  I'm sorry?

13                THE DEFENDANT:  I think it will be one, two minutes

14   we have for this.

15                THE COURT:  You want some additional time to discuss

16   it with them?

17                THE DEFENDANT:  I think if we have like one, two

18   minutes, it will be a little bit helpful.

19                THE COURT:  Okay.  I'll give you some time to have

20   some discussions with your standby counsel.

21                THE DEFENDANT:  Thank you, Your Honor.

22                (Defendant conferring with counsel)

23                THE COURT:  All right.  Mr. Malka, are you ready to

24   proceed?

25                THE DEFENDANT:  Yes, Your Honor.

                    Sue Ghorayeb,  Official Court Reporter

1                    THE COURT:  Okay.  You have consulted with standby
2   counsels, correct?
3                    THE DEFENDANT:  Yes.
4                    THE COURT:  All right.  I'm going to ask at this
5   time that my Courtroom Deputy place Mr. Malka under oath or
6   affirmation.
7                    THE CLERK:  Mr. Malka, please raise your right hand.
8                    Do you solemnly and sincerely affirm to tell the
9   truth, the whole truth, and nothing but the truth, this you
10  solemnly and sincerely affirm?  Your answer?
11                   THE DEFENDANT:  Yes.
12                   THE CLERK:  Your Honor, he has been affirmed.
13  M A T I T Y A U   M O S H E   M A L K A, Defendant,
14  having first been duly sworn, was examined by the Court and
15  testified as follows:
16                   THE COURT:  All right.  The record should reflect
17  that the Defendant has been sworn and\or placed under
18  affirmation.
19                   Mr. Malka, it is important for you to understand
20  that if you knowingly make a false statement during these
21  proceedings, you could be subject to prosecution for perjury
22  or for making a false statement to the Court, and you could
23  face punishment up to five years' imprisonment and a $250,000
24  fine for committing perjury.  This punishment would be
25  separate and apart from any sentence you may be facing on the

1   crime charged in the Superseding Indictment.  Do you

2   understand this?

3                 THE DEFENDANT:  Yes.

4                 THE COURT:  It is also important for you to

5   understand that any false statement that you make during this

6   proceeding, as well as any false statements you may have made

7   to Pretrial Services, may be used against you at a trial, if

8   you decide to testify.  Do you understand this?

9                 THE DEFENDANT:  Yes.

10                THE COURT:  Mr. Malka, can you please state your

11  full name?

12                THE DEFENDANT:  Matityau Moshe Malka.

13                THE COURT:  How old are you?

14                THE DEFENDANT:  Twenty-nine years.

15                THE COURT:  Do you have any difficulty reading,

16  writing, speaking or understanding the English language?

17                THE DEFENDANT:  Some difficult, but I think for this

18  proceeding, especially with the Yiddish interpreter there, I'm

19  okay.

20                THE COURT:  Okay.  So, the record should reflect

21  that we do have the Yiddish interpreter available.  If you

22  have — if at any time you need to use the Yiddish

23  interpreter, you should indicate as much, all right, and you

24  can use her services.  All right.  But you've indicated in the

25  past that you're comfortable with your ability to speak the

1  English language; is that correct?

2          THE DEFENDANT:  If I will have some difficults, I

3  will use the standby counsel, but ——

4          THE COURT:  Up to now, have you had any difficulty

5  with the English language?

6          THE DEFENDANT:  I have some difficults, yes.

7          THE COURT:  At this time?

8          THE DEFENDANT:  This time, no.

9          THE COURT:  Anything about what we said so far that

10  you're having difficulties with?

11          (Interpreter translating)

12          THE DEFENDANT:  No.  Sorry.

13          THE COURT:  Okay.  How far did you go in school?

14          THE DEFENDANT:  I go till the 18 years.  I was in

15  all the steps in the yeshiva.

16          THE COURT:  Okay.  Is it fair to say that your

17  education is the equivalent of a high school education in the

18  United States?

19          THE DEFENDANT:  I think so.  Sure.

20          THE COURT:  Have you ever been hospitalized or

21  treated for narcotic or alcohol addiction?

22          THE DEFENDANT:  No.

23          THE COURT:  In the last 24 hours, have you taken or

24  used any drugs, marijuana, alcohol or medication?

25          THE DEFENDANT:  No.

1              THE COURT:  Do you suffer from any physical or

2    mental problems which prevents you from fully understanding

3    today's proceedings?

4              THE DEFENDANT:  No.

5              THE COURT:  All right.  Mr. Malka, you have an

6    absolute right to be represented by counsel at this and every

7    stage of the proceeding against you, including representation

8    during any questioning by authorities, during any lineup, and

9    at all court proceedings, including this one.  That is, as we

10   have already discussed, you have intentionally, knowingly, and

11   voluntarily waived your right — that right and have chosen to

12   represent yourself, and you wish to continue representing

13   yourself in this matter; is that correct?

14             THE DEFENDANT:  Yes, Your Honor.

15             THE COURT:  Mr. Malka, you have been charged with

16   violating federal law based on a Superseding Indictment.  All

17   right.  Have you seen a copy of the Superseding Indictment

18   that was provided to you?

19             THE DEFENDANT:  Yes, Your Honor.

20             THE COURT:  Do you understand that the Indictment is

21   a document setting forth the Government's allegations against

22   you?

23             THE DEFENDANT:  Yes.

24             THE COURT:  All right.  Mr. Malka, did you read the

25   Superseding Indictment?

```
 1                   THE DEFENDANT:  Yes.
 2                   THE COURT:  And did you read the Superseding
 3     Indictment with the assistance of standby counsel?
 4                   THE DEFENDANT:  Yes.
 5                   THE COURT:  At this time, Mr. Malka, do you waive
 6     public reading of the Superseding Indictment?
 7                   THE DEFENDANT:  Yes, but maybe one or two, three
 8     paragraphs I will want to read it.
 9                   THE COURT:  You want to read it or do you want — do
10     you want it read publicly?
11                   THE DEFENDANT:  If it's possible to be read
12     publicly.
13                   THE COURT:  I'm sorry?
14                   THE DEFENDANT:  If it's possible to read it in
15     public, the two or three paragraphs that —
16                   THE COURT:  Is there a portion of the Indictment
17     that you don't understand?
18                   THE DEFENDANT:  The same thing.  First of all, it's
19     the same like I was trying to explain to the Court on the last
20     time, on the last arraignment, that there is many, many things
21     in the Indictment that's — that is, first of all, not true,
22     and also it's, one example, they're charging me with
23     conspiracy since December 18 until March — until March 21.
24                   THE COURT:  All right.  So, this is not — as I've
25     said to you, this is an accusatory instrument that lays out
```

1   the charges against you, all right.  Whether or not you agree
2   with it is not really the issue before us.  Whether or not you
3   believe it contains true and accurate statements is not really
4   relevant.

5           The purpose of this is to put you on notice of the
6   allegations which the Government believes you participated
7   in, all right, the crimes that you participated in, so that
8   you're fully informed and so that you can begin to defend
9   yourself against those allegations.  All right.  It's to put
10  you on notice, all right.  So, the only question that I have
11  for you at this time is whether or not you've read the
12  Superseding Indictment.

13          THE DEFENDANT:  Yes.

14          THE COURT:  All right.  And whether or not you wish
15  to have the charges contained in the Indictment publicly read
16  out loud, or whether or not you want those allegations —— or
17  you don't need to have them read out loud and therefore you're
18  waiving the public reading of the allegations.

19          Why don't you consult with standby counsel for a
20  moment or two and inquire whether or not you want to have it
21  read publicly or whether or not you're waiving the public
22  reading of the Indictment.

23          (Defendant conferring with standby counsel)
24          THE COURT:  Also, Mr. Malka, before —— I see you
25  have been consulting with standby counsel.  You do have the

Sue Ghorayeb,  Official Court Reporter

1    Yiddish interpreter here.  If there's any part of that

2    document or if you want the entire document read to you or

3    translated, you can have that done.  We can have that done.

4    So, if you want the assistance of the Yiddish interpreter, you

5    can request it at this time.

6              THE DEFENDANT:  Okay.

7              (Defendant consulting with counsel)

8              THE DEFENDANT:  Your Honor, I'm waiving the right to

9    read it in publicly the whole Indictment, but just that — but

10   just the three, three or four changes in the Indictment, this

11   paragraphs I want to read in public.

12             THE COURT:  So, you want just portions of the

13   Indictment read publicly into the record?

14             THE DEFENDANT:  Yes, Your Honor.

15             THE COURT:  Okay.  What paragraphs are those?

16             THE DEFENDANT:  First one is on Page 7, Paragraph

17   15.

18             THE COURT:  That pertains to the charge which

19   relates to Defendants' kidnap the minors from New York,

20   correct?

21             THE DEFENDANT:  Yes.

22             THE COURT:  And you're saying you want Paragraph 15

23   read into the record publicly?

24             THE DEFENDANT:  Yes.

25             THE COURT:  And what else?

1                    THE DEFENDANT:  And Page 8, Paragraph 17, in the

2      bottom, the change -- there were change in this Indictment.

3                    THE COURT:  So, basically, it's the background

4      information and not necessarily all of the counts, is that

5      what you're asking?

6                    THE DEFENDANT:  Just the three changes that is — it

7      didn't was by the — by the last Indictment.

8                    THE COURT:  Okay.  And what other paragraph?

9                    THE DEFENDANT:  The last one is on Page 14 and

10     Paragraph 25.

11                   MR. VITA:  24-g.

12                   THE COURT:  I'm sorry.  Which paragraph?

13                   THE DEFENDANT:  20-G.

14                   MS. BAGLIEBTER:  Your Honor, if I may, my

15     understanding of what the Defendant is seeking is to — it

16     appears that he is seeking to read the things that have been

17     taken out of the S2 Indictment and are not in the S3

18     Indictment.  So, I think the paragraphs that he's asking you

19     to read aligning to the S3 may not accomplish what he's

20     seeking, because he's trying to identify the changes between

21     the S-2 and the S-3.

22                   THE COURT:  Just so that we have a complete record,

23     I'm going to ask the Government to read the Indictment into

24     the record.

25                   MS. BAGLIEBTER:  The entire Indictment?

                     Sue Ghorayeb,  Official Court Reporter

1              THE COURT:  Yes.

2              MS. BAGLIEBTER:  Okay.  Okay.  This is Superseding

3     Indictment S-3 19-CR-497.

4              "Count One" is "Conspiracy to Transport A Minor

5     with Intent to Engage in Criminal Sexual Activity.

6              "The Grand Jury charges:  OVERVIEW

7              "1.  The charges set forth herein stem from the

8     role of NACHMAN HELBRANS, MAYER ROSNER, YAKOV WEINGARTEN

9     a/k/a "YAAKOV," a/k/a "YANKEV NACHUM," a/k/a "YAKOV NACHUM,"

10    SHMIEL WEINGARTEN, and YOIL WEINGARTEN, a/k/a "YOLE," a/k/a

11    "YOEL," the Defendants, in a conspiracy to sexually exploit a

12    minor girl ("Minor-1").

13             "2.  NACHMAN HELBRANS, MAYER ROSNER, YAKOV

14    WEINGARTEN a/k/a "YAAKOV," a/k/a "YANKEV NACHUM," a/k/a

15    "YAKOV NACHUM," SHMIEL WEINGARTEN, and YOIL WEINGARTEN, a/k/a

16    "YOLE," a/k/a "YOEL," the Defendants, are all U.S. citizens

17    and senior leaders of Lev Tahor, an extremist Jewish sect

18    based in Guatemala.

19             "In or about December 2018, HELBRANS, ROSNER, and

20    the WEINGARTENS enlisted other members of Lev Tahor,

21    including MORDECHAY MALKA, ARON ROSNER, a/k/a "AARON," and

22    JACOB ROSNER, a/k/a "CHAIM ROSNER," the Defendants, to kidnap

23    Minor-1 and her younger brother ("Minor-2," and together with

24    Minor-1, the "Minors") in New York to reunite Minor-1 with

25    JACOB ROSNER, an adult, so that ROSNER and Minor-1 could

1    resume their sexual relationship in order to procreate.

2    Following an international manhunt, law enforcement recovered

3    the Minors in Mexico in or about late-December 2018.  In or

4    about March 2019, approximately four months later, HELBRANS,

5    YAKOV WEINGARTEN, and MATITYAU MOSHE MALKA, the Defendants,

6    attempted to kidnap Minor-1 again.  Approximately two years

7    later, in or about March 2021, a co-conspirator not named as

8    a defendant herein ("CC-1"), who is also a member of Lev

9    Tahor, attempted to kidnap the Minors for a third time.

10            "LEV TAHOR

11            "3.   The Defendants are all members of Lev Tahor,

12   an extremist Jewish sect currently based in Guatemala and

13   comprised of approximately 250 members.  The group was

14   founded in the 1980s by the father of NACHMAN HELBRANS, the

15   Defendant.  HELBRANS' father remained the leader of Lev Tahor

16   until his death in or about 2017, when HELBRANS took over and

17   became the sect's new leader.

18            "4.   In addition to NACHMAN HELBRANS, the

19   Defendant, Lev Tahor has a number of other senior leaders,

20   including MAYER ROSNER, YAKOV WEINGARTEN a/k/a "YAAKOV,"

21   a/k/a "YANKEV NACHUM," a/k/a "YAKOV NACHUM," SHMIEL

22   WEINGARTEN, and YOIL WEINGARTEN, a/k/a "YOLE," a/k/a "YOEL,"

23   the Defendants.  These individuals, among others, are known

24   within the community as the "Hanhala" (translation:

25   management) of Lev Tahor.  The Hanhala manages the

1    operational affairs of the community and controls every

2    aspect of the lives of Lev Tahor's adherents.  In addition,

3    the Hanhala enlists members of the community for specific

4    tasks, including the kidnapping of the Minors in this case.

5             "5.  After NACHMAN HELBRANS, the Defendant, and his

6    leadership team took over in or about 2017, they seized tight

7    control over the group and embraced several extreme

8    practices, including strict, invasive monitoring of members,

9    frequent beatings, and forced marriages of minors to adult

10   members.  Children in Lev Tahor are often subject to

11   physical, sexual, and emotional abuse.

12             "MINOR-1's RELIGIOUS MARRIAGE TO DEFENDANT JACOB

13   ROSNER.

14             "6.  In or about 2017, NACHMAN HELBRANS, the

15   Defendant, arranged to have Minor-1, his then-twelve-year-old

16   niece, engaged to be religiously "married" to JACOB ROSNER,

17   a/k/a "CHAIM ROSNER," the Defendant, who was eighteen years

18   old at the time.  JACOB ROSNER is the son of MAYER ROSNER,

19   the Defendant, a Lev Tahor community leader and a member of

20   the Hanhala.

21             "Minor-1 and JACOB ROSNER were religiously

22   "married" the following year when she was thirteen and he was

23   nineteen, at which point, they immediately began a sexual

24   relationship with the goal of procreation.  Minor-1 and JACOB

25   ROSNER were never legally married.

1             "7.  All brides in the Lev Tahor community- no

2     matter their age- are required to have sex with their

3     husbands on predetermined intervals.  New brides and grooms

4     are also provided a tutorial before marriage instructing them

5     on when and how to have sex with their spouse, and the Lev

6     Tahor leadership directed young girls to tell people outside

7     of Lev Tahor that they were not married, to pretend to be

8     older, and to deliver babies inside their homes instead of at

9     a hospital, partially to conceal their young ages from the

10    public.

11            "THE DEFENANTS KIDNAP THE MINORS FROM NEW YORK

12            "8.  In or about October 2018, the mother of the

13    Minors (the "Mother"), who is also the sister of NACHMAN

14    HELBRANS, the Defendant, determined that it was no longer

15    safe for her children to remain in the Lev Tahor community in

16    Guatemala under the authority of her brother.  The Mother

17    escaped from the group's compound and arrived in the United

18    States in early November 2018.

19            "On or about November 14th, 2018, a Temporary Order

20    of Custody and a Temporary Order of Protection were issued in

21    Kings County Family Court (in Brooklyn, New York) granting

22    the Mother temporary custody of her six children, including

23    the Minors.  Those orders also prohibited the children's

24    father, a leader within Lev Tahor who is not named as a

25    Defendant herein, from having any communication with the

1   children.

2            "9.   After the Mother fled Guatemala and settled in

3   New York with her children, NACHMAN HELBRANS, MAYER ROSNER,

4   YAKOV WEINGARTEN a/k/a "YAAKOV," a/k/a "YANKEV NACHUM," a/k/a

5   "YAKOV NACHUM," SHMIEL WEINGARTEN, YOIL WEINGARTEN, a/k/a

6   "YOLE," a/k/a "YOEL," MORDECHAY MALKA, ARON ROSNER, a/k/a

7   "AARON," and JACOB ROSNER, a/k/a "CHAIM," the Defendants, and

8   others known and unknown, devised a plan to return the

9   Minors, then fourteen and twelve years old, to Lev Tahor.

10           "10.   At approximately 3:00 a.m., on or about

11   December 8th, 2018, NACHMAN HELBRANS, SHMIEL WEINGARTEN,

12   MORDECHAY MALKA, and JACOB ROSNER, a/k/a "CHAIM," the

13   Defendants, and others known and unknown, executed that plan

14   and kidnapped the Minors from a home in Woodridge, New York.

15           "11.   NACHMAN HELBRANS, SHMIEL WEINGARTEN,

16   MORDECHAY MALKA, and JACOB ROSNER, a/k/a "CHAIM," the

17   Defendants, and others known and unknown, took the Minors to

18   a hotel where the children were given new clothes to change

19   into before being driven to Scranton International Airport in

20   Pennsylvania.   HELBRANS also gave the Minors airplane tickets

21   and showed them passports bearing the names of two children

22   of HELBRANS, since the Mother possessed the Minors' actual

23   passports.

24           "HELBRANS and the Minors, using disguises meant to

25   conceal their identities, proceeded through airport security

1   in Scranton.  They then flew to Washington D.C., then to

2   Texas, and then took a bus across the border to Mexico.

3   Other Defendants, including SHMIEL WEINGARTEN, MORDECHAY

4   MALKA, and JACOB ROSNER, took separate routes out of the

5   country, all finding their way to Mexico.

6            "12.  Once in Mexico, NACHMAN HELBRANS, the

7   Defendant, and others known and unknown, transported the

8   Minors to several hotels and residences.  During this period,

9   the Defendants sought and received logistical help from

10  members of Lev Tahor in the United States, Mexico, and

11  Guatemala.  At various times, the Minors and HELBRANS were

12  met by other co-conspirators, including MAYER ROSNER, JACOB

13  ROSNER, a/k/a "CHAIM ROSNER," YOIL WEINGARTEN, a/k/a "YOLE,"

14  a/k/a "YOEL, and MATITYAU MOSHE MALKA, the Defendants, and

15  others known and unknown.

16           "13.  On or about December 27th, 2018, after a

17  three-week search involving scores of local, federal, and

18  international law enforcement entities, the Minors were

19  recovered in a hotel in Mexico.  At the time, they were

20  accompanied by SHMIEL WEINGARTEN and YOIL WEINGARTEN, a/k/a

21  "YOLE," a/k/a "YOEL, the Defendants.

22           "14.  At the time of the December 2018 kidnapping,

23  Lev Tahor leadership was seeking asylum for the entire Lev

24  Tahor community in the Islamic Republic of Iran.

25               "FURTHER ATTEMPTS TO KIDNAP THE MINORS BY LEV TABOR

1    MEMBERS

2             "15.  In or about March 2019, approximately three

3    months after the Minors were recovered in Mexico, NACHMAN

4    HELBRANS, YAKOV WEINGARTEN, a/k/a "YAAKOV," a/k/a "YANKEV

5    NACHUM," a/k/a "YAKOV NACHUM," and MATITYAU MOSHE MALKA, the

6    Defendants, and others known and unknown, attempted to kidnap

7    Minor-1 a second time.

8             "16.  In or about March 2021, CC-1, a member of Lev

9    Tahor, approached the Minors in New York and attempted to

10   kidnap them once again.  At the time of this attempted

11   kidnapping, CC-1 possessed three bus tickets from New York to

12   Georgia, drop phones, children's clothing, and birth

13   certificates for two children of ages similar to the Minors.

14   By late March 2021, CC-1 had returned" — to Lev Tahor — "to

15   the Lev Tahor compound in Guatemala.

16            "STATUTORY ALLEGATIONS

17            "17.  From at least on or about December 5th, 2018

18   up to and including at least on or about December 27th, 2018,

19   in the Southern District of New York and elsewhere, NACHMAN

20   HELBRANS, MAYER ROSNER, YAKOV WEINGARTEN a/k/a "YAAKOV,"

21   a/k/a "YANKEV NACHUM," a/k/a "YAKOV NACHUM," SHMIEL

22   WEINGARTEN, and YOIL WEINGARTEN, a/k/a "YOLE," a/k/a "YOEL,"

23   the Defendants, and others known and unknown, would and did

24   knowingly transport an individual who had not attained the

25   age of 18 years in interstate and foreign commerce with the

1    intent that the individual engage in" –– criminal –– "engage

2    in sexual activity for which any person can be charged with a

3    criminal offense, and conspired to do so, to wit, HELBRANS,

4    ROSNER, YAKOV WEINGARTEN, SHMIEL WEINGARTEN, and YOIL

5    WEINGARTEN devised and executed a plan to transport Minor-1

6    from New York to Pennsylvania and other states en route to

7    Mexico and Guatemala with a dominant motive of reuniting her

8    with JACOB ROSNER so that they would engage in criminal

9    sexual activity, namely, sexual activity for which a person

10   can be charged with a criminal offense under New York Penal

11   Law Section 130.30, the Penal Code of the State of Mexico,

12   Article 273, the Penal Code of Guatemala, and Title 18,

13   United States Code, Section 2423(c).

14            "COUNT TWO

15            "(Conspiracy to Travel with Intent to Engage in

16   Illicit Sexual Conduct)

17            "The Grand Jury further charges:

18            "18.   The allegations contained in Paragraphs 1

19   through 16 of this Indictment are repeated and realleged as

20   if fully set forth within.

21            "19.   From at least on or about December 5th, 2018

22   up to and including at least on or about December 27th, 2018,

23   in the Southern District of New York and elsewhere, NACHMAN

24   HELBRANS, MAYER ROSNER, YAKOV WEINGARTEN a/k/a "YAAKOV,"

25   a/k/a "YANKEV NACHUM," a/k/a "YAKOV NACHUM," SHMIEL

1    WEINGARTEN, and YOIL WEINGARTEN, a/k/a "YOLE," a/k/a "YOEL,"
2    the Defendants, and others known and unknown, would and did
3    knowingly travel in interstate commerce with a motivating
4    purpose of engaging in illicit sexual conduct, and conspired
5    to do so, to wit, HELBRANS, ROSNER, YAKOV WEINGARTEN, SHMIEL
6    WEINGARTEN, and YOIL WEINGARTEN devised and executed a plan
7    to travel and transport Minor-1, then fourteen years old,
8    from New York to Pennsylvania and other states en route to
9    Mexico and Guatemala with a motivating purpose of reuniting
10   her with JACOB ROSNER, then twenty years old, so that they
11   would engage in illicit sexual conduct, namely, a sexual act
12   with a person under eighteen years of age that would be in
13   violation of Title 18, United States Code, Section 2243(a)
14   (which prohibits knowingly engaging in a sexual act with a
15   person under sixteen who is at least four years younger than
16   the person so engaging) if the sexual act occurred in the
17   special maritime and territorial jurisdiction of the United
18   States."  And that's "Title 18, United States Code, Sections
19   2423(b) and (e).
20              "COUNT THREE
21              "(Conspiracy to Kidnap, Unlawfully Use a Means of
22   Identification, and Enter by False Pretenses the Secure Area
23   of an Airport)
24              "The Grand Jury further charges:
25              "20.   The allegations contained in Paragraphs 1

1    through 16 of this Indictment are repeated and realleged as

2    if fully set forth within.

3              "21.  From at least on or about December 5th, 2018

4    up to and including at least on or about March 16th, 2021, in

5    the Southern District of New York and elsewhere, NACHMAN

6    HELBRANS, MAYER ROSNER, YAKOV WEINGARTEN a/k/a "YAAKOV,"

7    a/k/a "YANKEV NACHUM," a/k/a "YAKOV NACHUM," SHMIEL

8    WEINGARTEN, YOIL WEINGARTEN, a/k/a "YOLE," a/k/a "YOEL,"

9    MORDECHAY MALKA, ARON ROSNER, a/k/a "AARON," JACOB ROSNER,

10   a/k/a "CHAIM ROSNER," and MATITYAU MOSHE MALKA, the

11   Defendants, and others known and unknown, willfully and

12   knowingly did combine, conspire, confederate, and agree

13   together and with each other to commit offenses against the

14   United States, to wit, international parental kidnapping, in

15   violation of Title 18, United States Code, Section 1204,

16   unlawful transfer, possession, and use of a means of

17   identification, in violation of Title 18, United States Code,

18   Section 1028(a)(7), and entry by false pretenses to any

19   secure area of any airport, in violation of Title 18, United

20   States Code, Section 1036.

21             "22.  It was a part and object of the conspiracy

22   that NACHMAN HELBRANS, MAYER ROSNER, YAKOV WEINGARTEN a/k/a

23   "YAAKOV," a/k/a "YANKEV NACHUM," a/k/a "YAKOV NACHUM," SHMIEL

24   WEINGARTEN, YOIL WEINGARTEN, a/k/a "YOLE," a/k/a "YOEL,"

25   MORDECHAY MALKA, ARON ROSNER, a/k/a "AARON," JACOB ROSNER,

1    a/k/a "CHAIM ROSNER," and MATITYAU MOSHE MALKA, the

2    Defendants, and others known and unknown, would and did

3    remove and retain two children, Minor-1 and Minor-2, who had

4    been in the United States, outside the United States, with

5    intent to obstruct the lawful exercise of parental rights, in

6    violation of Title 18, United States Code, Section 1204.

7              "23.  It was a part and object of the conspiracy

8    that NACHMAN HELBRANS, the Defendant, and others known and

9    unknown, would and did knowingly transfer, possess, and use,

10   in and affecting interstate and foreign commerce, without

11   lawful authority, a means of identification of another

12   person, knowing that the means of identification belonged to

13   another actual person, with the intent to commit, and to aid

14   and abet, and in connection with any unlawful activity that

15   constitutes a violation of Federal law or that constitutes a

16   felony under any applicable State or local law, to wit, on or

17   about December 8, 2018, HELBRANS used his own children's

18   identities to unlawfully evade airport security by pretending

19   that Minor-1 and Minor-2 were his children, in order to

20   unlawfully remove Minor-1 and Minor-2 from the United States,

21   with intent to obstruct the lawful exercise of parental

22   rights, all in violation of Title 18, United States Code,

23   Section 1028(a)(7).

24             "24.  It was a part and object of the conspiracy

25   that NACHMAN HELBRANS, the Defendant, and others known and

1    unknown, would and did, by fraud and false pretense, enter

2    and attempt to enter any secure area of any airport, with

3    intent to commit a felony, to wit, on or about December 8th,

4    2018, HELBRANS fraudulently portrayed Minor-1 and Minor-2 as

5    his own children in order to enter the secure area of Wilkes

6    Barre Scranton International Airport, in order to unlawfully

7    remove Minor-1 and Minor-2 from the United States, with

8    intent to obstruct the lawful exercise of parental rights,

9    all in violation of Title 18, United States Code, Section

10   1036.

11            "Overt Acts

12            "25.   In furtherance of the conspiracy and to

13   effect the illegal objects thereof, the following overt acts,

14   among others, were committed in the Southern District of New

15   York and elsewhere:

16            "a.   On or about December 5th, 2018, MORDECHAY

17   MALKA, the Defendant, rented a car for the purpose of

18   transporting the Minors.

19            "b.   On or about December 5th, 2018, JACOB ROSNER,

20   a/k/a "CHAIM ROSNER," SHMIEL WEINGARTEN, and MORDECHAY MALKA,

21   the Defendants, drove to a retail store to purchase clothing

22   that the Minors could wear during the kidnapping to hide that

23   they were ultra-Orthodox Jews.

24            "c.   On or about December 8th, 2018, NACHMAN

25   HELBRANS, MAYER ROSNER, SHMIEL WEINGARTEN, MORDECHAY MALKA,

1   and JACOB ROSNER, the Defendants, kidnapped the Minors from a

2   residence in the Village of Woodridge, Sullivan County, New

3   York, where they were staying with the Mother.

4           "d.  On or about December 8th, 2018, NACHMAN

5   HELBRANS, the Defendant, used his own children's identities

6   to allow the Minors to enter the secure area of an airport,

7   board an aircraft, and ultimately to leave the United States.

8           "e.  On or about December 7th, 8th, 9th, and 19th,

9   2018, ARON ROSNER, a/k/a "AARON," the Defendant, sent money

10  to co-conspirators via Google Pay in order to facilitate the

11  removal and retention of the Minors.

12          "f.  On or about December 16th, 2018, MAYER ROSNER,

13  the Defendant, called a co-conspirator not named as a

14  defendant herein ("CC-2") to convince him to come to Mexico

15  to evade law enforcement.

16          "g.  In or about March 2019, MATITYAU MOSHE MALKA,

17  the Defendant, provided Minor-1 with a cellular telephone in

18  order to facilitate her removal and retention.

19          "h.  In or about March 2021, CC-1 approached the

20  Minors and attempted to take them back to Guatemala.

21          "(Title 18, United States Code, Section 371.)

22          "COUNT FOUR

23          "(International Parental Kidnapping)

24          "The Grand Jury further charges:

25          "26.  The allegations contained in Paragraphs 1

Sue Ghorayeb,  Official Court Reporter

1   through 16 and Paragraph 27 of this Indictment are repeated

2   and realleged as if fully set forth within.

3           "27.  From at least on or about December 8th, 2018

4   up to and including at least on or about December 27th, 2018,

5   in the Southern District of New York and elsewhere, NACHMAN

6   HELBRANS, MAYER ROSNER, YAKOV WEINGARTEN a/k/a "YAAKOV,"

7   a/k/a "YANKEV NACHUM," a/k/a "YAKOV NACHUM," SHMIEL

8   WEINGARTEN, YOIL WEINGARTEN, a/k/a "YOLE," a/k/a "YOEL,"

9   MORDECHAY MALKA, ARON ROSNER, a/k/a "AARON," and JACOB

10  ROSNER, a/k/a "CHAIM," the Defendants, did remove and retain

11  a child, who had been in the United States, outside the

12  United States, with intent to obstruct the lawful exercise of

13  parental rights, to wit, HELBRANS, MAYER ROSNER, YAKOV

14  WEINGARTEN, SHMIEL WEINGARTEN, YOIL WEINGARTEN, MORDECHAY

15  MALKA, ARON ROSNER, and JACOB ROSNER, removed and retained

16  Minor-1 outside the United States and away from her mother,

17  who was lawfully in custody of Minor-1, and aided and abetted

18  the same.

19          "(Title 18, United States Code, Sections 1204(a)

20  and 2.)

21          "COUNT FIVE

22          "(International Parental Kidnapping)

23          "The Grand Jury further charges:

24          "28.  The allegations contained in Paragraphs 1

25  through 16 and Paragraph, 27 of this Indictment are repeated

1    and realleged as if fully set forth within.

2         "29.  From at least on or about December 8th, 2018

3    up to and including at least on or about December 27th, 2018,

4    in the Southern District of New York and elsewhere, NACHMAN

5    HELBRANS, MAYER ROSNER, YAKOV WEINGARTEN a/k/a "YAAKOV,"

6    a/k/a "YANKEV NACHUM," a/k/a "YAKOV NACHUM," SHMIEL

7    WEINGARTEN, YOIL WEINGARTEN, a/k/a "YOLE," a/k/a "YOEL,"

8    MORDECHAY MALKA, ARON ROSNER, a/k/a "AARON," and JACOB

9    ROSNER, a/k/a "CHAIM," the Defendants, did remove and retain

10   a child, who had been in the United States, outside the

11   United States, with intent to obstruct the lawful exercise of

12   parental rights, to wit, HELBRANS, MAYER ROSNER, YAKOV

13   WEINGARTEN, SHMIEL WEINGARTEN, YOIL WEINGARTEN, MORDECHAY

14   MALKA, ARON ROSNER, and JACOB ROSNER, removed and retained

15   Minor-2 outside the United States and away from his mother,

16   who was lawfully in custody of Minor-2, and aided and abetted

17   the same.

18         "(Title 18, United States Code, Sections 1204(a)

19   and 2.)

20         "COUNT SIX

21         "(International Parental Kidnapping)

22         "The Grand Jury further charges:

23         "30.  The allegations contained in Paragraphs 1

24   through 16 and Paragraph 27 of this Indictment are repeated

25   and realleged as if fully set forth within.

1          "31.  From at least on or about March 15th, 2019 up

2    to and including at least on or about March 25th, 2019, in

3    the Southern District of New York and elsewhere, NACHMAN

4    HELBRANS, YAKOV WEINGARTEN a/k/a "YAAKOV," a/k/a "YANKEV

5    NACHUM," a/k/a "YAKOV NACHUM," and MATITYAU MOSHE MALKA, the

6    Defendants, did attempt to remove and retain a child, who had

7    been in the United States, outside of the United States, with

8    intent to obstruct the lawful exercise of parental rights, to

9    wit, NACHMAN HELBRANS, YAKOV WEINGARTEN, and MATITYAU MOSHE

10   MALKA attempted to remove and retain Minor-1 outside the

11   United States and away from her mother, who was lawfully in

12   custody of Minor-1, and aided and abetted the same.

13          "(Title 18, United States Code, Sections 1204(a)

14   and 2.)"

15          THE COURT:  Before the Assistant U.S. Attorney

16   continues, sir, do you want her to read the forfeiture

17   allegations and the substitute asset provisions?

18          THE DEFENDANT:  I think it's not necessary.

19          THE COURT:  Okay.  So, so that the record is clear,

20   the substantive counts of the Indictment, Pages 1 through 16

21   have been read into the record, and the Defendant is not

22   requesting that the forfeiture allegation nor the substitute

23   asset provisions of the Indictment be read into the record.

24          All right.  Let's proceed then.  The charges as

25   they are set forth in the Superseding Indictment, how do you

1    wish to plead at this time, guilty or not guilty?

2             And you should consult with standby counsel before

3    you say anything further.

4             (Defendant conferring with counsel)

5             THE DEFENDANT:  I'm ready to put in a plea, but, but

6    because this is not a piece of paper, it's a Superseding

7    Indictment, and this is charges that the Government would put

8    on my shoulders, so I'm responsible to understand the charges

9    why the Government has put on my shoulders, but especially

10   that for, for each count, it's repeating that everything —

11   even the count that I am not charged with, everything gets

12   repeated and realleged as it put, exactly like, like it's —

13   even, even if — even if I didn't charge with it, but the

14   allegations it's still, it's still on me.  So, I want to

15   understand, especially when they're saying that I was, I

16   was — conspired together with co-defendant Nachman Helbrans

17   and, and Yakov Weingarten.  I know as a fact that nobody

18   was — did any conspiracy with me about that, and it's not

19   just about the conspiracy, they're charging me with from, from

20   December until March 2020 — 21.

21             THE COURT:  So, in essence, Mr. Malka, are you

22   denying the allegations?

23             You're saying that they never took place, correct?

24             THE DEFENDANT:  The allegations that the Government

25   put on me that it's a conspiracy from, from December of '18

Sue Ghorayeb,  Official Court Reporter

1  until March '21, I'm not understand.

2          THE COURT:  You're saying that that's a false

3  allegation?

4          THE DEFENDANT:  It's a false allegation because I

5  could not understand what I was have to do with the

6  December —

7          THE COURT:  Okay.

8          THE DEFENDANT:  — 2018.

9          THE COURT:  So, for purposes of a plea, you're

10  entering a not guilty plea on the Superseding Indictment.

11          All right.  So, now that the plea — a plea of not

12  guilty is entered on behalf of the Defendant on each and

13  every charge.  All right.  Let's move on, because Mr. Malka

14  indicated that he wants to make — he wants to have a de novo

15  bail application.

16          I'm going to address the Government and ask the

17  Government to address the Court with respect to the bail in

18  this matter.  And, Mr. Malka, I want you to pay attention

19  because you're going to be asked to address the Court as

20  well.

21          MS. BAGLIEBTER:  Thank you, Your Honor.  Your Honor,

22  the Government put in a letter on October 11th, yesterday,

23  setting forth the status of discussions between the Government

24  and Mr. Malka through his standby counsel.  So, the Court

25  is — that's the Government's general position, which is that

1    the parties have discussed to try and reach a proposed agreed

2    upon bail package, but we've reached an impasse on two

3    specific conditions, and that impasse has left us in a

4    position where, without those conditions, the Government does

5    not believe that there –– without those conditions, the

6    Government believes that the Defendant would be a risk of

7    flight and a danger to the community, and couldn't consent to

8    a bail package.

9              So, we would ask the Court to consider the proposed

10   bail package that the parties had discussed in advance of

11   today and to consider the two conditions that we have reached

12   an impasse on and make a ruling accordingly.

13             THE COURT:  Okay.  Can you address what those

14   conditions are?

15             MS. BAGLIEBTER:  Yes, Your Honor.  So, the two

16   conditions where we've resulted in an impasse are:  One, the

17   Government's position that the Defendant should not be able to

18   directly or indirectly associate or have contact outside the

19   presence of standby counsel with his co-defendants, and any

20   contact in the presence of standby counsel must be in a

21   language that standby counsel can understand.  This is a very

22   standard provision for a defendant in a multi-defendant case

23   who is out on bail.

24             I understand that while he is incarcerated, he does

25   have the ability to communicate with his co-defendants, but

1    when he's out on bail, more restrictive conditions in some

2    areas are needed in order to assure the safety of the

3    community and avoid a risk of flight, and, so, for that

4    reason, we think that that condition is necessary here.

5            We have been open to a compromise position where

6    the Defendant — because the Defendant is proceeding pro se,

7    where the Defendant would be able to have contact with his

8    co-defendants, in the presence of standby counsel, when

9    discussing joint defense matters, but — and that is our

10   attempt to, to reach a compromise position here.

11           The second condition is that the Defendant cannot

12   directly or indirectly associate or have contact with any

13   individual currently or formerly associated with Lev Tahor.

14   However, the Defendant can submit a list of names of people

15   associated with Lev Tahor to the Government and to Pretrial

16   Services for pre-approval for communications with those

17   people.  The Government in this case has previously required

18   that same condition for the other Defendant who is out on

19   bail without any limitations to it or without any carve-outs

20   to it.

21           Understanding that so much of the Defendant's

22   community and network and family is within Lev Tahor, we are

23   open to a carve-out here that would allow the Defendant to

24   have some interaction with the people in his life while he's

25   out on bail, and that all that we ask is a list of

1    preapproved names that would go to the Government and to

2    Pretrial Services.

3            My understanding from the Defendant's letter

4    submitted to the Court this morning is that he is unwilling

5    to agree to these conditions, and even if the Court were to

6    impose them, that he would be unwilling to abide by them.  If

7    that is the Defendant's position, then the Government does

8    not believe that there's any set of conditions that would

9    assure risk — that would assure his appearance in court and

10   the safety of the community.

11           THE COURT:  All right.  So, just to be clear, that

12   without those conditions, it's the Government's position that

13   Mr. Malka poses a risk of flight and a danger to the

14   community.  With respect to the risk of flight, why is it that

15   he poses such a risk?

16           MS. BAGLIEBTER:  Your Honor, the Defendant has very

17   minimal ties in the United States.  He spent the large

18   majority of his life in Guatemala.  He has mentioned some

19   family relations that are in the tristate area, but there is

20   no sense or no detail has been provided giving the Government

21   comfort that he would have a place to live here, that that

22   place would have people in his life that could provide for

23   moral suasion or serve the function that typically ties in

24   their jurisdiction or in the United States serve of

25   incentivizing the Defendant to stay here.  And, so, he

1    presents a very large risk of flight because of his minimal
2    ties to the United States, not to mention that the crime at
3    issue here involves crossing a border that we don't know how
4    it was crossed, it involves multiple — it involves efforts to
5    remove individuals out of the United States, which in and of
6    itself shows an unwillingness — the very crime itself shows
7    an unwillingness to follow court orders or a willingness to
8    act in contravention with court orders, and that, of course,
9    adds to the risk of flight concern.

10           On the dangerousness prong, the Defendant here was
11   in Mexico in December 2018 with the minor children and his
12   co-defendants after they had taken them from New York to
13   Mexico.  He was there when the house that they were in was
14   raided by Mexican law enforcement.  He was there when they
15   came back to the United States, and the other individuals
16   that he were with — he was with were arrested on charges in
17   this case.  The Defendant was not arrested at that time, but
18   he was certainly aware that individuals had been — his
19   co-conspirators had been engaging in conduct that was
20   illegal.

21           After that, several months after that, after the
22   children had been found and had been returned to New York,
23   the Defendant, along with two of his co-defendants, worked
24   together to attempt to kidnap the children again, and as
25   we've stated to Your Honor before and as Your Honor is aware

1    and is also in the Indictment, efforts to obstruct this

2    mother's parental rights have continued through this year.

3    And, so, there is real concern about danger to the community

4    if the Defendant is released and doesn't have strong enough

5    conditions on him that he is willing to abide by, that would

6    truly protect the safety of these victims.

7              THE COURT:  All right.  Thank you, Counselor.

8              Mr. Malka, there appears to be a showing that's

9    been made that, A, you constitute a risk of flight because

10   you have minimal to no contacts in the United States, that's

11   number 1, and, number 2, that you pose a danger to the

12   community by virtue of some of the — some of the conduct

13   that you've engaged in in this matter.  So, the Court would

14   like for you to address both issues.

15             THE DEFENDANT:  Yes, Your Honor.  I was working very

16   hard yesterday to prepare a statement to notify the Court

17   exactly about these two things and, and I was going to have

18   few people from — people from, from my community to help me

19   out to translate it from Yiddish to English.  It was very,

20   very hard, especially with this conditions in the jail, that

21   we don't have the minimum tools to prepare any document, and

22   even that the Court seen that there is three pages filed

23   today.  So, I want to put it clear in the record how it's

24   been, how it's been — how the work was done on this.

25             I was, I was on the phone together with — I

1    was —— I was writing it in Yiddish, then it was gone over

2    with some of my co-defendants to help me out, and then I

3    was —— then I was trying to get in touch with few people in

4    my community to translate it from Yiddish to English and then

5    to type it and to send it to my lawyer.  It took me at least

6    the whole day, since the morning until almost 9:30 in the

7    night yesterday to prepare it, and even after I have it ready

8    in my hand, it's not a 100 percent exactly.  If I will

9    have —— if I was have the tools in my hands so I was able to

10   try to announce it to the Court much more clearly, but —— and

11   I was trying to —— I was trying my best to, to answer the

12   Court exactly about these two things that Your Honor was just

13   asking.

14          So, I want to ask Your Honor please to allow me to

15   ask the interpreter to read this three pages, and I have an

16   explanation of the two things that the Government just ——

17   they just spoken now, but before that, I have to read you

18   this because this is my statement that ——

19          THE COURT:  Is that document different from that

20   which was filed with the Court?

21          THE DEFENDANT:  The same document that was filed

22   today, in the morning.

23          THE COURT:  Okay.  So, it's written in what

24   language?

25          THE DEFENDANT:  English.

Sue Ghorayeb,  Official Court Reporter

```
 1                THE COURT:  So, you want it read into the record?
 2                THE DEFENDANT:  I want to ask the interpreter to
 3      read it in the record.
 4                THE COURT:  You don't want to read it on the record?
 5                THE DEFENDANT:  It will be, it will be for me very
 6      hard to —
 7                THE COURT:  You want the interpreter to read this on
 8      your behalf into the record?
 9                THE DEFENDANT:  Yes, Your Honor.
10                THE COURT:  Okay.  Why don't you hand it to her.
11                You can sit down and read it.
12                THE INTERPRETER:  Let me turn this off because I
13      hear myself double here.
14                THE DEFENDANT:  "At our status conference September
15      23rd, 2021, the Court directed to pro se defendants Jacob
16      Rosner and Matityahu Malka to discuss and deal with the
17      prosecutors team regarding to get an agreement for the bail
18      proposal and conditions.  However, the defendants replied in
19      open court that some of the prosecution's top conditions would
20      be very unfair and even impossible for us or for any
21      reasonable person to accept those kind of conditions, because
22      it violates the defendants' most protected humanitarian and
23      constitutional rights and, therefore, it is not a starting
24      point.  Despite this, the Court still continued to direct the
25      defendants to discuss a future debate with the prosecution's
```

```
 1    team to get an agreement regarding the conditions, and on this

 2    background the Court scheduled a bail hearing for October 12,

 3    2021.

 4             "Your Honor, since the last conference, I tried in

 5    any possible way to follow the Court's directions and I had

 6    my standby counsel to approach the prosecution team in

 7    multiple times and we tried to get clarification with them

 8    and to get a compromise regarding our bail proposal as well

 9    (as the Court is aware, the defendants of this case tried

10    many times to beg the prosecution team and to explain to them

11    that it is simply unfair and against the interest of justice

12    from the prosecution team to oppose every bail request from

13    the defendants and particularly in this circumstances that

14    this defendants are, as incarcerated pro se defendants,

15    without any basic tools or means to compete with the

16    prosecution team and their bail oppositions, including not

17    even a possibility to respond effectively on the nine-page

18    bail opposition motion that the prosecution team filed

19    against of my previous bail hearing back in February, let

20    alone any other defense preparation).

21             "However, the initial respond" — response — "of

22    the government to my standby counsel when trying to deal

23    regarding the bail conditions was that they still strictly

24    want to focus particularly and only on those conditions that

25    the defendants clearly mentioned in the status conference
```

1  that" — is — "that it is violating their rights.  Still, we
2  tried to clarify to the prosecution team that we will accept
3  all reasonable conditions that the government proposed
4  and" — will oppose in the future — "and will" — excuse
5  me — "proposed and will propose in the future, but we begged
6  and cried to the government not to impose on us these two
7  conditions that violates all my basic rights as the simple
8  First Amendment right of freedom of religion and assembly, as
9  well as the Fifth and Sixth Amendment rights of due process,
10  fair process and fair trial.  The government responded that
11  they will discuss it and reconsider it and they will try to
12  get" — an arrangement — "an agreement of their office
13  regarding those conditions.

14          "In any way, we were convinced that after the
15  thirty months I am incarcerated already and after the new
16  discovery that I brought to the attention of the Court and
17  the government in the last status conference regarding my
18  minimal participation in the alleged acts in the Indictment
19  and, therefore, I raised my hope that the government was
20  going to stop their oppositions and the request of unfair
21  conditions.

22          "Today, October 11, 2021, just a few hours ago, I
23  heard by my standby counsel that the government had filed a
24  matter to the Court that though they will not oppose on bail
25  and they are not seeking detention, they are still continuing

1    to request those conditions mentioned above and they are

2    asking the Court should impose on me those two conditions

3    that we fought so much against it.  Namely, the condition

4    that I should not be allowed to talk or communicate with any

5    member of my community and even any person associated with my

6    community, and condition number two is that I am not going to

7    be allowed to talk to any of my pro se co-defendants in my

8    case.  Your Honor, there is no circumstances that I can agree

9    to those unfair conditions.  It violates all my rights and

10   the rights of my community.

11           "Regarding the government's first condition, Lev

12   Tahor is a religious community that I grew up in my entire

13   life.  It's a peaceful, lovely, Jewish community of kindly

14   men, women, and children who chose to practice the original

15   Jewish religion of their parents and grandparents, and the

16   only thing that my community, Lev Tahor, is engaging in is to

17   simply study and practice our Jewish religion and making a

18   living in their happy community in Guatemala.  In fact, this

19   is my only religious community and friends and relatives that

20   I am a part of since my childhood.  So, because the

21   prosecution team is engaging in a religious persecution

22   campaign against this pious Jewish community, it maliciously

23   decided to select and bring charges against eight (innocent)

24   individuals who are living in my community and, therefore,

25   automatically, all 300 men, women, and children of the

 1    community became criminals.  And, therefore, to mark and

 2    label a Jewish peaceful community as a gang/mafia/criminal

 3    group so far that it is causing me to be a flight risk and

 4    dangerous to the public only if I will even try to

 5    communicate with anyone of my community is outrageous, evil,

 6    and malicious motivated, and the only intention of the

 7    prosecution team in enforcing on me those conditions is

 8    to" — oblige — "obligate me to leave my holy original

 9    Jewish (extreme/isolate), who my parents and grandparents

10    (extremists) followed and practiced for generations after

11    generations for over 2,000 years and were therefore

12    persecuted for thousands of years, and here the prosecution

13    team is seeking to assimilate me and my children and to force

14    us to accept the prosecution's (mainstream modern/reform/-

15    normal) Jewish religion.

16            "This is clearly a hate crime and crime against

17    humanity and motivated by personal bias and hate from the

18    reform Jewish prosecutors against my original Jewish

19    community and, therefore, I will never let this to happen

20    and, of course, I will never agree on my own" — to violate—

21    "on my own will to violate all of our rights, my own rights,

22    my families' rights, and all rights from the 300 innocent

23    human beings of my community.  And even if the prosecution

24    team will seek detention and I would therefore have to stay

25    in jail another thirty months on top of the thirty months

1    that the government had already unjustifiably detained me and

2    my co-defendants I would be proud of it, the same as my

3    co-defendant Jacob Rosner was proud of refusing to agree to

4    those violations when the government was trying to force him

5    so — to force him so in his bail hearing in March 2020.

6            "Regarding the government's second condition, no

7    communication with my other co-defendants, my answer to this

8    is as I have said to the first one, because all of my

9    co-defendants are my religious community members and close

10   family.  In addition, as Rabbi Helbrans is my personal only

11   religious Rabbi that I have in this world for many years.

12   Moreover, this condition will extremely damage and eliminate

13   any ability to present my case and to have a fair trial and

14   due process.  Because, as the Court is aware, I am the

15   attorney on record in this case and representing myself as

16   pro se, the same that all of my co-defendants are material

17   witnesses to my case, and the same I am a witness in their

18   case, and I extremely rely on them regarding preparation of

19   my defense and to obtain many evidence in defense that only

20   they can provide me, in addition to affidavits or facts that

21   only they can provide, and only with them I can draft those

22   affidavits regarding" — all the — "to the alleged

23   conspiracy that allegedly we all conspired one with each

24   other.

25           "Therefore, in addition, me and my co-defendants

1    are secondary in English, and new law students.  For over

2    two-and-a-half years, we have spent most of the day together

3    and worked as a group in the jail to try to study and defend

4    our joint case, in the legal part to study the law in

5    general, and in particular the laws applicable to this case,

6    as well as to learn and research the factual part of the

7    case, including the review of the voluminous discovery

8    material.  Therefore, since our English and legal skills —

9    because of our English and legal skills limitations, we

10   strongly depend on each other's help.

11            "Moreover, due to the many obstacles and

12   restrictions imposed on the defendants incarcerated regarding

13   the defense preparations (see docket #217-1 and #320-1, 2),

14   we often are forced, because of the conditions, to divide

15   among ourselves the substantial work from the legal and

16   factual research, and very often (for the last 3 years) we

17   divide among ourselves the excessive amount of work for our

18   defense for the upcoming day/week; then, in the end of the

19   day/week, we all share among us our findings, and we

20   learn/teach each other the results of the specific

21   legal/factual topics that we have learned and/or discovered

22   during those research periods.  Therefore, our defenses are

23   extremely connected one" — with the other — "to each other

24   and we share the very same defense strategies and

25   legal/factual arguments.

 1                "Therefore, for all those reasons, to force me to

 2      accept those conditions is simply to guarantee to the

 3      prosecution team a guilty plea or at least a conviction,

 4      because I will simply be cut off of all my defense resources,

 5      evidence, witnesses, or any defense preparation, and

 6      therefore, this would directly violate my constitutional

 7      rights guaranteed to me by the Fourth, Fifth and Sixth

 8      Amendments, and therefore there is no starting point with

 9      these conditions as well.

10                "Nevertheless, with this statement, I want to

11      clarify to the Court in advance of my bail hearing, that if

12      the Court intends to impose on me one of these conditions, I

13      would not be able to accept it and to agree with them in any

14      way.  Moreover, in all other conditions that I did agree, it

15      is not because I believe it is even necessary, because I am

16      convinced that I can prove that not me and no — not any one

17      of my co-defendants are not flight risk or dangerous to any

18      person, let alone the minors of this case that we allegedly

19      helped them to escape from their captivity and their abuse.

20      And I would like to direct the Court's attention to exhibit

21      filed by Rabbi Helbrans in his motion filed on September 11,

22      2021, docket #339-8, and this is a letter that I worked very

23      hard for many months to draft back in February 2021 for my

24      previous bail hearing, and it has been done through video

25      screen-sharing (when we still had the possibility to do it

1    before the jail had restricted this tool and since then our

2    last opportunity to prepare something for the Court in

3    writing was totally eliminated), although this was originally

4    directed to Judge McCarthy and because all the restrictions

5    facing in jail, I was not able to finalize and submit timely

6    at this previous bail hearing in February.

7              THE COURT:  All right.  Thank you.

8              THE DEFENDANT:  Your Honor ——

9              THE COURT:  Okay.  So, I'm going to basically take a

10   moment to speak about another case that is scheduled to be

11   heard at 1:00 o'clock.  I have a matter that's on at

12   1:00 p.m., United States v. Curtis Lee.  It's a telephone

13   conference.  It's an initial appearance.  It's already just

14   past 1:00 o'clock.  So, I'm going to continue with this

15   hearing.  I'm going to ask those that have joined this matter

16   by telephone that they be patient with the Court, because we

17   still haven't completed the bail hearing on the matter that's

18   currently before the Court, that is in the matter of

19   19-CR-497.  So, those of you that are on the telephone line

20   waiting on the matter of United States v. Curtis Lee, Index

21   Number 21-CR-520, I'm going to ask you to remain patient and

22   just give us a couple of more minutes so that I can complete

23   the bail hearing and then move on to that matter.

24             THE DEFENDANT:  Yes.  Your Honor, I just wanna ——

25             THE COURT:  Mr. Malka, in addition to the statement

1    that you had the interpreter read into the record, do you want
2    to make an additional comment?

3            THE DEFENDANT:  Yes, Your Honor.

4            THE COURT:  Okay.

5            THE DEFENDANT:  About the — about this two
6    conditions that the Government just was requesting the Court
7    to, to put it on my behalf is, everything would — that I was
8    saying here is true, because my only way how I will be able to
9    defend my — to defend myself and to try to get a fair trial
10   is just if I will have an opportunity — if I will have
11   opportunity to talk to the co-defendants themself, because
12   each of us sharing the same —

13           THE COURT:  I understand that, Mr. Malka.  I don't
14   think the Government wished to totally cut you off.  I don't
15   think that that's a condition that I would agree to.  All
16   right.

17           So that the record is clear, the request is that
18   you have standby counsel present when you have those
19   conversations, and that those conversations take place in
20   English, so that the standby counsel can understand what's
21   taking place.  So, they are not trying to cut you off
22   completely.  The other thing is — so, I want the record to
23   to be clear.  You do have — you are entitled to speak to
24   witnesses, potential witnesses.  So, I understand that you
25   may want to speak to members of your community, that's not

1    something that I would restrict you from doing.  However, to

2    the extent that you have those conversations, those

3    conversations should take place also with the presence of

4    standby counsel and it should be — you should not be

5    precluded from having those conversations with potential

6    witnesses.  That's not something that I would agree to or

7    that I would impose upon you.  But there are some

8    restrictions that I believe the Government has raised that I

9    think are valid, and, therefore, what you've indicated to the

10   Court is that you're not prepared to abide by any of the

11   conditions that may be imposed —

12              THE DEFENDANT:  That's not correct.

13              THE COURT:  — that limits your communications with

14   the Defendants, all right, and that limits your communications

15   with your community.  So, that's what you've indicated by

16   virtue of your statement to the Court that was read into the

17   record, unless you're telling me something differently.

18              THE DEFENDANT:  Something differently, because just

19   it was not so clear written, because I have a lot of pressure

20   yesterday to finish it, to have it ready for the morning.  So,

21   because this, at the end of this letter, there's few things

22   that if I have more, more time, so I'll try to explain it more

23   clearly.

24              THE COURT:  Mr. Malka, I'm going to interrupt you

25   one more time, because, with all due respect, at our

1    conference on September 23rd, I alerted you to the fact that

2    there was going to be a bail hearing today.  So, when you said

3    you only had a day to put this together, I beg to differ.  My

4    calculation is that you had approximately two weeks, in excess

5    of two weeks, closer to 18 or 19 days to put this together,

6    and I've informed you and advised you and your colleagues that

7    you should make every effort to communicate with standby

8    counsel, so that they can provide you some legal advice with

9    respect to the standards that need to be applied and that will

10   be applied by the Court at these proceedings.  All right.

11            I'm not sure whether or not you availed yourself to

12   the services or resources of the standby counsel, I'm not

13   here to judge you on that.  However, when you make the

14   representation that you only had a day or so to prepare,

15   that's not a fair assessment, because you were told back on

16   September 23rd that such a hearing was going to take place,

17   all right, and we've also had prior — if I'm not mistaken,

18   you have appeared before the Magistrate Judge on a prior bail

19   application.  I believe it may have been Judge McCarthy, if

20   I'm not mistaken, and unless I'm mistaken, she applied the

21   same standard.  All right.

22            So, you've indicated you're not prepared to abide

23   by any set of conditions that the Court may impose that you

24   beg to differ from or that you believe compromises your

25   ability to represent yourself and/or impedes your ability to

1    communicate with your community, even if those are somewhat
2    limiting restrictions.  And I'm not saying that I would
3    impose total restrictions on you, because I do recognize that
4    you represent yourself.  You are entitled to confer with your
5    co-defendants to the extent that you may have similar
6    defenses, all right, and that there is a potential for
7    calling witnesses from your community, all right, that you
8    may want to have testify at trial.  So, I would not impose
9    severe restrictions, but there may be some restrictions on
10   your communications with your co-defendants and with your
11   community.

12            I will also say this though, that I do have
13   concerns, grave concerns about your ties to the United
14   States.  They relate to the risk of flight.  While you are an
15   American citizen from what I understand, you have very little
16   ties to the United States.  You've spent most of your time
17   outside of the United States.  So that raises grave concerns
18   to the Court with respect to your risk of flight.

19            Your community is not -- what you indicated that
20   you're very close to — is not within the United States, it
21   is abroad, it is in Guatemala, all right.  And, so, there is
22   concerns about your risk of flight and your ties to the
23   United States, and whether or not — if I do release you,
24   whether or not you would return as required.

25            Also, with respect to danger to the community, as

1    the Government has indicated and after reading rather the

2    Indictment, you are charged or — you are charged with being

3    a part of a conspiracy that not only removed the children on

4    one occasion, but that was involved in multiple attempts to

5    remove the children.

6             So, with that in mind, I find that given all the

7    factors that the Court must consider, one, you are a risk of

8    flight, you do pose a risk of flight, and, two, you do pose

9    danger to the community, all right, and you've indicated that

10   were the Court to set — impose a set of conditions and

11   require you to post bail, that you're not inclined to follow

12   them.

13            THE DEFENDANT:  I didn't —

14            THE COURT:  Well, Mr. Malka, I gave you, I gave you

15   an opportunity to not only file the document which was read

16   into the record, but I also gave you an opportunity to read

17   the document into the record.  You object to any conditions

18   that the Government may propose.

19            I asked you to — with the use of standby counsel

20   to try to negotiate conditions that might be acceptable to

21   the Government.  I've read your statement to, to believe that

22   if I were to set a — impose a set of conditions, that you

23   would not follow them.

24            THE DEFENDANT:  I think not —

25            THE COURT:  If you have ideological — you have

1    ideological reasons for not following them.  And with that

2    said, all right, I'm convinced that you would not follow any,

3    any conditions that I may, I may set.

4                    THE DEFENDANT:  It was my mistake.

5                    THE COURT:  So, I'm going to deny your application

6    for bail.  The Court finds that you impose — rather, that you

7    pose a flight risk and a danger to the community.  All right.

8                    And, also, just for the record, what is his

9    exposure if the Defendant were to be convicted of both

10   counts, which is, he's mentioned in Count One and in Count

11   Four?

12                   MS. BAGLIEBTER:  Your Honor, it's Count Three and

13   Count Six for the Defendant.  His maximum exposure is eight

14   years and the Guidelines range as the Government calculates it

15   is 46 to 57 months.

16                   THE COURT:  All right.  So, I'm just going to alert

17   the Government that there comes a time where, if his

18   Guidelines sentence is 46 to 57 months — he's been in for 36

19   months?  For how many months?  In excess of thirty months?

20                   THE DEFENDANT:  Thirty months.

21                   THE COURT:  That's correct?

22                   THE DEFENDANT:  Thirty months.

23                   THE COURT:  Thirty months.  I understand that the

24   allegations are serious, but we are getting close to that time

25   period where, you know, he's serving a considerable amount of

Sue Ghorayeb,  Official Court Reporter

1   time already or has served a considerable amount of time

2   already.

3           MS. BAGLIEBTER:  Your Honor, if I may, I just want

4   to note the Government agrees with the Court's assessment on

5   that and that is the motivating factor here in trying to work

6   towards a resolution with the Defendant where he could be

7   released out on bail on conditions that would make the Court

8   and the Government comfortable.  Unfortunately, we've been

9   unable to reach such a place.

10          THE COURT:  Mr. Malka, your — the reason I'm not

11  inclined to set bail is because you will not be able to follow

12  any set of conditions that I may set.

13          THE DEFENDANT:  It's not what I said.

14          THE COURT:  Well, with all due respect, that's —

15  your statement was pretty firm, all right, which is why I've

16  cautioned you, all right, I've cautioned you about what

17  statements you make to the Court.  I've cautioned you about

18  your decision to represent yourself and not to heed the advice

19  of standby counsel or even utilize the services of standby

20  counsel.  All right.

21          So, the statements that you make to the Court are

22  very important, very important.  So, I'll advise you to

23  reconsider your position on, one, representing yourself; two,

24  using the services of standby counsel.  All right.  They're

25  not just there to file documents on your behalf.  They should

1 be a source for legal advice.  So, I'm stressing that you

2 need to utilize their services as much as possible.  Take,

3 you know — you should, you know, use them as often as you

4 can.  All right.

5          Is there anything further we need to do?

6          If you want your standby counsel to communicate

7 with the Government and reconsider your position with respect

8 to certain conditions that may — that the Court may impose

9 or that the Government may suggest, and you're inclined to

10 adhere to those conditions, all right, you're more than

11 welcome to ask standby counsel to communicate with the

12 Government with respect to that aspect, and possibly, you

13 know, you can come back to me, all right, or even the

14 Magistrate Judge and make, you know, another bail

15 application.  But your statement seems pretty clear to me,

16 all right.

17          You have to be careful what you say to the Court.

18 You're not only a Defendant here, but you are serving as your

19 own attorney and your words, statements, and comments matter.

20 Do you understand me?

21          THE DEFENDANT:  Yes, Your Honor.  I want to make

22 sure to make it clear before I was beginning — I was asking

23 Your Honor to the permission to the interpreter to read it.

24 So, I was making clear that this document — this statement

25 that was filed, if I was have an opportunity to do it by my

1  own and not to —— to take time and not so much pressure that I

2  was unable to review it a 100 percent after it was already

3  typed, so it's not —— so, there's many things that I would be

4  able to explain it differently and especially about this point

5  that I'm —— I never even one ——

6          THE COURT:  Mr. Malka, you have every right to

7  represent yourself, but the law is a very complicated area,

8  especially the laws that you're charged with.  You have made

9  an affirmative decision to represent yourself, and I told you

10 from the very beginning that as such I will treat you like any

11 other attorney that appears before me.  You've made a decision

12 to represent yourself.

13         THE DEFENDANT:  That's right, but, but ——

14         THE COURT:  All right.  So, I have to take you at

15 your word and statements that you make matter.

16         THE DEFENDANT:  I make it clear to the Court before.

17         THE COURT:  Statements that you make matter.

18 Documents where you make —— where you make affirmative

19 statements and that you ask the Court to consider matter.

20         THE DEFENDANT:  But I was never —— I was never

21 told —— even, even one second was —— if the Court was to put

22 me on conditions and I solve it, I would never in my life

23 violate any conditions from any Court.

24         THE COURT:  Mr. Malka, that seems to be somewhat

25 different than the representation that you made previously on

1     the record, both orally and on your paper.  Statements that

2     you make to the Court matter.

3            THE DEFENDANT:  This is just because I didn't have

4     the minimum tools to do it by my own and I was supposed to —

5     I was supposed to have and take help, but I didn't.

6            THE COURT:  Mr. Malka.  Mr. Malka, you have standby

7     counsel available as a resource.  Whether or not you're

8     utilizing them, I can't say, because any communications that

9     you make — that you may have between you is confidential, I'm

10    not privy to, and they don't — they're not in a position to

11    inform the Court of any communications that you may have with

12    them.  They don't tell me what you say.  They don't tell me

13    what issues are discussed.  But they have been available to

14    you from the very first day when you represented to the Court

15    that you're making an affirmative decision to represent

16    yourself.

17           THE DEFENDANT:  That's right, but yesterday —

18           THE COURT:  They are there to provide you legal

19    advice.  Whether or not you're asking them for legal advice, I

20    don't know, but they have been present from the very beginning

21    that you asked to represent yourself.  As a matter of fact,

22    they've both appeared at each and every conference, and I know

23    that you communicate with them because they've filed documents

24    on your behalf.

25           THE DEFENDANT:  To file documents it's one thing,

1   but to type —

2          THE COURT:  Mr. Malka, you should be using them at

3   all times.

4          THE DEFENDANT:  I'm trying the most that's possible,

5   but standby counsel is very, very limited, and yesterday, when

6   I was — when I was trying to do this statement through the

7   standby counsel, so it was — I was unable to do it through

8   standby counsel this —

9          THE COURT:  Mr. Malka, you had more than a day.  I

10  reminded you on September 23rd that this hearing was going to

11  take place.  So, for you to tell me, "I didn't have enough

12  time to prepare," doesn't hold too much water with me.

13         THE DEFENDANT:  I was received the letter from the

14  Government just yesterday afternoon.  So, because of that, I

15  was going to reply on that.

16         THE COURT:  As your own attorney, you're responsible

17  for knowing what the standard is, the standards that the

18  courts have to consider at bail, and I know that you have

19  treatises, I know that you have certain books that talk about

20  bail, so you are responsible for that legal research.  You

21  also have resources by way of standby counsel.  You did not —

22  I don't know if you're availing yourself of them, but I rely

23  on the statements that you make before me.

24         I'm not going to repeat myself, all right.  I've

25  made a decision, all right.  If you want — if you're

1     prepared to reconsider your position, all right, I'll

2     consider it, but not now.

3                THE DEFENDANT:  I was, I was just making —

4                THE COURT:  Okay?

5                THE DEFENDANT:  Just to make clear with, with the

6     Court that after, after interpreter was finish it, I told for

7     the Court that this is not just only my statement.  I have a

8     verbal that I was preparing it by handwriting and I didn't

9     even start one word.  I have four pages of notes that I was —

10    I want to notify the Court about these two things and this was

11    just one part of it, and I was unable to do it.

12                THE COURT:  Okay.  So quickly tell me why you don't

13    pose a risk of flight.

14                THE DEFENDANT:  Because two things:  First of all,

15    even by the Guidelines of the Government, if I will escape —

16    if I will escape or, or run away from the country, definitely

17    for sure I will get more charges and more years, because I'm

18    violating the Court's order, so — and also because at the end

19    of my — of the trial — of the trial will be ready eleven

20    months from now, it will be way more than the Sentencing

21    Guidelines.  And about the risk of flight, to, to — it's

22    going to make sense that somebody that have a trial in eleven

23    months and by the date of the trial, even if, even if he found

24    guilty, God forbid, so then it's time served because he

25    already received the maximum he could?  So, for eleven months,

1   I should run away from the country?

2              I never said that I will not follow Your Honor's

3   order.  I'll follow all the orders, but just I want to talk

4   about these two conditions and to explain to Your Honor a

5   little bit more about these two conditions, why.

6              THE COURT:  Mr. Malka, whatever conditions I set —

7   I may set is not for discussion.  If I set a condition, you

8   must follow it.  It's not for you to negotiate with the Court.

9   I do not negotiate with defendants or detained individuals who

10  are seeking bail.  I set the conditions and you either meet

11  them or you don't.  It is not a negotiation.

12             The Government proposes conditions and I may or may

13  not accept those requests or those proposals, but I set the

14  conditions, and you must be able to demonstrate to me that if

15  I set a condition, you will follow it.  You didn't

16  demonstrate that to me by virtue of your statement to the

17  Court, and this is why we're here.

18             I've made a decision.  If you're going to take a

19  different position, I suggest you consult with standby

20  counsel, so they could be better addressed and you can make a

21  better presentation to the Court.  Okay?

22             And if there's nothing further, we are in recess.

23             THE DEFENDANT:  I want, I want to say to Your Honor

24  that I never told even one time that I will not follow an

25  order.

1          THE COURT:  We have already addressed that.  Your

2    statement was clear to me.  I take you at your word and I am

3    not going to repeat myself.

4          You will have an opportunity now to go back and

5    speak with standby counsel, so that they can explain to you

6    what the standards are, and if you're going to take a

7    different position, you can come back and ask to see me

8    again, but I'm not going to go around in circles with you,

9    Mr. Malka.  You are now acting as your own attorney, I take

10   you at your word.  We are in recess.

11          (Case adjourned)

12

13

14

15

16

17

18

19

20

21

22

23

24

25