UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA,

    -against-

MATITYAU MOSHE MALKA and
MORDECHAY MALKA,

                     Defendants.

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: __05/11/2022__

S3 19-CR-497 (NSR)
(05) (09)

OPINION & ORDER

NELSON S. ROMÁN, United States District Judge:

This case involves the kidnapping of two minors, Minor-1 and Minor-2 (collectively, "the Minors"), from their Mother in New York by members of Lev Tahor, an insular religious community currently based in Guatemala, of which the Mother and the Minors were previously members. *Pro se* Defendants Matityau Moshe Malka and Mordechay Malka (collectively, the "Malkas") are members of Lev Tahor whom the Government charged in a six-count superseding indictment for their involvement in the kidnapping of the Minors.[1] ("S3," ECF No. 358.) A jury trial for the Malkas is scheduled on May 18, 2022.

Presently pending before the Court are the parties' motions in *limine* in anticipation of such jury trial: the Government's ("Gov't MIL," ECF No. 478), Mordechay's ("Mordechay MIL," ECF No. 494), and Matityau's ("MM 1st MIL," ECF No. 482; "MM 2nd MIL," ECF No. 506). For the

---

[1] The Government also charged Nachman Helbrans (01), Mayer Rosner (02), Aron Rosner (03), Jacob Rosner (04), Yakov Weingarten (06), Shmiel Weingarten (07), and Yoil Weingarten (08). With respect to Nachman Helbrans and Mayer Rosner, the Court has already sentenced them after a jury found them guilty of the offenses charged against them. On April 25, 2022, Jacob Rosner entered a guilty plea pursuant to an agreement with the Government. Aron Rosner is currently in the process of doing the same. With respect to Shmiel and Yakov Weingarten, they were extradited from Guatemala and made their first appearance before the magistrate judge on April 21, 2022. And finally, Yoil Weingarten has not yet appeared before this Court, as the Court understands that he is currently in custody in Guatemala awaiting extradition to the United States in connection with this matter.

Given that most of these defendants share the same last names, the Court will refer individually to the Defendants by their first name for the sake of clarity.

following reasons, the Court GRANTS IN PART, DENIES IN PART the Government's motions, and GRANTS IN PART, DENIES IN PART the Malkas' motions in *limine*.

## BACKGROUND

The following background derives from the Government's allegations as charged in the S3 Superseding Indictment and other relevant court filings.

### I.      Lev Tahor and the "Marriage" of Minor-1

All Defendants in this case are members of Lev Tahor, a Jewish religious community of about 250 members founded in the 1980s by Nachman Helbrans's father. (S3 ¶ 3.)  Nachman took over as the community's leader after his father passed away in 2016 or 2017. (*Id.*) Regardless of their age, all brides in the Lev Tahor community are required to have sex with their husbands on predetermined intervals and new brides and grooms are instructed by community leaders on when and how to have sex before they are married. (*Id.* ¶ 7.)

In 2017, Nachman arranged to have Minor-1, his then-twelve-year-old niece, engaged to be religiously "married" to Jacob Rosner, who was eighteen years old at the time. (*Id.* ¶ 6.) Minor-1 and Jacob were religiously "married" the following year when she was thirteen and he was nineteen. (*Id.*) They were never legally married. (*Id.*) They immediately began a sexual relationship with the goal of procreation. (*Id.*)

### II.     Mother and Minors relocate to the United States

In early November 2018, the Mother and her six children, including the Minors, left Lev Tahor and relocated to the United States. (*Id.* ¶ 8.)

On November 14, 2018, the Kings County Family Court in Brooklyn, New York (the "Family Court") granted the Mother temporary sole custody over her six children, including the Minors, and enjoined the children's father, Aaron Teller, a leader in the Lev Tahor community not

named as a defendant in this case, from having any communication with the children. (*Id.*) The orders of the Family Court are collectively referred to as "the Family Court Order."

## III.    December 2018

After the Mother and her children left Guatemala, the Defendants and others devised a plan to return the Minors, then fourteen and twelve years old, to Lev Tahor. (*Id.* ¶ 9.) At approximately 3:00 a.m., on December 8, 2018, Helbrans, Mordechay, Jacob, Shmiel Weingarten, and others removed the Minors from a home in Woodridge, New York. (*Id.* ¶ 10.) They, along with others, took the Minors to a hotel where they were provided with new clothes before they were driven to Scranton International Airport in Pennsylvania. Nachman and the Minors, dressed in secular clothing, and using passports bearing the names of two of Nachman's children proceeded through airport security in Scranton, flew to Washington, D.C., then to Texas, and then took a bus across the border to Mexico. (*Id.* ¶ 11.) Other Defendants, including Mordechay, Shmiel, and Jacob, took separate routes out of the country to Mexico. (*Id.*) Once in Mexico, Nachman and others transported the Minors to several hotels and residences with assistance from Lev Tahor members in the United States, Mexico, and Guatemala. At various times, Nachman and the Minors were met by Mayer Rosner, Jacob, Yoil Weingarten, Matityau, and others. (*Id.* ¶ 12.)

On December 18, 2018, Mexican law enforcement raided a house in San Miguel Tlaixpan, Mexico, and detained Nachman, Mayer, Jacob, and Matityau, among other individuals. On December 26, 2018, officials from Mexico's immigration authority, Instituto Nacional de Migración ("INM"), informed the FBI that INM had elected to deport Nachman, Mayer, Jacob, and Matityau—all of whom were and are U.S. citizens—from Mexico and deliver them into the custody of the FBI. On December 27, 2018, two INM officials accompanied Nachman, Mayer, Jacob, and Matityau on a commercial flight from Mexico City to New York. The FBI arrested Nachman, Mayer, and Jacob upon their arrival at John F. Kennedy International Airport (Minute

3

Entries dated December 27, 2018), pursuant to a complaint alleging that that they conspired to kidnap two victims. (Dkt No. 18 MJ 10939, ECF No. 1.)

On December 27, 2018, the Minors were recovered at a hotel in Mexico. (S3 ¶ 13.) At the time, the Minors were accompanied by Shmiel and Yoil Weingarten. (*Id*.) In December 2018, the entire Lev Tahor community was seeking asylum in Iran. (*Id.* ¶ 14.)

## IV.   March 2019

In March 2019, approximately three months after the Minors were recovered in Mexico, Helbrans, Yakov, Matityau, and others, attempted to remove Minor-1 a second time. (S3 ¶ 15.) On March 26, 2019, a complaint was filed charging Matityau with conspiracy to kidnap and conspiracy to obstruct justice in violation of 18 U.S.C. §§ 1201, 1512, and 2. (Dkt No. 19 MJ 3011, ECF No. 1.) Matityau was arrested the same day. (Minute Entry dated March 26, 2019.)

## V.   The 2019 Indictments

On July 8, 2019, the Government sought and obtained a four-count Indictment charging (1) all Defendants with conspiracy (i) to commit international parental kidnapping, (ii) to unlawfully use a means of identification, and (iii) to enter by false pretenses the secure area of an airport, in violation of 18 U.S.C. § 371; (2) all Defendants (except Mordechay) with two counts of international parental kidnapping (one for each Minor in the December Kidnapping), in violation of 18 U.S.C. § 1204; and (3)  Nachman, Matityau, and Yakov with another count of international parental kidnapping (for the March 2019 attempted kidnapping of Minor-1), in violation of 18 U.S.C. § 1204. The Government charged Mordechay, Yoil, Shmiel, and Yakov in a separate sealed superseding indictment containing the same counts and allegations, S1 19 Cr. 497 (ECF No. 52), because, at the time, these four Defendants were at-large. None of the indictments charge any of the Defendants with violating 18 U.S.C. § 1201.

## VI.    Hague Convention Proceedings

On May 29, 2019, Teller, the father of the Minors, filed a petition in the United States District Court for the Eastern District of New York ("the Hague Court"), under the Hague Convention on the Civil Aspects of International Child Abduction (the "Hague Convention"),[2] seeking the expedited return of his six children to Guatemala, including the Minors. (*Teller v. Helbrans,* 19 Civ. 3172 (SJB) (E.D.N.Y.) (the "Hague Case") at ECF No. 1.) On October 22, 2019, the Hague Court denied Teller's petition with prejudice, holding that Teller had "engaged in a pattern and practice of misconduct and paid little attention to and disregarded the obligations attendant to a litigant in a federal civil proceeding," because Teller had "repeatedly told [the court] that he [had] no intention of appearing for any trial," and that "[f]rom the start, Teller has resisted discovery, failed to attend any proceeding, and clearly never intended to appear in the United States." (Hague Case, ECF No. 110.)

On December 9, 2019, Teller filed a notice of appeal. (Dkt. No. 19-4063 (2d Cir.) at ECF No. 1.) On February 7, 2020, the Second Circuit dismissed the appeal because Teller failed to file a required form. (*Id*. at ECF No. 21).

## VII.    March 2021

In March 2021, Co-Conspirator-1 ("CC-1"), a member of Lev Tahor, approached the Minors in New York and attempted to remove them again. (S3 ¶ 16.) At the time, CC-1 possessed three bus tickets from New York to Georgia, drop phones, children's clothing, and birth certificates

---

[2]  "The Hague Convention, which was drafted in 1980 and, as of May 1995, had been ratified by forty-one nations, . . . was adopted in order "to protect children internationally from the harmful effects of their wrongful removal or retention and to establish procedures to ensure their prompt return to the State of their habitual residence, as well as to secure protection for rights of access." *United States v. Amer*, 110 F.3d 873, 881 (2d Cir. 1997) (quoting the Hague Convention, preamble).

for two children of ages similar to the Minors. By late March 2021, CC-1 had returned to Guatemala. (*Id.*)

## VIII. Relevant Procedural Background

On November 19, 2019, the Court set the initial schedule for pre-trial motions at a status conference on November 19, 2019. In February 2020, the Malkas requested a three-week extension of the briefing schedule (ECF Nos. 65 and 66), which the Court granted (ECF Nos. 67 and 68). On March 18, 2020, Jacob sought a one-month extension of the briefing schedule that the Malkas and the other defendants either joined or did not object to (ECF No. 74), which the Court granted (ECF No. 75).

On March 20, 2020, Matityau requested a hearing under *Faretta v. California,* 422 U.S. 806 (1975), for the Court to consider his application for *pro se* representation (ECF No. 81), which the Court granted and scheduled such hearing on April 28, 2020. (ECF No. 78.) Mordechay requested the same on April 2, 2020 (ECF No. 80), and the Court granted and scheduled such hearing for June 3, 2020. (ECF No. 82.)

By order dated April 6, 2020, in light of the COVID-19 pandemic, the Court, *inter alia,* once again extended the briefing schedule for the pre-trial motions to begin on May 20, 2020. (ECF No. 82.) On May 13, 2020, the Defendants requested a sixty-day extension of the pre-trial motion briefing schedule due to logistical impediments to attorney-client communication due to the COVID-19 pandemic (ECF No. 86), which the Court granted (ECF No. 87). In light of the COVID-19 pandemic, the limited resources of the courts, and the need to obtain a Yiddish interpreter, the Court also adjourned the *Faretta* hearings for Matityau to May 27, 2020, and for Mordechay to June 3, 2020. (*Id.*)

In mid-July 2020, the Defendants again requested a further one-week extension of the pre-trial motion schedule due to additional voluminous discovery that, due to the COVID-19

6

pandemic, the Defendants were delayed in accessing. (ECF Nos. 99 and 100.) The Court granted this extension. (ECF Nos. 101 and 103.) During a status conference on July 24, 2020, the Court again adjourned the *Faretta* hearings and indicated that it would extend the motion schedule due to additional anticipated discovery.

On November 20, 2020, Nachman, Matityau, and Mordechay filed their counseled pre-trial motions. Matityau moved (1) to dismiss the International Parental Kidnapping Crime Act ("IPKCA"), 18 U.S.C. § 1204, conspiracy and 2019 IPKCA counts of the Indictment; (2) to suppress statements he made to law enforcement prior to his arrest, (3) for *in camera* review of Grand Jury minutes; (4) for an order directing various Government disclosures; and (5) for permission to join in any motions filed by his co-defendants. (ECF No. 123.) Mordechay moved (1) for an order directing various Government disclosures; and (2) for permission to join in any motions filed by his co-Defendants. (ECF Nos. 125 & 126.)

On December 2, 2020, the Court issued an order confirming the extension of the Defendants' deadline to file their motions to December 4, 2020, directing the Government to file its opposition by February 5, 2021, and directing Defendants to file any replies by February 19, 2021. (ECF No. 130.) The Court also indicated that the scheduling of *Faretta* hearings would be addressed at the upcoming status conference. (*Id.*)

During a status conference on January 12, 2021, the Court directed that any additional pre-trial motions must be filed by January 22, 2021. At a status conference on January 29, 2021, Mayer and Nachman renewed their requests for *Faretta* hearings to be scheduled as soon as possible. On January 29, 2021 and February 5, 2021, the Court issued orders confirming the Government's disclosure obligations under *Brady v. Maryland*, 373 U.S. 83 (1963), and its progeny, which directed the Government to (1) disclose all *Brady* materials "to the defense promptly after its

existence becomes known to the Government so that the Government may make effective use of the information," and (2) disclose any impeachment information under *Giglio v. United States*, 405 U.S. 150 (1972), "sufficiently in advance of trial in order for the defendant to make effective use of it at trial." (ECF Nos. 153 and 168.) Following *Faretta* hearings, the Court granted the Malkas leave to represent themselves *pro se* and CJA counsel were appointed to serve as standby counsel. (ECF Nos. 195 & 196.)

On April 19, 2021, the Government filed a Superseding Indictment (S2). (ECF No. 229.) The Malkas and their co-Defendants were arraigned on the S2 Superseding Indictment in May and June 2021. During these proceedings, the Government indicated that it had provided Defendants with a Proposed Protective Order and that once the Defendants had executed the Proposed Protective Order, which the Government provided to the Defendants on or about May 12, 2021, the Government would produce the 3500 materials. (*See* Minute Entry dated May 20, 2021.)

On July 6, 2021, the Government informed the Court that it had made one additional discovery production consisting of (i) recently obtained jail records and video visits from Westchester County Jail, and (ii) materials related to the alleged March 2021 kidnapping by a member of Lev Tahor. (ECF No. 283.) The Government further indicated that it had provided the Defendants with a Proposed Protective Order on or about May 12, 2021 requiring their signatures, and that none of the *pro se* Defendants had signed and requested that the Court enter the Proposed Protective Order. (ECF No. 283.) On July 7, 2021, the Court entered the Protective Order. (ECF No. 285.)

On July 8, 2021, the Court issued an opinion and order denying with prejudice Defendants' counseled motions (1) to dismiss, (2) for a bill of particulars, (3) for *in camera* review of the grand jury minutes, and (4) for disclosure of the identities and statements of co-conspirators; and denying

without prejudice as premature and/or moot the Defendants' motions for orders directing pretrial disclosures of *Brady*, *Giglio*, 3500, and Rule 404(b) materials, and trial exhibits, demonstratives, and summary charts. (ECF No. 287, *United States v. Helbrans*, No. 19 Cr. 497 (NSR), 547 F. Supp. 3d 409 (S.D.N.Y. 2021).)

The Court repeatedly informed the Defendants before and after they were granted *pro se* status, that they would be permitted to supplement the counseled pretrial motions. On July 8, 2021, the Court set the briefing schedule for any non-duplicative pretrial motions the *pro se* Defendants wished to file, pursuant to which moving papers were due August 9, 2021. (ECF No. 291.)

By letter dated July 12, 2021, the Government stated that "on July 9, 2021, the Court instructed the Government (1) that a maximum of two defendants can be tried at once; (2) that the first trial in this case is scheduled for October 18, 2021; and (3) that the Government should submit a letter setting forth a proposal for which defendants should be tried together, and in what order." (ECF No. 299.) The Government indicated that the first trial would involve Nachman and Mayer. (*Id.*)

No supplemental pretrial motions from the Malkas were filed on the due date of August 9, 2021, nor was an extension of that deadline sought. On August 13, 2021, the Court issued an opinion and order denying the two pending suppression motions, one of which was filed by Matityau. ("Suppression Op." (ECF No. 309).)

On August 14, 2021, the Court issued an order (1) directing each *pro se* Defendant to confer with his standby counsel on or before Wednesday, August 18, 2021, to create a list of the motions he plans to file and for standby counsel to file those lists on or before Friday, August 20, 2021; (2) extending the time for all *pro se* Defendants to file their supplemental pre-trial motions to

August 31, 2021; and (3) confirming the trial date and setting the pretrial deadlines for the trial of Nachman and Mayer. (ECF No. 310.)

In compliance with the Court's order, the *pro se* Defendants through their standby counsel filed letters setting forth, *inter alia*, the motions they intend to file. (ECF Nos. 316, 317, 318, 319, and 320.) The Court directed the Government to respond to the "legal issues" raised in the Defendants' letters. (ECF No. 321.) The Government misconstrued the Court's order and only addressed the legal issues "apart from their [proposed] substantive motions," raised by the Defendants' letters (i) their alleged inability to file motions due to a purported lack of tools and resources at Westchester County Jail ("WCJ"); and (ii) the alleged constitutional violations posed by their alleged inability to speak in Court and the Court's "*ex parte*" orders. (ECF No. 327.) The Government indicated that it would not object to the Defendants' apparent requests to extend the motion deadline and to adjourn the current trial date of October 18, 2021. (*Id.*) The Court ordered the Government to respond to the substance of the Defendants' proposed supplemental motions.[3] (ECF No. 333.) The Government enumerated the motions proposed by the Defendants, emphasizing that each Defendant's letter indicated that his list was not exhaustive and characterized them as duplicative or remaining. (ECF No. 341.)

On September 28, 2021, the Government filed another Superseding Indictment (S3). (ECF No. 358.) In that Superseding Indictment, the Government charges Matityau with (i) conspiracy to commit international parental kidnapping, unlawfully use a means of identification, and enter by false pretenses the secure area of an airport, in violation of 18 U.S.C. § 371; and (ii) one count

---

[3] On September 11, 2021, Nachman filed a motion to disqualify the Court on the basis that in the early 1990s, well before I was on the federal bench, I served as an assistant district attorney in Brooklyn during a period that overlapped with the prosecution of Nachman's father by the Brooklyn District Attorney's Office. (ECF No. 339.) Following in-person argument on the motion during the September 13, 2021 status conference, the Court denied the motion.

of international parental kidnapping in connection with the attempted March 2019 kidnapping of Minor-1, in violation of in violation of 18 U.S.C. § 1204. The Government also charges Mordechay with (1) conspiracy to commit international parental kidnapping, unlawfully use a means of identification, and enter by false pretenses the secure area of an airport, in violation of 18 U.S.C. § 371; and (ii) two counts of international parental kidnapping (one for each minor) in connection with the December 2018 kidnapping of the Minors. (*Id.*) On November 10, 2021, a jury convicted Nachman and Mayer of all charges the Government brought against them.

On December 9, 2021, the Malkas were arraigned with respect to the charges brought against them in the S3 Superseding Indictment. That same day, after the arraignment, the Court scheduled a three-week jury trial for Jacob and Mordechay for May 18, 2022, and set the briefing schedule for the parties' motions in *limine* in which moving papers to be filed on March 18, 2022, opposition papers on April 1, 2022, and replies on April 15, 2022. The Court also scheduled a three-week jury trial for Aron and Matityau for June 21, 2022, and set the briefing schedule for the parties' motions in *limine* in which moving papers to be filed on April 29, 2022, opposition papers on April May 6, 2022, and replies on May 13, 2022.

On March 10, 2022, the Court held a status conference in which the Government proposed trying Matityau with Jacob and Mordechay because Aron was finishing discussions with the Government about a plea disposition for his case. The Court asked Matityau if he needed additional time to prepare for trial, but he could not give the Court a straight answer. Instead, Matityau restated all the difficulties he claims he had in preparing legal documents while incarcerated but did not ask the Court for any extensions. Accordingly, the Court held that Matityau would be tried with Jacob and Mordechay on May 16, 2022, and that all the briefing deadlines for Jacob and Mordechay's motions in *limine* also applied to him.

On March 18, 2022, the Government filed its motions *in limine*. (Gov't MIL, ECF No. 478.) That same day, Matityau filed his first set of motions *in limine* and also sought an extension of his deadline to file additional motions in *limine*. (MM 1st MIL, ECF No. 482.)  The Court granted the extension request and extended his deadline to March 25, 2022, while also making clear that no further extensions would be granted. (ECF No. 486.)

On March 22, 2022, Mordechay filed a letter styled as "motions to dismiss and in limine," which is joined by Matityau, and attached two supplemental motions and hundreds of pages of exhibits, including letters, affidavits, and media reports. (Mordechay MIL, ECF No. 494) Despite the deadline for filing pre-trial motions has long passed, Mordechay's letter seeks to dismiss the S3 Superseding Indictment on a variety of grounds, including by attacking the Family Court Order. (*See* ECF Nos. 494-1 & 494-2). His letter also references and seeks to incorporate motions filed by Nachman and Mayer (*see* Mordechay MIL at 13), which the Court has already decided, and re-hashes the same arguments the Court has already rejected (*see id.* at 3–9).

While Matityau missed the March 25, 2022 deadline to file additional motions, he nonetheless filed a second set of motions in *limine* on March 27, 2022 (MM 2nd MIL, ECF No. 506), which are also joined by Mordechay. Like Mordechay, Matityau's second set of motions seeks—well after the deadline for pre-trial motions—to dismiss the S3 Superseding Indictment on various grounds, including many grounds already rejected by the Court, including that: the Defendants lack access to adequate resources, Jacob and Minor-1 were legally married, and the Family Court Order was invalid and obtained by fraud, among others. On April 1, 2022, the Government filed its response in opposition to the Malkas' motions in *limine* and to dismiss. ("Gov't Resp. in Opp'n," ECF No 528.) On April 7, 2022, Jacob filed a response in opposition of the Government's motions in limine (ECF No. 533), which the Malkas joined (ECF Nos. 537 &

539).[4] On April 15, 2022, Matityau filed his reply ("MM Reply," ECF No. 544), which Mordechay

joined (ECF No. 548). That same day, the Government also filed its reply. ("Gov't Reply," ECF

No. 545.)[5]

## LEGAL STANDARDS

### I.   Admissibility of Evidence

The party seeking to introduce evidence bears the burden of establishing its relevance. *See*

*Dowling v. United States*, 493 U.S. 342, 351 n.3 (1990). Though the "standard of relevance

established by the Federal Rules of Evidence is not high," *United States v. Southland Corp.*, 760

F.2d 1366, 1375 (2d Cir. 1985), the Court has "broad discretion to balance probative value against

possible prejudice" under Rule 403, *United States v. Bermudez*, 529 F.3d 158, 161 (2d Cir. 2008).

With certain exceptions, all relevant evidence is admissible, and evidence which is not

relevant is not admissible. Fed. R. Evid. 402. Evidence is relevant if "it has any tendency to make

a fact more or less probable than it would be without the evidence . . . and the fact is of consequence

in determining the action." Fed. R. Evid. 401(a)-(b). Relevant evidence may still be excluded by

the Court "if its probative value is substantially outweighed by a danger of one or more of the

following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time,

or needlessly presenting cumulative evidence." Fed. R. Evid. 403; *see United States v. Hsu*, 669

F.3d 112, 119 (2d Cir. 2012) (noting that "[d]istrict courts have broad discretion to balance

---

[4] However, as explained above in footnote 1, Jacob Rosner has since then entered a guilty plea pursuant to an agreement with the Government. As such, the Court will consider the arguments made therein solely to the extent that his response in opposition is applicable to the Malkas' cases.

[5] On May 7, 2022, Matityau filed, without prior leave of court, a "supplementary" reply in support of his motions in *limine*. (ECF No. 612.) As Matityau did not request prior leave of court before filing this "supplementary reply, the Court does not consider such filing. And even if the Court were to consider its contents, Matityau's "supplementary" reply merely re-raises the same arguments from his other filings without anything new. In fact, Matityau appears to attempt to raise an argument challenging the circumstances surrounding the extradition of Shmiel and Yakov from Guatemala by attaching as exhibits certain legal documents in Spanish (without accompanying translations), none of which have any bearing whatsoever on Matityau's motions in *limine*.

probative value against possible prejudice"). Applying Rule 403, courts have routinely excluded evidence that, even if relevant, might improperly confuse the jury or influence jurors by unduly distracting their attention from the charged crimes through sympathy. *See, e.g.*, *United States v. Paccione*, 949 F.2d 1183, 1201 (2d Cir. 1991) (affirming district court's exclusion of evidence that defendant's son had cerebral palsy because such evidence "could well cause the jury to be influenced by sympathies having no bearing on the merits of the case"); *United States v. Sabir*, No. 5-CR-673 (LAP), 2007 WL 1373184, at *9 (S.D.N.Y. May 10, 2007) (excluding evidence because it "would suggest that the jurors should have sympathy for Dr. Sabir because of his troubled childhood and would implicitly encourage them to nullify by acquitting him based on something other than the question of whether the Government has proved each element of the crimes charged beyond a reasonable doubt"); *United States v. Crown*, No. 99- CR-1044 (AGS), 2000 WL 709003, at *3 (S.D.N.Y. May 31, 2000) (precluding evidence regarding defendant's medical condition as irrelevant and holding that even if the evidence were relevant, "its probative value would be outweighed by its potential prejudicial effect on the jury" because it "would likely appeal to the jury's sympathy, and thus constitute an improper influence on the jury members' consideration of the factual and legal issues bearing on the merits of the case").

Evidence is also inadmissible if it is hearsay not subject to a hearsay exception. "Hearsay" is a statement "the declarant does not make while testifying at the current trial or hearing" and that "a party offers in evidence to prove the truth of the matter asserted in the statement." Fed. R. Evid. 801(c). There are various exceptions to the hearsay rule including that certain out of court statements are not hearsay if (1) they are a declarant-witnesses' prior statement, or (2) an opposing party's statement offered against the defendant. Fed. R. Evid. 801(d).

## II.      Motions in Limine

"A district court's inherent authority to manage the course of its trials encompasses the right to rule on motions *in limine*." *Highland Capital Mgmt., L.P. v. Schneider*, 551 F. Supp. 2d 173, 176-77 (S.D.N.Y. 2008) (citing *Luce v. United States*, 469 U.S. 38, 41 n. 4 (1984)). An *in limine* motion is intended "to aid the trial process by enabling the Court to rule in advance of trial on the relevance of certain forecasted evidence, as to issues that are definitely set for trial, without lengthy argument at, or interruption of, the trial." *Palmieri v. Defaria*, 88 F.3d 136, 141 (2d Cir. 1996). "[C]ourts considering a motion *in limine* may reserve judgment until trial, so that the motion is placed in the appropriate factual context." *United States v. Ozsusamlar*, 428 F. Supp. 2d 161, 165 (S.D.N.Y. 2006). "Because a ruling on a motion *in limine* is 'subject to change as the case unfolds,' this ruling constitutes a preliminary determination in preparation for trial." *United States v. Perez*, No. 09–CR–1153 (MEA), 2011 WL 1431985, at *1 (S.D.N.Y. Apr. 12, 2011) (quoting *Palmieri*, 88 F.3d at 139).

### DISCUSSION

By its motions in *limine*, the Government asks the Court to determine the admissibility of:

(1)  the Defendants' (*i.e.*, the Malkas' and their co-Defendants') prior bad acts, including the rules and practices within Lev Tahor surrounding marriage;

(2)  the statements of the Malkas' co-conspirators; and

(3)  certain business records from various entities that would be certified under Federal Rule of Evidence 902(11).

(Govt'l MIL at 8–20, 29–34.) Additionally, the Government asks the Court to preclude the Malkas from making the following arguments or eliciting related testimony for lack of relevance and/or improper purpose:

(1)  contesting the legitimacy of the Family Court Order granting the Mother sole custody over the two Minors;

(2) questioning the Mother's parental rights during the entire period charged in the S3 Superseding Indictment;

(3) arguing that the Mother, her associates, or members of the Kasho community engaged in misconduct;

(4) arguing that they were seeking to "rescue" the Minors;

(5) arguing that Lev Tahor has been historically persecuted by the U.S. and Israel;

(6) arguing that the Defendants are being prosecuted for their religious views;

(7) arguing that the marriage between Jacob and Minor-1 was predicated on their religious beliefs and such conduct was not illegal;

(8) arguing that the marriage between Jacob and Minor-1 is a legitimate marriage and as such, is a defense to kidnapping and/or the marital privilege applies to prevent Minor-1's testimony; and

(9) arguing that the Minors' consent to traveling with the Defendants out of the country is a defense to the charged crimes.

(*Id.* at 20–28.) By their motions in *limine* (at least those that are seemingly properly briefed), the

Court liberally construes the Malkas' motions to request to:

(1) preclude the admissibility of their statements made on affidavits, declarations, and other filings on the record into evidence;

(2) permit them to challenge the legitimacy of the Family Court Order;

(3) preclude the Government from using the terms "kidnapping" and "abduction" at trial;

(4) preclude the Government from using the term "victims" at trial; and

(5) preclude the Government from mentioning, raising, and/or discussing the sexual charges or marital practices in Lev Tahor;

(6) preclude the Government from labeling or defining the marriages in Lev Tahor as "forced" marriages or and any other similar labels/definitions

16

(MM 1st MIL at 1–3; MM 2nd MIL at 133–149; MM Reply at 176–317.) The Malkas also argue

that the Court should dismiss the charges against them on several grounds (despite the deadline to

do so having long passed), at least those that are seemingly properly briefed, including:

> (1)  the validity of the alleged marriage between Jacob Rosner and Minor-1 (such
>       that Minor-1 was emancipated by marriage);
>
> (2)  the invalidity of the Family Court Order (such that it purportedly denies their
>       intent to obstruct the Mother's parental rights);
>
> (3)  the Government's alleged "forged transcription" of an incriminating phone call;
>       and
>
> (4)  the Government's alleged failure to provide complete and accurate
>       transcriptions.

(Mordechay MIL at 14; MM 2nd MIL at 85–132; MM Reply at 71–264, 318–331.) The Court

discusses these arguments in that order.

Further, in their briefing, the Malkas seem to raise numerous motions in *limine* and to

dismiss that are made in passing and unaccompanied by any effort at developed argumentation.

Due to their perfunctory nature and the lack of proper briefing, the Court declines to address any

such motions and deems the arguments they raise waived. *See, e.g., United States v. Griffin*, 794

F. App'x 14, 17 (2d Cir. 2019) ("Although we 'liberally construe' Griffin's briefs, 'reading such

submissions to raise the strongest arguments they suggest,' and afford him 'some latitude in

meeting the rules governing litigation,' we usually do not decide issues that a defendant raises only

in passing." (citations omitted)); *Gerstenbluth v. Credit Suisse Secs (USA) LLC*, 728 F.3d 139, 142

n.4 (2d Cir. 2013) (explaining that *pro se* litigant "waived any challenge" to the district court's

adverse ruling because brief mentioned ruling only "obliquely and in passing"); *United States v.*

*Botti*, 711 F.3d 299, 313 (2d Cir. 2013) ("[I]ssues adverted to in a perfunctory manner,

unaccompanied by some effort at developed argumentation, are deemed waived." (citation

omitted)); *Tolbert v. Queens College*, 242 F.3d 58, 75 (2d Cir. 2001) (similar); *Cleveland v. Long Island R.R. Co.*, No. 18-CV-2080 (VEC), 2019 WL 4511952, at *7 (S.D.N.Y. Sept. 18, 2019) ("Nevertheless, because Plaintiff has not adequately developed this argument, the Court need not fully consider it."). And finally, with respect to those arguments that the Malkas raise by incorporating by reference the previous motions that the Court has already decided and for which the Malkas fail to provide any supplementary arguments, the Court adheres to its prior rulings from each of such motions.

Accordingly, the Court only discusses those arguments that are seemingly properly briefed and from which the Court can liberally construe that the Malkas seek some kind of relief—which are those outlined above.

I.     **The Government's Motions in *Limine***

   A.     *Admissibility of the Defendants' Prior Bad Acts*

The Government first seeks to elicit testimony from Minor-1, the Mother, and CC-1 about Minor-1's alleged marriage to Jacob and the rules and practices within Lev Tahor surrounding marriage. (Gov't MIL at 8.) The Government argues that this testimony is admissible as direct evidence and essential background for the kidnapping conspiracy. (*Id.*) The Government further contends that, to the extent any of this testimony constitutes "evidence of any other crimes, wrong or act," it is admissible as direct evidence of the charged crimes, or alternatively, admissible under Federal Rule of Evidence 404(b) to show the Malkas' motive, intent, knowledge, and opportunity. (Gov't MIL at 12–13.)

But the Malkas oppose the introduction of such testimony on the basis that it is irrelevant in their trial, as compared to that of Nachman and Mayer's, because they are not charged with any sexual related charges—namely, 18 U.S.C. §§ 2304(a) and (e), conspiracy to transport an of a minor with intent to engage in criminal sexual activity. (MM Reply at 309.) In other words, they

seem to contend that evidence of Lev Tahor's sexual practices surrounding marriage is unduly prejudicial because the charges against them do not require the Government to prove beyond reasonable doubt any element that relates to sexual conduct. (*Id.* at 311.)

After due consideration, insofar as the testimony from Minor-1, the Mother, and CC-1 relates to marriage involving individuals under the age of sixteen, and their intended purpose—procreation, the Court agrees that it constitutes direct evidence of the charged crimes. However, to the extent the Government's evidence relates to Lev Tahor's sexual practices (such as providing "[n]ew brides and grooms . . . a tutorial before marriage instructing them on when and how to have sex with their spouse" (S3 ¶7), among others), the Court agrees with the Malkas that the probative value of such evidence is substantially outweigh by unfair prejudice—particularly, in view that evidence indicating that procreation was the purpose of the alleged marriage here is admissible.

1.    Evidence of "Other Acts" under Rule 404(b)

Evidence of a defendant's "crime[s], wrong[s], or other act[s] is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character." Fed. R. Evid.  404(b)(1). "In other words, evidence that a defendant committed crimes beyond those presented to the jury is not admissible to show that the defendant is a bad person who is therefore likely to be guilty of the crimes charged." *Hsu,* 669 F.3d at 118. However, Rule 404(b) expressly permits the introduction of evidence of other crimes for a variety of other purposes "such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident." Fed. R. Evid. 404(b)(2). The Second Circuit has therefore "adopted the 'inclusionary' rule that other crimes evidence is admissible for any purpose for which it is relevant, except to support the prohibited inferences of bad character or propensity to commit crimes." *Hsu*, 669 F.3d at 118. Additionally, "evidence of criminal behavior may be admissible as direct evidence of the crime charged if it arose out of the same transaction or series of transactions

as the charged offense, if it is inextricably intertwined with the evidence regarding the charged offense, or if it is necessary to complete the story of the crime on trial." *Id.* In other words, "[t]o be relevant, evidence need only tend to prove the government's case, and evidence that adds context and dimension to the government's proof of the charges can have that tendency. Relevant evidence is not confined to that which directly establishes an element of the crime." *United States v. Gonzalez*, 110 F.3d 936, 941 (2d Cir. 1997).

      2.   <u>Application</u>

Here, the Government provides a representative list of testimony regarding rules and practices within the Lev Tahor community that may include instances of uncharged criminal conduct or other wrongs or bad acts. (Gov't MIL at 11–12.) Most of these examples relate to testimony from CC-1 and the Mother regarding Lev Tahor's practice of having arranged marriages involving children as young twelve or thirteen years old, and that it was well-known that all marriages in Lev Tahor—regardless of the age of the bride—involved procreation. (*Id.*) The Court agrees that evidence of the Defendants' involvement in arranging marriages including marriages involving children as young as twelve or thirteen years old, and particularly the marriage of Minor-1 to Jacob when she was fourteen years old is "inextricably intertwined with the evidence regarding the charged offense[s]," *Hsu*, 669 F.3d at 118, particularly because such evidence provides "the whole rationale for the Defendants executing an audacious kidnapping of [Minor-1] . . . ." (*Id.* at 12.) Moreover, the Court agrees with the Government that such evidence would "explain to the jury how the illegal relationship between the participants in the crime developed." (*Id.* (quoting *United States v. Pitre*, 960 F.2d 1112, 1119 (2d Cir. 1992).) However, insofar as the evidence relates to alleged non-sexual abuse of children in Lev Tahor, including malnutrition and non-sexual physical abuse—other than those directly related to marriage involving children under

sixteen years of age, the Court precludes such evidence because it is neither relevant nor necessary to the Government's case on the charged counts against the Malkas.

Further, the Court will preclude evidence relating to Lev Tahor's sexual practices, such as providing "[n]ew brides and grooms . . . a tutorial before marriage instructing them on when and how to have sex with their spouse" (S3 ¶7), and other similar practices that are irrelevant to the charges against the Malkas. The Court agrees with the Malkas that the probative value of such evidence is substantially outweighed by unfair prejudice—particularly, in view that evidence showing that procreation was the main purpose of the alleged marriage here is admissible. In fact, in their briefing, the Malkas appear to concede that marriages in Lev Tahor—regardless of age— necessarily involve procreation. (MM Reply at 310.) Hence, while the Court will allow the Government to present evidence showing that "all marriages in Lev Tahor—regardless of the age of the bride—involved procreation" (Gov't MIL at 11), it will also closely monitor the Government's use of the term "procreation" or "marital relations" to ensure that the term is not overused or employed in a prejudicial manner.

Accordingly, the Government's evidence of uncharged wrongs or bad acts within the Lev Tahor community must be limited to evidence directly related to community's rules and practices relating to arranged marriages, for the purpose of procreation, involving children under the age of sixteen.

Finally, to the extent the Government intends to introduce any 404(b) evidence that is not squarely within the above approved evidence above, the Government must demonstrate that evidence's relevance at trial, and that it is more probative than prejudicial. The Court also notes its intention to provide a limiting instruction regarding any testimony about the marriage practices in Lev Tahor other than evidence regarding the relationship between Minor-1 and Jacob Rosner.

### B.      Admissibility of the Statements from the Malkas' Co-Conspirators

At trial, the Government also intends to introduce certain statements made by the Malkas' co-conspirators through testimony from, among others, CC-1, the Mother, and Minor-1, and through electronic evidence (including communications retrieved from cellphones and email accounts). For example, the Government anticipates that CC-1 will testify that Shmiel told him about the plan for the December 2018 kidnapping and shared other statements Nachman made about the kidnapping. (Gov't MIL at 18.) The Government contends that these statements are admissible as co-conspirator statements under Federal Rule of Evidence 801(d)(2)(E), and as statements against interest under Federal Rule of Evidence 804(b)(3). (*Id.* at 13–20.) The Government further avers that several of these statements are non-hearsay because they are being offered not for the truth of the matter, but rather for the effect on the listener or for another non-hearsay purpose. (*Id.* at 13 n.6.)

But the Malkas—through Jacob's counseled response—argue that the Government has not satisfied the common intent principle element that forms the basis for admission under Federal Rule of Evidence 801(d)(2). (ECF No. 533 at 5.) After due consideration, the Court agrees with the Government.

### 1.      Availability of Co-Conspirators

As a preliminary matter, the Malkas appear to dispute whether certain co-conspirators or members of Lev Tahor constitute "unavailable witnesses" as that term is defined by the relevant hearsay exceptions.

A declarant is considered unavailable as a witness if, for example, he or she "is absent from the trial or hearing and the statement's proponent has not been able, by process or other reasonable means, to procure: (A) the declarant's attendance, in the case of a hearsay exception under Rule 804(b)(1) or (6); or (B) the declarant's attendance or testimony, in the case of a hearsay exception

under Rule 804(b)(2), (3), or (4)." Fed. R. Evid. 804(a). One such process is that the Court "may order the issuance of a subpoena requiring the appearance as a witness before it, . . . if the court finds that particular testimony . . . is necessary in the interest of justice." 28 U.S.C. § 1783(a). "[I]ssuance of a § 1783 subpoena is appropriate only upon a judicial order" and only applies to United States citizens living abroad. *United States v. Brennerman*, No. 17-CR-0155 (LAK), 2017 WL 4513563, at *2 n.2 (S.D.N.Y. Sept. 1, 2017).

The Government states in its moving papers that a number of co-conspirators and other members of the Lev Tahor community are located abroad, beyond the Government's subpoena power, and would likely invoke the Fifth Amendment if they were questioned under oath. (Gov't MIL at 19.) But the Malkas seem to contend that the Government is itself contriving to make these witnesses unavailable because "[i]f those witnesses were assured of the [G]overment's forbearance from arresting and incarcerating them the moment they stepped on U.S. soil' they would very likely welcome the opportunity to testify." (MM Reply at 335–36.)

The Court understands the Malkas to represent that these witnesses would consent to testify on their behalf only if the Court or the Government guarantees certain conditions for their transportation and treatment by United States authorities. But for one thing, the Court lacks jurisdiction to order such conditions. *Cf. United States v. Meza*, No. 15CR3175 JM, 2017 WL 1321383, at *2 (S.D. Cal. Apr. 7, 2017) ("[T]his court does not possess the authority to order the United States to submit a request to a foreign government, on behalf of the defendant, pursuant to an [Multi Lateral Assistance Treaty]." (cleaned up)). Additionally, the Malkas' own representation seems to agree with the Government's assertion that these witnesses located abroad would likely invoke the Fifth Amendment if they testified under oath. Thus, on the record before it, the Court is satisfied that such witnesses are unavailable at this time.

Finally, if either the Government or the Malkas seek a subpoena directing that any United States citizens who are currently living abroad appear to testify at trial, that party must request the issuance of a subpoena under Section 1783.

### 2. Admissibility of Co-Conspirator Statements

"[S]tatements proffered as co[-]conspirator statements may be admitted in evidence on a conditional basis, subject to the later submission of the necessary evidence of [relevant] prerequisites." *United States v. Tracy*, 12 F.3d 1186, 1199 (2d Cir. 1993).

The Government states that it intends to elicit testimony, for example, from CC-1 that during planning meetings for the December Kidnapping, Shmiel told him the plan for the kidnapping. CC-1 also shared with the other co-conspirators statements made by Nachman about the kidnapping. (Gov't MIL at 18.) The Government also intends to elicit testimony from the Mother about statements that Nachman made to her in furtherance of the conspiracy, including during a call from Westchester County Jail in March 2019, in which he told her that he would take the children away from her. (*Id.*) The Mother would also testify about March 2019 statements that Yakov made to her about co-conspirators' plans to kidnap Minor-1 again and threatened her by insisting that their efforts to return the Minors to Lev Tahor would not end until they were successful. (*Id.*) The Government also intends to elicit testimony from Minor-1 that multiple Defendants told her to lie to people outside of Lev Tahor by telling them that she was not married and that she was older. (*Id.*)

#### a) Statements by Co-Conspirator in Furtherance of Conspiracy Under Rule 801 (d)(2)(E)

Rule 801(d)(2)(E) provides in relevant part that "[a] statement is not hearsay if . . . the statement is offered against an opposing party and was made by the party's co-conspirator during and in furtherance of the conspiracy." Fed. R. Evid. 801(d)(2)(E). To admit a statement pursuant

24

to this rule, a district court must find two facts by a preponderance of the evidence: first, that a conspiracy that included the defendant and the declarant existed; and second, that the statement was made during the course and in furtherance of that conspiracy. *Bourjaily v. United States*, 483 U.S. 171, 175 (1987); *United States v. Gigante*, 166 F.3d 75, 82 (2d Cir. 1999). A statement is made in furtherance of a conspiracy if "designed to promote or facilitate achievement of the goals of that conspiracy." *Glenn v. Bartlett*, 98 F.3d 721, 728 (2d Cir. 1996). A statement need not be made by one co-conspirator to another co-conspirator in order to be in furtherance of a conspiracy. *United States v. Green*, 887 F.2d 25, 27-28 (1st Cir. 1989) (coconspirator's statement to shooting victim admissible against co-defendant under Rule 801(d)(2)(E)); *see United States v. Gupta*, 747 F.3d 111, 125 (2d Cir. 2014) (a statement need not be made to a member of the conspiracy to be admissible under Rule 801(d)(2)(E) because "[s]tatements designed to induce the listener's assistance with respect to the conspiracy's goals satisfy the Rule's in-furtherance requirement").

Although only co-conspirator statements made "in furtherance" of the conspiracy are admissible under Rule 801(d)(2)(E), the standard for what qualifies as a statement "in furtherance" of a conspiracy is not very restrictive. The requirement that the challenged statement be "in furtherance of" the conspiracy is satisfied if the statement's objective is "designed to promote or facilitate achievement of the goals of the conspiracy." *United States v. Rivera*, 22 F.3d 430, 436 (2d Cir. 1994). It permits, for example, introduction of any co-conspirator statement that "reasonably [can] be interpreted as encouraging a co-conspirator or other person to advance the conspiracy, or as enhancing a co-conspirator or other person's usefulness to the conspiracy." *United States v. Tarantino*, 846 F.2d 1384, 1412 (D.C. Cir. 1988).

The Second Circuit has held that co-conspirator statements that "provide reassurance, or seek to induce a co-conspirator's assistance, or serve to foster trust and cohesiveness or inform

25

each other as to the progress or status of the conspiracy" further the ends of the conspiracy, *United States v. Dresna*, 260 F.3d 150, 159 (2d Cir. 2001), as do statements "that apprise a co-conspirator of the progress of the conspiracy," *United States v. Rahme*, 813 F.2d 31, 36 (2d Cir. 1987); *see also United States v. Amato*, 15 F.3d 230, 234 (2d Cir. 1994) (statement apprising co-conspirator in loansharking conspiracy of status of loan was made in furtherance of the conspiracy); *United States v. Rastelli*, 870 F.2d 822, 837 (2d Cir. 1989) (statement among conspirators that defendant was receiving proceeds of extortion was in furtherance of conspiracy because it informed conspirators of status of conspiracy).

Although the Government must demonstrate that the defendant and the declarant belonged to the same conspiracy, the defendant and declarant need not both be members of the charged conspiracy in order for the declarant's statement to be admissible against the defendant. *See United States v. Bowe*, 221 F.3d 1183, 1193 (11th Cir. 2000) ("[T]he conspiracy that forms the basis for admitting a coconspirator's out of court statements need not be the same conspiracy for which the defendant is charged."); *United States v. Arce*, 997 F.2d 1123, 1128 (5th Cir. 1993); *United States v. Lyles*, 593 F.2d 182, 194 (2d Cir. 1979) ("It is settled law that the conspiracy which serves as the vehicle for the introduction of a vicarious admission by a co-conspirator need not be charged in the indictment."); *see also United States v. Stratton*, 779 F.2d 820, 829 (2d Cir. 1985) ("[I]t is not necessary that the Government charge a conspiracy to take advantage of Fed. R. Evid. 801(d)(2)(E)."); *Maldonado-Rivera*, 922 F.2d at 962 (same).

The Second Circuit has explained that, to admit a co-conspirator statement made in a separate conspiracy, the Government must demonstrate only that the defendant and the declarant are members of some conspiracy that somehow is "factually intertwined" with the charged offenses. *See Stratton*, 779 F.2d at 829 (the Government must demonstrate that the conspiracy to

which the defendant and the declarant belong "is factually intertwined with the offenses being tried") (internal quotations omitted); *see also Lyles*, 593 F.2d at 194.

> b) *Statements Against the Declarants' Penal Interest Under Rule 804(b)(3)*

The hearsay rule does not exclude the out-of-court statements of an unavailable declarant if the statements were against the declarant's penal interest. *See* Fed. R. Evid. 804(b)(3); *United States* v. *Williams*, 506 F.3d 151, 155 (2d Cir. 2007). A statement is sufficiently against the declarant's penal interest if: a reasonable person in the declarant's position would have made [the statement] only if the person believed it to be true because, when made, it was so contrary to the declarant's proprietary or pecuniary interest or had so great a tendency to . . . expose the declarant to civil or criminal liability. Fed. R. Evid. 804(b)(3). This rule "is founded on the commonsense notion that reasonable people, even reasonable people who are not especially honest, tend not to make self-inculpatory statements unless they believe them to be true." *Williamson v. United States*, 512 U.S. 594, 599 (1994).

To satisfy Rule 804(b)(3), the proponent of the statement must show by a preponderance of the evidence: "(1) that the declarant is unavailable as a witness, (2) that the statement is sufficiently reliable to warrant an inference that a reasonable man in [the declarant's] position would not have made the statement unless he believed it to be true, and (3) that corroborating circumstances clearly indicate the trustworthiness of the statement." *United States v. Wexler*, 522 F.3d 194, 202 (2d Cir. 2008) (internal quotation marks omitted). A declarant is unavailable for purposes of Rule 804 if, as relevant here, the declarant is "exempted from testifying about the subject matter of the declarant's statement because the court rules that a privilege applies," Fed. R. Evid. 804(a)(1), or "is absent from the trial or hearing and the statement's proponent has not

been able, by process or other reasonable means, to procure the declarant's attendance or testimony," *id.* 804(a)(5)(B).

"A statement will satisfy Rule 804(b)(3)'s requirement that it 'tended' to subject the declarant to criminal liability if it would be probative in a trial against the declarant." *United States v. Persico*, 645 F.3d 85, 102 (2d Cir. 2011) (internal quotation marks omitted). Moreover, a declarant need not "be aware that the incriminating statement subjects him to immediate criminal prosecution," but instead, that the "incriminating statement sufficiently tended to subject the declarant to criminal liability so that a reasonable man in his position would not have made the statement unless he believed it to be true." *United States v. Lang*, 589 F.2d 92, 97 (2d Cir. 1978) (internal quotation marks and citation omitted).

The Second Circuit requires corroboration of both the declarant's and the statement's trustworthiness. *United States v. Doyle*, 130 F.3d 523, 543-44 (2d Cir. 1997). Statements made to co-conspirators, not in response to questioning and not made in coercive atmospheres, are sufficiently reliable for purposes of this Rule. *See, e.g.*, *United States v. Matthews*, 20 F.3d 538, 546 (2d Cir. 1994).

Moreover, although "non-self inculpatory statements . . . made within a broader narrative that is generally self-inculpatory" are not admissible as statements against penal interest, *Williamson*, 512 U.S. at 600–01, a statement describing inculpatory acts committed by the declarant and a defendant are admissible in full as statements against the declarant's self-interest, especially where the context of the statement demonstrates that the declarant was not attempting to "minimize his own culpability, shift blame onto [the defendant], or curry favor with authorities." *Williams*, 506 F.3d at 155; *accord Wexler*, 522 F.3d at 203 (admitting statements that implicated both declarant and defendant); *United States* v. *Saget*, 377 F.3d 223 (2d Cir. 2004) (admitting

taped conversations implicating both the declarant and the defendant in joint criminal activity).

Finally, because statements to associates about crimes in which the declarant participated are not

testimonial, the admission of such statements does not violate the Confrontation Clause. *Williams*,

506 F.3d at 157.

In sum, based on the foregoing standards, the Court preliminarily admits the co-conspirator

statements described above, "subject to the [Government's] submission of the necessary evidence

of [relevant] prerequisites." *Tracy*, 12 F.3d at 1199.

### C.  Admissibility of Certain Business Records Under Fed. R. Evid. 803(6) and 902(11)

The Government expects to introduce business records from several entities, including

United Airlines, Google, Walmart, Super 8 Motel, and Westchester County Jail. In addition, the

Government anticipates introducing video footage from several locations. (Gov't MIL at 29–35.)

The Government has provided notice of intent to offer these records and asks the Court to admit

the records pursuant to written certifications under Federal Rule of Evidence 902(11).[6] (*Id.*)

Federal Rule of Evidence 803(6) provides an exception to the hearsay rule for:

> A memorandum, report, record, or data compilation, in any form, of acts [or]
> events, . . . made at or near the time by, or from information transmitted by, a person
> with knowledge, if kept in the course of a regularly conducted business activity,
> and if it was the regular practice of that business activity to make the memorandum,
> report, record, or data compilation, all as shown by the testimony of the custodian
> or other qualified witness, unless the source of information or the method or
> circumstances of preparation indicate lack of trustworthiness.

---

[6] The Government indicates that on March 11, 2022, it inquired through standby counsel and via mailing a letter to WCJ as to whether the Defendants intend to contest the authenticity and business-records-nature of these materials, and if not, whether the Defendants would be amenable to stipulations for their authenticity. Though the Government requested a written response by March 17, 2022, no response was received as of March 18, 2022, the date the motions *in limine* were due. To the extent that Defendants do not contest the authenticity of these records, the Court encourages the parties to stipulate to their authenticity to avoid unnecessary testimony by record custodians. (Gov't MIL at 29–35.)

Fed. R. Evid. 803(6). Rule 803(6) "favor[s] the admission of evidence rather than its exclusion if it has any probative value at all," *In re Ollag Constr. Equip. Corp.,* 665 F.2d 43, 46 (2d Cir. 1981) (quotation omitted), and the "principal precondition" to admissibility "is that the record[ ] [has] sufficient indicia of trustworthiness to be considered reliable." *Saks Int'l v. M/V "EXPORT CHAMPION",* 817 F.2d 1011, 1013 (2d Cir. 1987). Further, the proffered record must be supported by a proper foundation, namely, that the document was "'kept in the course of a regularly conducted business activity' and also that it was the 'regular practice of that business activity to make the [record].'" *United States v. Freidin,* 849 F.2d 716, 719–20 (2d Cir.1988) (quoting Rule 803(6)). This foundation must be established by the "'testimony of the custodian or other qualified witness' of the record." *Id.* at 720 (quoting Rule 803(6)).

"Rule 902(11) extends Rule 803(6) 'by allowing a written foundation in lieu of an oral one.'" *United States v. Rom*, 528 F. App'x 24, 27 (2d Cir. 2013) (quoting 5 Weinstein's Federal Evidence § 902.13[1] (2d ed. 2008).). If a party seeks to certify a business record pursuant to Rule 902(11) rather than by providing live testimony pursuant to Rule 803(6)(D), it "must give an adverse party reasonable written notice of the intent to offer the record—and must make the record and certification available for inspection—so that the party has a fair opportunity to challenge them." Fed. R. Evid. 902(11). This notice requirement "is intended to give the opponent of the evidence a full opportunity to test the adequacy of the foundation set forth in the declaration." Fed. R. Evid. 902(11) advisory committee's note.

The Government indicates that it provided notice of its intent to introduce these business records by communication to the Malkas directly and through standby counsel on March 11, 2022, over a month before the start of the trial, and again in its motions *in limine*. Accordingly, the Court preliminarily concludes that the Government has provided the Malkas with the reasonable notice

required under Rule 902(11). *See, e.g.*, *United States v. Rom*, 528 F. App'x 24, 27 (2d Cir. 2013) (holding that reasonable notice had been provided where defendant "had five full days between when the government disclosed the records and when the records were admitted into evidence, which was sufficient time to verify the records' certification . . . . [and] [i]n those five days, Rom raised no concerns that the bank records were improperly certified or that the foundation was otherwise improper").

Assuming that the Government establishes the relevance of these business records, the Court will permit the Government to authenticate them through written certifications under Federal Rule of Evidence 902(11).

### D.     *Preclusion of Certain Arguments for Irrelevance and Improper Purpose*

The Government next seeks to preclude several arguments that the Malkas have raised through their filings throughout the case. (Gov't MIL at 20–21.) The Government contends that these arguments should be precluded for lack of relevance under Federal Rule of Evidence 401, or, alternatively, under Rule 403 because they would serve an improper purpose. (*Id.*)

#### 1.     Validity of the Family Court Order

The Government asks the Court to preclude the Malkas from challenging the validity of the Family Court Order at trial because such arguments would only serve to confuse the issues and mislead the jury. (*Id.* at 21–22.) Specifically, the Malkas' briefing indicates they intend to dispute whether the Mother had "lawful" parental rights because they take issue with the process by which the Family Court issued its Order or the Family Court Order itself. They specifically seem to contend that the Family Court lacked jurisdiction to issue the Family Court Order, that the Mother obtained the Family Court Order by fraud, and that the Family Court failed to properly notify Teller of the issuance of the Family Court Order. (Mordechay MIL at 13; MM 2nd MIL at 127–32; MM Reply at 176–264). They also contend that the inclusion of the phrase "lawful exercise of

31

parental rights" in the IPKCA invites inquiry into whether the Family Court should have granted the Mother custody of the minors. (MM Reply at 176–78). After due consideration, the Court agrees with the Government.

As the Court held in its July 8, 2021 Opinion, "[d]efendants' contention that the Kings County Family Court should not have granted sole custody to the Mother did not entitle them to disobey it." *United States v. Helbrans*, 547 F. Supp. 3d 409, 428 (S.D.N.Y. 2021); *see also McDonald v. Head Crim. Ct. Supervisor Officer*, 850 F.2d 121, 124 (2d Cir. 1988) ("An order issued by a court must be obeyed, even if it is later shown to be erroneous.").

Further, this Court lacks the authority to review the propriety of the Family Court Order or the process under which it was issued. Where a custody order has "supplant[ed] the default custody arrangement provided by state family law," that order and not the law of the child's state of habitual residence governs "parental rights" under the IPKCA. *See United States v. Zodhiates*, 235 F. Supp. 3d 439, 454–55 (W.D.N.Y. 2017), *aff'd*, 901 F.3d 137, 145 (2d Cir. 2018). Where, as here, parental rights are governed by "court order . . . . the state of a child's 'habitual residence' is irrelevant." *Id.* That Teller did not effectively challenge the Family Court Order even if the Defendants (including the Malkas) sincerely believe it to be defective, did not give him or any of the Defendants here leave to flagrantly disobey it and interfere with the sole parental rights it conferred on the Mother. *See United States v. Miller*, 626 F.3d 682, 689 (2d Cir. 2010) (affirming district court's exclusion of certain evidence proffered by IPKCA defendant because there was no evidence that the operative custody order in effect at the time of the alleged kidnapping was ever appealed or stayed and therefore, at the time defendant took the child, defendant was "required to comply with the Vermont court order which gave [the other parent] lawful parental rights to full custody, rights [the defendant] frustrated by keeping [the child] outside the United States").

To the extent that the Malkas also claim that Minor-1's marriage to Jacob somehow extinguished any parental rights held by either the Mother or Teller, that argument should have been made to the Family Court. This Court lacks jurisdiction to second-guess or alter the Family Court's orders. *Cf. Tuggle v. Cnty. of Cherokee*, 147 F. App'x 52, 53 (10th Cir. 2005) (stating in context of state prisoner's 28 U.S.C. § 2254 habeas petition that while federal courts have an "inherent power" to "make its records speak the truth," that power does not "permit[] a court to correct . . . a judgment of another court," including a state court). Additionally, insofar as the Malkas claim that Minor-1 is in the process of seeking legal emancipation, no final order of emancipation has been presented to the Court and, in any event, the only relevant court orders in existence at the time of the charged crimes was the Family Court Order, which gave sole custody to the Mother.

In sum, any arguments about the process by which the Family Court Order was issued or the terms of the Family Court Order are irrelevant as to whether the Malkas intended to obstruct the Mother's exercise of parental rights, which clearly existed according to the Family Court Order, and would only serve to "confus[e] the issues, [and] mislead[] the jury." Fed. R. Evid. 403; *see also United States v. Sardana*, 101 F. App'x 851, 855 (2d Cir. 2004) (holding that the district court did not abuse its discretion in excluding evidence defendant father sought to introduce in IPKCA prosecution suggesting that mother was unfit to be a custodial parent: "[s]uch evidence might have been relevant if Sardana had pursued a custody challenge against his wife in New York courts. It could not, however, justify his removal of their child from the United States to India in order to obstruct his wife's exercise of parental rights.").

## 2.   The Mother's Parental Rights During the Period Charged

On a similar basis, the Court also agrees with the Government that any argument about whether the Mother lacked parental rights over the Minors during the relevant period charged in

the Superseding Indictment is irrelevant and would only serve to "confus[e] the issues, [and] mislead[] the jury." Fed. R. Evid. 403. As the Second Circuit has consistently held, under New York law, "the biological mother . . . enjoys the right to physical custody of her children unless and until this right is terminated by law." *United States v. Amer*, 110 F.3d 873, 878 (2d Cir. 1997); *see also, e.g.*, *Sardana*, 101 F. App'x at 853–54 ("Under New York law, . . . the biological mother[] enjoys the right to physical custody of her children unless and until this right is terminated by law. Thus, the government was not obliged to offer proof of a court custody order to secure Sardana's conviction; it could rely on established New York law."). Here, it is undisputed that the Mother is the biological mother of the Minors. Further, as no court has ever terminated her parental rights by law, the Mother has always had parental rights as a matter of law during all relevant periods— regardless of the status of any family court orders.[7] Accordingly, the Court precludes Defendants from arguing that the Mother lacked parental rights during any period charged in the Superseding Indictment.

---

[7] As the Court also noted in its July 8, 2021 Opinion:

> Even assuming *arguendo* that the Kings County Family Court Order was insufficient to grant Mother sole custody, the Mother, at the very least, held joint custody with Teller, to whom she was married during the relevant period. Defendants do not dispute that the Mother is married to Teller and the biological mother of the Minors and they do not allege that her parental rights were ever stripped. This is dispositive because under the law of both Guatemala and New York, a biological mother retains custody of her children unless and until that custody is terminated. *See, e.g. Amer*, 110 F.3d at 878 (noting that under New York law a biological mother "enjoys the right to physical custody of her children unless and until this right is terminated by law"); *Palencia v. Perez*, 921 F.3d 1333, 1340 (11th Cir. 2019) (holding that under Guatemala law, when a couple is married, custody rights are "exercised jointly by the father and mother over minor children" (citing Article 252 of the Guatemalan Civil Code)); *Ischiu v. Gomez Garcia*, 274 F. Supp. 3d 339, 346 (D. Md. 2017) ("[I]n Guatemala, biological parents have parental rights under the doctrine of *patria potestas*," which "generally refers to the rights of both biological parents to exercise authority over their children.").

*Helbrans*, 547 F. Supp. 3d at 428 n.12.

3.      Alleged Misconduct from the Mother and the Kasho Community

In their briefing, the Malkas seem to contend that the Mother is the one who "forcibly abducted" the Minors to bring them to New York. (MM 1st MIL at 33, 38, 41, 44, 127; MM Reply at 188, 224.) But if the Mother interfered with his parental rights, Teller could have pursued the return of his children through Hague Convention proceedings, which he did in fact unsuccessfully attempted by failing to comply with the Hague Court's orders, resulting in the dismissal of his petition with prejudice and dismissal of the subsequent appeal for failure to pay a required fee. *See* 22 U.S.C.A. § 9003 (Judicial Remedies) ("Any person seeking to initiate judicial proceedings under the Convention for the return of a child or for arrangements for organizing or securing the effective exercise of rights of access to a child may do so by commencing a *civil* action by filing a petition for the relief sought in any court which has jurisdiction of such action and which is authorized to exercise its jurisdiction in the place where the child is located at the time the petition is filed." (emphasis added)).

As with the unsuccessfully challenged Family Court Order already discussed, Teller's unsuccessful attempt to secure the return of his children through a Hague Convention petition did not give him or members of his community license to violate the Family Court order. *See Helbrans*, 547 F. Supp. 3d at 428 n.13.

Moreover, the Mother's motivations for leaving Lev Tahor are irrelevant to the elements of the charged crimes and, even if they provide context, their probative value would be outweighed by their potential to prejudice the jury against the Malkas. The Malkas have thus far presented no convincing argument as to why such evidence would be relevant or its probative value would outweigh any prejudicial effect. Additionally, as already discussed above, any argument that the Mother should not have been granted custody of her children, including the Minors, is one that should have been presented to the Family Court and that this Court cannot consider. Accordingly,

to the extent that the Malkas intend to present evidence of marital problems between the Mother and Teller, or describe her falling out with the Lev Tahor community, (*see, e.g.*, (ECF No. 494-6 at 39–91 (describing the Mother's opposition to the decisions of Lev Tahor Leaders; her subsequent threats to leave the community with her children and refusal to come to an agreement with Teller about who should keep their children; and, ultimately her efforts to take all six of her children with the assistance of various individuals, including people in Guatemala and from the United States, by abusing Guatemalan and other legal systems and using trickery violence), the Court precludes the Malkas from doing so.

The Malkas also seem intent on offering evidence that various members of the rival Hasidic Jewish community Kasho assisted the Mother to engage in allegedly unlawful activity including removing the Minors from Guatemala, helping her to secure the Family Court Order, and assisting her to keep the Minors in the United States after she was awarded custody. As described above, to the extent the Malkas wish to adduce evidence of purported mistreatment by the Mother and members of the Kasho community in an attempt to undermine the validity of the Family Court Order, such arguments are irrelevant here. And even if it were relevant, before proffering such evidence, the Malkas must still show how the probative value of such evidence would likely outweigh any prejudice. However, any evidence of alleged mistreatment of other children who are not the Minors is not relevant to the charges against the Malkas for kidnapping and transporting the Minors here.

Additionally, insofar as the Malkas seek to broadly introduce evidence of the "bad character" of the Mother or any of her alleged collaborators that is not directly related to their treatment of the Minors or the offenses charged in this case, that evidence is irrelevant to the issues on trial and will not be permitted. The Court also precludes the Malkas from presenting evidence

36

of Kasho's decades of alleged crimes against Lev Tahor or attacks on Lev Tahor members not directly related to domestic violence toward the Minors.[8]

### 4.    Argument that Defendants Were "Rescuing" Victims

The Government next seeks to preclude the Malkas from arguing that they believed they were rescuing the Minors from the Mother and others in New York. (Gov't MIL at 23.) The Government contends that while this argument was relevant in the trial for Nachman and Mayer, that argument is irrelevant here. (*Id.* at 23–24.) Specifically, this argument was relevant in the previous trial because of the sexual exploitation counts, as Nachman and Mayer sought to refute the Government's argument that they were motivated to execute the kidnapping for Jacob to resume his unlawful sexual relationship with Minor-1 instead of solely "rescuing" her. (*Id.*) But the Government contends that such argument is irrelevant here because the Malkas are not charged with sexual charges as Nachman and Mayer were. (*Id.*) After due consideration, the Court agrees.

In relevant part, the Malkas are charged with the IPKCA, 18 U.S.C. § 1204, which *only* provides three potential statutory defenses:

> (c) It shall be an affirmative defense under this section that—
>
> (1) the defendant acted within the provisions of a valid court order granting the defendant legal custody or visitation rights and that order was obtained pursuant to the Uniform Child Custody Jurisdiction Act and was in effect at the time of the offense;
>
> (2) the defendant was fleeing an incidence or pattern of domestic violence;
>
> (3) the defendant had physical custody of the child pursuant to a court order granting legal custody or visitation rights and failed to return the child as a result of circumstances beyond the defendant's control, and the defendant notified or made reasonable attempts to notify the other parent or lawful

---

[8] As it will be discussed below, insofar as the second affirmative defense in the IPKCA—"fleeing an incidence or pattern of domestic violence"—applies to the Malkas, the defense is limited to "incidence[s] or pattern[s] of domestic violence" that involve *physical (including sexual) abuse*—not "emotional, psychological, and financial abuse." *United States v. Nixon*, 901 F.3d 918, 919 (7th Cir. 2018).

custodian of the child of such circumstances within 24 hours after the visitation period had expired and returned the child as soon as possible.

18 U.S.C. § 1204(c). As a matter of statutory construction, the IPKCA does not seem to provide for any other affirmative defense but those three; nor has the Second Circuit held that the any other affirmative defense applies under the IPKCA.

Most notably, in *United States v. Amer*, 110 F.3d 873 (2d Cir. 1997), the Second Circuit rejected the defendant's argument that the IPKCA incorporated the defenses available under the Hague Convention. *Id.* at 880–81. In that case, the defendant argued that "he was justified in removing and retaining [his] children in Egypt under the Hague Convention" because Article 13(b) of the Hague Convention afforded him a defense where "there is a grave risk that [the children's] return would expose the child[ren] to physical or psychological harm or otherwise place the child[ren] in an intolerable situation." *Id.* at 880. But after analyzing Congress's ratification of the Hague Convention and the legislative history of the IPKCA, the Second Circuit held that "the IPKCA's listing of three, *and only three*, affirmative defenses is a strong indication that the defenses arguably inferred from the Hague Convention are not available in an IPKCA prosecution." *Id.* at 880–81 (emphasis added).

With that in mind, none of the IPKCA's statutory defenses are applicable here. The first and third affirmative defenses clearly are inapplicable here because the Malkas are not claiming that they had any kind of legal custody or visitation rights over the Minors. And with respect to the second affirmative defense, while the Malkas seem to contend they were "rescuing" the Minors from some kind of alleged abuse, the plain statutory language indicates that the affirmative defense solely applies when "*the defendant*" himself or herself is "fleeing an incidence or pattern of domestic violence" with the removed child. 18 U.S.C. § 1204(c)(2) (emphasis added); *see also Arciniaga v. Gen. Motors Corp.*, 460 F.3d 231, 236 (2d Cir. 2006) ("When a statute's language is

38

clear, [the Court's] only role is to enforce that language 'according to its terms.'" (quoting *Arlington Cent. Sch. Dist. Bd. of Educ. v. Murphy*, 548 U.S. 291, 296 (2006)).

Further, even to the extent that this second affirmative defense is somehow applicable to defendants who are not themselves "fleeing an incidence or pattern of domestic violence," but who are instead aiding a child to do so, the defense seems to be limited to "incidence[s] or pattern[s] of domestic violence" that involve *physical (including sexual) abuse*—not "emotional, psychological, and financial abuse." *United States v. Nixon*, 901 F.3d 918, 919 (7th Cir. 2018) (discussing second affirmative defense where defendant-mother presented evidence that father physically and sexually abused child but jury found she had not carried her burden after prosecutor demonstrated she had fabricated this evidence). But here, while the Malkas claim that the Minors "were frequently treated with verbal, physical and sexual assaults," they fail to reference any evidence whatsoever to substantiate their claims. Hence, insofar as the second affirmative defense is somehow applicable to the Malkas—who were not themselves "fleeing an incidence or pattern of domestic violence," but who instead claim to have been aiding the Minors to do so—absent any evidence supporting their claims of abuse, they still cannot assert that defense or argue it to the jury. Thus, as none of the statutory affirmative defenses apply here, the Court precludes the Malkas from arguing that they were "rescuing" the Minors in attempt to assert a statutory affirmative defense.

Lastly, to the extent the Malkas seek to argue that their motive was to "rescue" the Minors to show that they lacked intent to obstruct the Mother's parental rights, the Court also precludes such argument as irrelevant. "The motive that [a] defendant had or claimed to have had for committing a crime charged is irrelevant to his guilt or non-guilt." *United States v. Edwards,* 101 F.3d 17, 19 (2d Cir. 1996). That is because motive and intent are "two fundamentally district

concepts." *Rosemond v. United States*, 572 U.S. 65, 88 (2014) (Alito, J., concurring in part). Indeed, "the fact that a defendant carries out a crime because he feels he must do so on pain of terrible consequences does not mean he does not intend to carry out the crime." (*Id.*) As such, that the Malkas were motivated to commit an offense under 18 U.S.C. § 1204 to "rescue" the children is irrelevant as to whether they intended to obstruct the Mother's parental rights. *See, e.g.*, *United States v. Homaune*, 898 F. Supp. 2d 153, 163 (D.D.C. 2012) (noting that "whenever a parent with physical custody rights is unwillingly cut off from her child, that parent's rights to physical custody are 'obstructed'"); *Sardana*, 101 F. App'x at 855 ("Finally, the district court did not abuse its discretion in excluding evidence suggesting that Ms. Sardana was unfit to be a custodial parent. Such evidence might have been relevant if Sardana had pursued a custody challenge against his wife in New York courts. It could not, however, justify his removal of their child from the United States to India in order to obstruct his wife's exercise of parental rights.").

And while the Malkas appear to argue that motive is relevant for purposes of asserting a necessity defense, (*see* MM Reply at 295), as noted above, the statutory language does not suggest—and neither the Second Circuit nor the United States Supreme Court have recognized— that the IPKCA allows for the defense of necessity. *See, e.g.*, *United States v. Oakland Cannabis Buyers' Coop.*, 532 U.S. 483, 490 (2001) ("[I]t is an open question whether federal courts ever have authority to recognize a necessity defense not provided by statute."). Even if the Court were to assume, without deciding, that the Malkas could assert a necessity defense under the IPKCA, absent any evidence indicating that (1) the Minors were under "unlawful and present, imminent, and impending threat of death or serious bodily injury;" (2) the Malkas "did not negligently or recklessly place [themselves] in a situation where [they] would be forced to engage in criminal conduct;" (3) that the Malkas "had no reasonable legal alternative to violating the law;" and (4)

40

there was a direct causal relationship between the alleged offense and the avoidance of the threatened harm, the Court precludes them from presenting that defense. *See United States v. White*, 552 F.3d 240, 246–47 (2d Cir. 2009); *see also United States v. Williams*, 389 F.3d 402, 404 (2d Cir. 2004) ("A federal court may preclude a defendant from presenting a defense when 'the evidence in support of such a defense would be legally insufficient.'" (citations omitted)).

Accordingly, as none of the statutory affirmative defenses apply here and the Malkas' motive in executing the Minors' kidnapping is irrelevant, the Court precludes the Malkas from arguing that they were "rescuing" the Minors.

5. <u>Argument that the U.S. and Other Countries Have Historically Persecuted Lev Tahor</u>

The Government next asks the Court to preclude the Malkas from arguing that the Lev Tahor community has faced persecution by the United States and/or Israel and Canada. (Gov't MIL at 26–27.) A review of their briefing reveals that the Malkas provide decades of background regarding the historical conflict between Lev Tahor and Kasho, repeatedly claiming that due to improper financial and other influence from Kasho, various governments, including with the United States, Israel, and Canada, have persecuted Lev Tahor, including by smearing their community in the media. As the Court has already stated, insofar as the Malkas seek to introduce evidence of historic persecution to undermine the legitimacy of the Family Court Orders, those orders are not reviewable by this Court. The Malkas have failed to explain the relevance of historic persecution, especially incidents that occurred decades ago, to either the elements of the charges against them or their defenses. Absent compelling argument regarding the relevance of historic persecution, the Court precludes the Malkas from presenting evidence at trial of alleged historic persecution by the United States or any other government entity or from detailing long-standing tensions between Lev Tahor and any other community.

6.      Argument that Defendants are Being Persecuted for their Religious Views

The Government also asks the Court to preclude any argument that the Malkas are being prosecuted because of their religious views. (Gov't MIL at 27.) Typically, "a defendant who advances a claim of selective prosecution must do so in pretrial proceedings." *United States v. Sun Myung Moon*, 718 F.2d 1210, 1229 (2d Cir. 1983).

Selective prosecution claims are rooted in "the equal protection component of the Due Process Clause of the Fifth Amendment, which dictates that "the decision whether to prosecute may not be based on an unjustifiable standard such as race, religion, or other arbitrary classification." *United States v. Armstrong*, 517 U.S. 456, 464 (1996) (internal quotation marks omitted). "In order to dispel the presumption that a prosecutor has not violated equal protection, a criminal defendant must present "clear evidence to the contrary." *Id.* at 465. "The requirements for a selective-prosecution claim draw on ordinary equal protection standards. The claimant must demonstrate that the federal prosecutorial policy had a discriminatory effect and that it was motivated by a discriminatory purpose." *Id.* (quotation marks and citations omitted). In order to be entitled to discovery on a selective prosecution claim, courts "require some evidence . . . [of] discriminatory effect and discriminatory intent." *Id.* at 468. Evidence of discriminatory effect means "a credible showing of different treatment of similarly situated persons." *Id.* at 470.

Here, the Malkas have failed to adduce any evidence of either discriminatory intent or discriminatory effect. Instead, they merely make unsubstantiated accusations against the Government and the Court as well. Because "a selective prosecution defense alleges a defect in the institution of the prosecution, [it] is an issue for the court rather than the jury." *United States v. Farhane*, 634 F.3d 127, 167 (2d Cir. 2011) (internal quotation marks omitted). Accordingly, because the Court determines that the Malkas have not made the requisite showing to pursue a

selective prosecution claim, they are precluded from making such a claim before the jury. *See Farhane*, 634 F.3d at 127 (holding that the district court did not abuse its discretion in precluding defendant from arguing in summation that the Government had targeted him for prosecution based on his religion); *United States v. Loera*, No. 09 Cr. 466 (BMC), 2018 WL 2744701, at *6 (E.D.N.Y. June 7, 2018) (precluding defense arguments to the jury that the Government's motives were improper); *United States v. Stewart*, No. 03 Cr. 717(MGC), 2004 WL 113506, at *1 (S.D.N.Y. Jan. 26, 2004) (same).

7.   Argument that the Marriage was Predicated on Religious Belief as a Defense

The Government next asks the Court to preclude the Malkas from arguing that the alleged marriage between Jacob and Minor-1 was predicated on their religious beliefs such that their religious beliefs excuse their alleged unlawful conduct. (Gov't at 27–28.) The Court agrees.

Courts have been clear that religious motivation is not a defense to criminal conduct. *See, e.g.*, *United States v. Cleveland*, 329 U.S. 14, 20 (1946) (holding that the fact that a practice "is supported by a religious creed affords no defense in a prosecution" for that conduct because to hold otherwise "would place beyond the law any act done under claim of religious sanction"); *United States v. Rahman*, 189 F.3d 88, 135 (2d Cir. 1999) ("If the evidence showed that [the defendant] conspired to levy war against the United States or solicited others to commit crimes of violence . . . it would not constitute a defense that he was justified in doing so within a framework of Islamic Law.").

And as the Court noted in its opinion addressing Nachman and Mayer's motions in *limine*, "religious motivation is not a defense to otherwise criminal conduct." (ECF No. 388 at 67.) Accordingly, the Malkas may not claim at trial that because the alleged marriage and sexual

relationship between Jacob and Minor-1 was sanctioned by their religious beliefs, then somehow that inoculates them from prosecution.

### 8.   Validity of the Marriage Between Jacob Rosner and Minor-1

Next, the Government asks the Court to preclude the Malkas from arguing to the jury that the alleged religious marriage between Jacob and Minor-1 was a legally valid marriage, which the Malkas appear to contend establishes either a defense to the kidnapping charges and that Jacob can assert the marital privilege to preclude Minor-1 from testifying. (Gov't MIL at 28.) The Government avers that the Court should rely on its own prior rulings holding that the allege marriage was not legally valid. (*Id.*) The Court agrees.

Liberally construing their papers, the Malkas appear to assert a defense to the IPKCA charges by contending that because the alleged marriage between Jacob and Minor-1 is legally valid, then somehow extinguished any parental rights held by the Mother. However, as the Court previously held in its opinion addressing the motions in *limine* from Nachman and Mayer, "that is an argument that should have been made to the Family Court" and that "[t]his Court does not have jurisdiction to second-guess or alter the Family Court's Orders." (ECF No. 388 at 58.)

But even if the Court were to consider the merits of such argument, the Court has already previously held twice that the alleged marriage between Jacob and Minor-1 was not legally valid when Jacob attempted to raise his purported marital privilege during Nachman and Mayer's trial. *See United States v. Helbrans*, --- F. Supp. 3d ---, No. S219CR497NSR0102, 2021 WL 5132403 (S.D.N.Y. Nov. 4, 2021) (ECF No. 427), *reconsideration denied*, No. S319CR497NSR010204, 2021 WL 5233611 (S.D.N.Y. Nov. 10, 2021) (ECF No. 434). Thus, under "the law of the case" doctrine, the Court would still nonetheless preclude the Malkas from arguing to the jury that the alleged marriage between Jacob and Minor-1 was legally valid for any reason whatsoever,

including to assert a potential defense to the IPKCA charges or to have Jacob preclude Minor-1

from testifying. *See Arizona v. California*, 460 U.S. 605, 618 (1983) (noting that under the "law

of the case" doctrine, once "a court decides upon a rule of law, that decision should continue to

govern the same issues in subsequent stages in the same case."); *see also United States v. Plugh*,

648 F.3d 118, 123 (2d Cir. 2011) ("As a general matter, this Court will adhere to its own decision

made at an earlier stage of the litigation." (internal quotation marks and citation omitted)).

Further, even if the Court were to liberally construe the Malkas' briefing as a successive

motion for reconsideration, the Court would still find that there is no clear error in holding that the

alleged marriage was not legally valid. *See Virgin Atl. Airways, Ltd. v. Nat'l Mediation Bd.*, 956

F.2d 1245, 1255 (2d Cir. 1992) (noting that common grounds for reconsideration include "an

intervening change of controlling law, the availability of new evidence, or the need to correct a

clear error or prevent manifest injustice." (citation omitted)).

Specifically, the Malkas proffer a supplemental expert opinion concerning the validity of

the alleged marriage between Jacob and Minor-1 under Guatemalan law from a Guatemalan law

expert who previously provided his opinion on the same subject when Jacob filed his motion for

reconsideration. (*Compare* ECF No. 432, Ex. I. at 21–24; *with* ECF No. 494-12.) In this

supplemental expert opinion, the Malkas' expert opines that this Court "erred significantly in

understanding" his original opinion because while underage marriages are clearly forbidden under

Guatemalan law, such marriages are nonetheless still legally valid because nowhere does

Guatemalan law explicitly render them null and void *ab initio*. (*See* ECF Nos. 494-12 at 1, 6–7.)

In supporting his position, the expert discusses the articles from the Guatemalan Civil Code

relating to underage marriage and the amendments they underwent in September 2017. (*Id.* at 22–

26.)

The expert explains that before September 21, 2017, Articles 82,[9] 83,[10] 84,[11] 89, and 90 of the Guatemalan Civil Code allowed for underage marriages under certain circumstances but still prohibited them under any circumstance when the minors were under the age of sixteen. (*Id.*) But the expert explains that despite this latter prohibition, Guatemalan law nonetheless expressly recognized the validity of any underage marriage executed in violation of such prohibition. (*Id.*) Specifically, before September 21, 2017, Article 89 provided that:

Marriage may not be authorized:

1st. Of the minor of eighteen years, without the express consent of the parents or her guardian;

2nd. Of the male under the age of sixteen or of the woman under fourteen years of age, unless the woman has conceived before that age and the persons exercising parental authority or guardianship give her consent;

3rd. Of the woman, before three hundred days have elapsed from the dissolution of the previous marriage, or the de facto union, or since the marriage is declared void, unless there has been childbirth within that term, or one of the spouses has been materially separated from the other or absent for the term indicated. If the nullity of the marriage has been declared due to impotence of the husband, the woman may enter into marriage without waiting for any term;

4th. Of the guardian and the tutor or their descendants, with the person who is under their guardianship or tutorship;

5th. Of the guardian or tutor or their descendants, with the person who has been under their guardianship or tutorship, only after the accounts of their administration have been approved and cancelled;

---

[9] Back then, Article 82 provided the following: "Exception of age. Exceptionally and for well-founded reasons, the marriage of minors may be authorized, with the age of undone (16) years, in accordance with the regulations of this Code." (ECF No. 494-12 at 23.)

[10] Back then, Article 83 provided the following: "Prohibition of getting married. They may not marry or be authorized in any way, the marriage of minors under sixteen (16) years of age." (ECF No. 494-12 at 23.)

[11] Back then, Article 84 provided the following: "Judicial authorization. The request to authorize a marriage of minors, with the age of sixteen, will be presented before a competent judge, who without forming an article and listening in a single hearing to the minors, will decide on the request." (ECF No. 494-12 at 23.)

6th. Of the one who, having children under his parental authority, does not make a judicial inventory of their assets, nor guarantees their management, unless the administration is transferred to another person; and

7th. Of the adopter with the adoptee, while the adoption lasts.

(*Id.* at 24.) But in turn, Article 90 provided the following:

If, notwithstanding the provisions of the preceding article, the marriage is celebrated, it shall be valid, but both the official and the persons guilty of the infraction shall be liable in accordance with the law, and the persons referred to in paragraphs 4 and 5 shall lose the administration of the property of the minors and may not succeed them by intestacy.

(*Id.* at 25.)

On September 13, 2017, the Guatemalan Congress amended the Civil Code to prohibit all marriages of minors under the age of eighteen executed after September 21, 2017, without exception, by *inter alia*, (i) repealing Articles 82 and 84; (ii) amending Article 83 to read: "No one under the age of eighteen (18) years of age shall, nor shall be authorized, under any circumstances to enter into a marriage contract"; and (iii) repealing paragraphs 1 and 2 of Article 89. (*See* ECF No. 376-4, Ex. A (Translation of the Sept. 13, 2017 Amendments to the Guatemalan Civil Code, Decree Number 13-2017).)

However, the Malkas' expert contends that the Guatemalan legislators' intent behind these specific amendments was "to leave [underage] marriages valid and legitimate, despite the extending scope of the prohibition." (ECF No. 494-12 at 26.) He opines that despite repealing all references to underage marriages in Articles 82, 84, and 89, and amending Article 83, had the Guatemalan legislators truly intended to render null and void *ab initio* any underage marriage executed in violation of Article 83's prohibition, then they also would have amended Article 88 (regarding the absolute impediments for marriage) to expressly provide the same. (*Id.*) Hence, the Malkas' expert concludes that the alleged marriage between Jacob and Minor-1, although held on

47

January 16, 2018, is legally valid because there is no provision under Guatemalan law rendering it null and void *ab initio*. (*Id.* at 33.)

But after due consideration, the Court rejects the Malkas' expert opinion based on its own independent examination of the plain language of the statute. *See Rutgerswerke AG & Frendo S.p.A. v. Abex Corp.*, No. 93 CIV.2914 JFK, 2002 WL 1203836, at *16 (S.D.N.Y. June 4, 2002) ("[A] court may reject even uncontradicted expert testimony [on foreign law] and reach its own decisions on the basis of independent examination of foreign legal authorities.") (citing *Curtis v. Beatrice Foods Co.*, 481 F. Supp. 1275, 1285 (S.D.N.Y.), *aff'd.,* 633 F.2d 203 (2d Cir. 1980)).

"When construing a foreign statute, the Court certainly must presume that the most pertinent and authoritative source on the scope and import of any foreign law is the plain language of the statute itself." *Knight Cap. Partners Corp. v. Henkel Ag & Co., KGaA*, 290 F. Supp. 3d 681, 687–88 (E.D. Mich. 2017); *accord Blasko v. Thomas*, No. 118CV01649DADSAB, 2019 WL 1081209, at *8 (E.D. Cal. Mar. 7, 2019). As with construing the statutory language of domestic law, "statutory construction [of foreign law] generally begins with an analysis of the language of the statute and, if that language is clear, ends there as well." *SEC v. Gibraltar Global Securities, Inc.*, No. 13-2575, 2015 WL 1514746, at *2 (S.D.N.Y. Apr. 1, 2015) (citing *Hughes Aircraft Co. v. Jacobson*, 525 U.S. 432, 438 (1999)).

Here, the plain language of Article 83 is clear and unambiguous in prohibiting all marriages of minors under the age of eighteen executed after September 21, 2017, without exception. (*See* ECF No. 376-4, Ex. A (Translation of the Sept. 13, 2017 Amendments to the Guatemalan Civil Code, Decree Number 13-2017).) Such statutory construction is consistent with the Guatemalan legislators' repeal of *all* references allowing for underage marriages in Articles 82, 84, and 89. (*Id.*) Indeed, most notably, the Guatemalan legislators did not amend Article 90, which expressly

provides for the validity of marriages that are executed "notwithstanding the provisions of the preceding article"—that is, Article 89—which the Guatemalan legislators *did* amend by removing *all* references to underage marriages. (*Id.*) In other words, these specific amendments strongly suggest that the Guatemalan legislators intended underage marriages executed after September 21, 2017, to be neither authorized nor valid under Guatemalan law without exception. *See United States v. Dauray*, 215 F.3d 257, 263 (2d Cir. 2000) ("A statute should be construed to be consistent with subsequent statutory amendments." (citing *Bowen v. Yuckert*, 482 U.S. 137, 149–51 (1987)).

As such, once again, the Court concludes that there was no clear error in holding that the alleged marriage between Jacob and Minor-1 was not legally valid under Guatemalan law, and thus, not valid under New York law. *See Helbrans*, 2021 WL 5132403, at *4 ("Under the doctrine of comity, the general rule is that the validity of a marriage is determined by the law of the jurisdiction where it is celebrated." (citations omitted)). Therefore, the Court precludes the Malkas from arguing to the jury that the alleged marriage between Jacob and Minor-1 was legally valid.

9.   Argument that the Minors' Consent to Travel Out of the Country Excuses their Conduct

Lastly, the Government asks the Court to preclude the Malkas from arguing that the Minors' supposed consent to travel out of the country is a defense to the charges. (Gov't MIL at 28.) The Court agrees.

The IPKCA states that "[w]hoever removes a child from the United States, or attempts to do so, or retains a child (who has been in the United States) outside the United States with intent to obstruct the lawful exercise of parental rights" is guilty of international parental kidnapping. 18 U.S.C. § 1204(a). Accordingly, "[t]o establish a violation of the IPKCA, the government must prove: (1) that the child had previously been in the United States; (2) that the defendant took the child from the United States to another country or kept the child from returning to the United States

49

from another country; and (3) that the defendant acted with the intent to obstruct the lawful exercise of another person's parental rights." *United States v. Houtar*, 980 F.3d 268, 274 (2d Cir. 2020) (citing *Miller*, 626 F.3d at 688). Neither the statutory language nor the courts applying the statute require a showing of force. In fact, multiple courts have held that parental kidnapping is not categorically a crime of violence. *See, e.g.*, *Woolverton v. City of Wardell*, No. 1:17 CV 170 ACL, 2018 WL 2193663, at *5 (E.D. Mo. May 14, 2018) (stating in context of analyzing claim for failure to train and supervise police officers that felony parental kidnapping is not a crime of violence).

In fact, the legislative history at H.R. Rep. No. 103–390 does not mention the will or desires of the removed, retained, or abducted child—defined as "a person who has not attained the age of 16 years"—other than to observe that "parental kidnappings seriously affect both the children and the parents deprived of rightful custody. Some child psychologists believe that the trauma children suffer from these abductions is one of the worst forms of child abuse." H.R. REP. 103-390, 2. That children may suffer from being separated from their parents does not in and of itself mean that the removal or retention that is the basis for the IPKCA charge entailed force.

Because the law is clear that neither lack of force nor consent of the child are cognizable defenses under the IPKCA, the Malkas are precluded from arguing to the jury that that they are innocent of parental kidnapping because the Defendants did not remove the Minors by force. Any such argument would only serve to "confus[e] the issues, [and] mislead[] the jury." Fed. R. Evid. 403.

## II.    The Malkas' Motions in *Limine*

### A.    *The Malkas' Ability to Prepare and Present Their Defense*

As a preliminary matter, the Court addresses the Malkas' repeated contentions that they lack access to necessary and/or constitutionally require resources to prepare their defense, an issue

that the Court has addressed at every conference in this matter since at least the *Faretta* hearings in February 2021.

The Supreme Court has observed that "*Faretta* says nothing about any specific legal aid that the State owes a *pro se* criminal defendant." *Kane v. Garcia Espitia*, 546 U.S. 9, 10 (2005). The Supreme Court acknowledged that "federal appellate courts have split on whether *Faretta*, which establishes a Sixth Amendment right to self-representation, implies a right of the *pro se* defendant to have access to a law library" but has not has occasion to resolve the issue. *Id.*, *see, e.g.*, *Hawkins v. Dexter,* No. C08-1087 SI (PR), 2008 WL 1777375, at *2 (N.D. Cal. Apr. 18, 2008) (explaining that while a criminal defendant "had a right to represent himself, there is no clearly established law from the U.S. Supreme Court as to the supplies and services that had to be provided to him to conduct that representation"). "*Faretta* itself recognized that '[w]hen an accused manages his own defense, he relinquishes, as a purely factual matter, many of the traditional benefits associated with the right to counsel.'" *United States v. Denton*, 535 F. App'x 832, 835 (11th Cir. 2013) (quoting *Faretta*, 422 U.S. at 835) (holding that court did not impose unjustified and extreme restrictions on defendant's ability to access legal materials relevant to the criminal proceedings against him where defendant who was awaiting trial in county jail without a law library who was for a period of two weeks transported daily to the United States Marshals' office in the courthouse where he could review discovery and request legal materials from the court's law librarian. The magistrate judge allowed Denton to be brought to the United States Marshals' office in the courthouse on a daily basis for a two-week period, where he could review discovery and request legal materials from the court's law librarian and thereafter, instead of routine visits to the courthouse, he could file requests for specific legal materials that were relevant to the remaining trial proceedings); *Samuels v. Walker*, No. ED CV 10-01164 DMG, 2011 WL

7637265, at *4 (C.D. Cal. Oct. 12, 2011), *report and recommendation adopted*, No. EDCV 10-01164 DMG RZ, 2012 WL 1068075 (C.D. Cal. Mar. 27, 2012) (denying *pro se* petitioner's claim that trial court, after granting him *pro se* status and appointing a defense investigator, denied his constitutional rights when it rejected his motions for extra law-library time (compared to what ordinarily was accorded to *pro se* jail inmates) and, possibly, for toll-free phone calls). The Second Circuit has "recognize[d] of course, that the right to represent oneself in criminal proceedings is protected by the Sixth Amendment. But this right does not carry with it a right to state-financed library resources where state-financed legal assistance is available." *Spates v. Manson,* 644 F.2d 80, 85 (2d Cir. 1981); *see Wesley v. City of New York,* No. 05 CIV. 9227 (DLC), 2006 WL 2882972, at *4 (S.D.N.Y. Oct. 10, 2006) (holding that at the time defendant who was representing himself in a criminal case in the early 2000s "neither the Supreme Court nor the Second Circuit had held that a defendant who declines state-funded representation is entitled to any access to a prison library-let alone access at a given time of day").

The Court has been honest with all Defendants throughout this case about the perils of proceeding *pro se* and provided for extraordinary resources to enable them to proceed *pro se*. First, since the Defendants sought to proceed *pro se*, the Court has frankly apprised each and every Defendant that proceeding *pro se* despite their lack of formal legal training, and/or facility in the English language would inevitably result in challenges, especially during the COVID-19 pandemic. Each Defendant repeatedly and unequivocally asserted his right and preference to proceed *pro se*.

Second, the Court has provided resources to enable the Defendants to vigorously defend themselves (as reflected by their voluminous motions). For example, the Court appointed standby counsel who are under clear instructions to assist the Defendants, including by conducting legal

research for them. The Court also ordered the Government and standby counsel to coordinate with the Westchester County Jail (the "Facility") to ensure that the Defendants received access to the discovery produced in this matter and to laptops on which they could use basic translation software and take notes. The Defendants confirm that by early June 2021 they received their laptops.[12]

Even if the Defendants believe that, under different circumstances, they could have raised additional issues, or raised issues more clearly, the record belies their claim that they have been prevented from presenting issues to the Court. For example, the Malkas' motions in *limine* are accompanied by over 1,000 pages of exhibits (ECF Nos. 525) and a 340-page reply in support of them, all of which demonstrate that the Malkas do in fact have the ability to access the Court and present their defense. Likewise, the sheer number of legal issues raised in the motions, which are discussed below, demonstrate that the Malkas—like Nachman and Mayer before them—adopted a scorched earth approach to their defense and undermines any suggestion that the Malkas would have raised multiple times as many arguments had they been afforded different (unspecified) resources. The Court has reviewed these submissions, construes them broadly, and addresses the issues raised below.

### B.   Admissibility of Matityau Moshe Malka's Statement into Evidence

The Malkas first seek to preclude the Government from admitting Matityau's own written statement—dated February 18, 2021—at trial. (MM 1st MIL at 2–3.) They contend that the substance of such statement includes legal arguments who were discussed in confidential attorney-

---

[12] Any delay in the provision of these materials to *pro se* Defendants was, in part, the result of the Defendants' own conduct inasmuch as they refused to sign protective orders in order to access confidential discovery materials. Certain provision of resources was further delayed by ongoing COVID-19 pandemic, which has disrupted supply chains and delayed manufacturers from fulfilling orders for resources including laptops.

client meetings with his now-standby counsel, who at the time was representing him. (*Id.*) They further contend that the document itself was not filed publicly at that time. (*Id.*)

But the Government argues that while Matityau made this argument in his first set of motions in *limine*, he retracted from that position in his second set of motions in *limine,* in which he in fact "makes clear that he stands by the statement and wants it admitted." (Gov't Resp. in Opp'n at 4.) But even if he did not retract his position, the Government argues that Matityau's statement is admissible as a statement of a party opponent under Federal Rule of Evidence 801(d)(2) and as a statement against penal interest under Federal Rule of Evidence 804(b)(3). (Gov't Resp. in Opp'n at 4–5.) After due consideration, the Court agrees with the Government.

To begin, liberally construing the Malkas' relevant briefings, it does seem to the Court that Matityau retracted his initial position and is now instead seeking to have his own statement admitted. (*Compare* MM 1st MIL at 2–3 *with* Mordechay MIL at 10–11; ECF No. 494-8 at 63–92; *and* MM 2nd MIL at 9.) But notwithstanding Matityau's position, it is well-settled that a defendant's own statements are admissible as statements of a party opponent. *See* Fed. R. Evid. 801(d)(2); *see also United States v. Bosch*, 399 F. Supp. 2d 521, 522-23 (S.D.N.Y. 2005) (admitting letter to the Court that contained inculpatory statements because a "defendant's voluntary statements made while in custody but not in response to any interrogation by law enforcement may be used against a defendant at trial"). Furthermore, to the extent a defendant elects not to testify, his statements are also admissible as statements against penal interest. *See* Fed. R. Evid. 804(b)(3).

While the Malkas argue that the document "includes legal arguments . . . discussed in confidential attorney[-]client meetings," (MM 1st MIL at 2), the record shows that Matityau relinquished his attorney-client privilege when he shared his statement with his co-Defendants and

associates in preparing their own filings, as well as in approving that such statement be filed in the public docket. *See Schaeffler v. United States*, 806 F.3d 34, 40 (2d Cir. 2015) ("The privilege . . . protects communications between a client and its attorney that are intended to be, and in fact were, kept confidential. A party that shares otherwise privileged communications with an outsider is deemed to waive the privilege by disabling itself from claiming that the communications were intended to be confidential."); *United States v. Scali*, No. 16 Cr. 466 (NSR), 2018 WL 543584, at *6 (S.D.N.Y. Jan. 23, 2018) (same). Indeed, the statement itself is addressed to U.S. Magistrate Judge McCarthy, which further undermines any claim that the document was privileged. Even assuming that Matityau "never authorized" its public disclosure on the docket, the same would be irrelevant to the admissibility analysis. *See United States v. Maxwell*, 545 F. Supp. 3d 72, 78 (S.D.N.Y. 2021) (noting that the Fifth Amendment "does not prohibit the Government from using a defendant's voluntary statements in a subsequent criminal prosecution").

Accordingly, provided that the Government lays the proper foundation for Matityau's statements, that they are relevant, and that their probative value is not outweighed by prejudice, the Court will admit these statements.

### C.    Attack on the Family Court Order

Next, the Malkas ask the Court to dismiss the charges against them based on the alleged invalidity of the Family Court Order, or, alternatively, to allow them to challenge the validity of the Family Court Order at trial. (Mordechay MIL at 13; MM 2nd MIL at 127–32; MM Reply at 176–264.) But for the reasons already discussed above and in its previous orders, the Court both denies their untimely motion to dismiss and precludes the Malkas from presenting any arguments about the process by which the Family Court Order was issued or the terms of the Family Court Order.

With respect to the untimely motion to dismiss, as noted above, this Court lacks the authority to review the propriety of the Family Court Order or the process that resulted in it. Where a custody order has "supplant[ed] the default custody arrangement provided by state family law," that order and not the law of the child's state of habitual residence governs "parental rights" under the IPKCA. *Zodhiates*, 235 F. Supp. 3d at 454–55, *aff'd*, 901 F.3d 137, 145 (2d Cir. 2018). Where, as here, parental rights are governed by "court order . . . . the state of a child's 'habitual residence' is irrelevant." *Id.* That Teller did not effectively challenge the Family Court Order even if the Malkas sincerely believe it to be defective, did not give him or any of the Defendants here leave to flagrantly disobey it and interfere with the sole parental rights it conferred on the Mother. *See Miller*, 626 F.3d at 689 (affirming district court's exclusion of certain evidence proffered by IPKCA defendant because there was no evidence that the operative custody order in effect at the time of the alleged kidnapping was ever appealed or stayed and therefore, at the time defendant took the child, defendant was "required to comply with the Vermont court order which gave [the other parent] lawful parental rights to full custody, rights [the defendant] frustrated by keeping [the child] outside the United States").

Moreover, even if the Court had authority to review the Family Court Order here *and* the Malkas successfully contest its validity, as already noted above, it is undisputed that the Mother is the biological mother of the Minors and that no court has ever terminated her parental rights by law. Thus, regardless of whether the Family Court Order is valid, the Mother has always had parental rights as a matter of law. *See Amer*, 110 F.3d at 878 ("[T]he biological mother . . . enjoys the right to physical custody of her children unless and until this right is terminated by law."); *Sardana*, 101 F. App'x at 853–54 ("Under New York law, . . . the biological mother[] enjoys the right to physical custody of her children unless and until this right is terminated by law. Thus, the

government was not obliged to offer proof of a court custody order to secure Sardana's conviction; it could rely on established New York law."). Hence, the Court denies the Malkas' untimely motion to dismiss.

With respect to allowing the Malkas to raise any arguments challenging the validity of the Family Court Order, as noted above, such arguments are irrelevant as to whether the Malkas intended to obstruct the Mother's exercise of parental rights, which clearly existed according to the Family Court Order, and would only serve to "confus[e] the issues, [and] mislead[] the jury." Fed. R. Evid. 403; *see also Sardana*, 101 F. App'x at 855. Additionally, even assuming that these arguments were somehow relevant to show what the Malkas contend is the Mother's "lawful exercise" of those parental rights under the IPKCA, such question is actually a legal question for courts, and not a factual question for the jury. Thus, given that the Family Court, the federal court in the Hague Case, and this Court have already decided this legal question, the Malkas may not contest the same at trial. Otherwise, were the Court to allow the jury to decide this legal question, the Court would be effectively ruling that every defendant charged under the IPKCA may circumvent established procedures and collaterally attack family court rulings on custody and other related matters. Such a ruling would be problematic for a number of reasons, but most notably, it would run afoul of the domestic relations exception. *See McKnight v. Middleton*, 699 F. Supp. 2d 507, 516 (E.D.N.Y. 2010), *aff'd*, 434 F. App'x 32 (2d Cir. 2011) (noting that the domestic relations exception divests federal courts of jurisdiction over matters involving divorce, alimony, and child custody decrees because "states have traditionally adjudicated marital and child custody disputes and therefore have developed competence and expertise in adjudicated such matters, which federal courts lack." (quoting *Thomas v. New York City*, 814 F. Supp. 1139, 1146 (E.D.N.Y. 1993)).

Here, for example, if the Malkas successfully contest the validity of the Family Court Order, then that would necessarily entail that the Court's ruling would modify the child custody determination with respect to the Minors—a determination that the U.S. Supreme Court has explicitly held federal courts have no authority to make. *See Ankerbrandt v. Richards*, 504 U.S. 689, 701–02 (1992) (noting that the domestic relations exception does not "strip the federal courts of authority to hear cases arising from the domestic relations of persons *unless they seek the granting or modification of . . . a child custody decree.*" (emphasis added)). Accordingly, as discussed above, the Court precludes the Malkas from raising any arguments challenging the validity of the Family Court Order.

### D.  *Validity of the Marriage Between Jacob Rosner and Minor-1*

The Malkas next ask the Court to dismiss the charges against them based on the alleged validity of the alleged marriage between Jacob and Minor-1, or, alternatively, to allow them to argue the validity of the alleged marriage at trial. (MM 2nd MIL at 98–125; MM Reply at 71–175.) But for the reasons already discussed above and in its previous orders, the Court both denies their untimely motion to dismiss and precludes the Malkas from presenting any arguments regarding the validity of the alleged marriage between Jacob and Minor-1.

As noted above, the Malkas appear to assert a defense to the IPKCA charges by contending that because the alleged marriage between Jacob and Minor 1 is legally valid, then somehow extinguished any parental rights held by the Mother. Yet, "that is an argument that should have been made to the Family Court" and "[t]his Court does not have jurisdiction to second-guess or alter the Family Court's Orders." (ECF No. 388 at 58.) Even if the Court were to consider the merits of such argument, the Court has already previously held twice that the alleged marriage between Jacob and Minor-1 was not legally valid when Jacob attempted to raise his purported marital privilege during Nachman and Mayer's trial. (ECF Nos. 427 & 434.)

Further, even if the Court were to liberally construe the Malkas' briefing as a successive motion for reconsideration, based on the reasons discussed in detail above, the Court still finds that there is no clear error in holding that the alleged marriage was not legally valid. *See Virgin Atl. Airways, Ltd.*, 956 F.2d at 1255 (noting that common grounds for reconsideration include "an intervening change of controlling law, the availability of new evidence, or the need to correct a clear error or prevent manifest injustice." (citation omitted)).

Accordingly, the Court both denies their untimely motion to dismiss and precludes the Malkas from presenting any arguments regarding the validity of the alleged marriage between Jacob and Minor-1.

### E.    *The Use of the Terms "Kidnapping" and "Abduction" at Trial*

The Malkas next ask the Court to preclude the Government from using terms such as "kidnapping" or "abduction" to describe the Defendants' actions because the Government admits the Minors were not removed by force. (MM 2nd MIL at 133–48; MM Reply at 295–308.) The Government avers that the Court should reject this request because (1) it would be "highly impractical" to avoid the term "kidnapping" given that "kidnapping" is part of the statutory title of four of the counts charged and the jury instructions will necessarily include the terms; (2) courts routinely allow the use of terms—even highly prejudicial terms—when the terms are necessary to complete the story of the crime alleged; (3) the Malkas are aware that they are charged under the IPKCA and that consent of the child is not a cognizable defense; and (4) courts routinely use the words "kidnapping" and "abduction" when discussing IPKCA cases that do not involve the taking of children by force. (Gov't Resp. in Opp'n at 15–17.)

The Court agrees with the Government that where, as here, the language objected to including "kidnapping" and "abduction" constitute the "common name" for the crime charged, parental kidnapping, "there is no rule of evidence or ethics that forbids the prosecutor from

referring to the crime by its common name . . . . [t]here is no rule requiring the prosecutor to use a euphemism for it or preface it by the word 'alleged.'" *United States v. Rude*, 88 F.3d 1538, 1548 (9th Cir. 1996), *as amended on denial of reh'g* (Sept. 10, 1996). The Court also agrees that the term "kidnapping" at least must be used in its instructions to the jury describing the crimes with which the Defendants are charged and the elements of those crimes. It therefore declines to preclude the Government from using the terms "kidnapping" and "abduction". *See, e.*g., *People of Territory of Guam v. Torre*, 68 F.3d 1177, 1180 (9th Cir. 1995) (holding that no objection to prosecutor's use of terms "rape" and "raped" would have been sustained where defendant was being tried for three counts of first-degree criminal sexual conduct, two counts of second-degree criminal sexual conduct and one count of second-degree kidnapping), *United States v. Ahmed*, 94 F. Supp. 3d 394, 435–36 (E.D.N.Y. 2015) (denying motion to preclude government witnesses from using terms "terrorist," "terrorist activity (or activities)," or "terrorism" where "charged offenses require the Government to prove, *inter alia,* that the Defendants assisted a designated foreign *terrorist* organization" and noting that "it is unclear how the Government could meet its burden of proving, for example, that al-Shabaab was a designated foreign terrorist organization, without using the word 'terrorism'").

      F.      *The Use of the Term "Victims" at Trial*

The Malkas also ask the Court to preclude the Government from using the term "victims" to describe the Minors. (MM 2nd MIL at 133–48; MM Reply at 295–308.) The Government opposes this request on the basis that (1) it has a "good faith basis for arguing that the Minors were victims of the defendants' criminal conduct"; (2) use of the word "victims" particularly in opening and closing arguments is fair argument and any prejudice would be cured by the Court's standard jury instruction that lawyers' arguments are not evidence; and (3) the term "victim" accurately reflects the Minors' status under the Crime Victims' Rights Act, 18 U.S.C. § 3771(e)(2)(A)), which

Case 7:19-cr-00497-NSR   Document 625   Filed 05/11/22   Page 61 of 67

defines a "crime victim" as a person directly and proximately harmed as a result of the commission of a Federal offense."  (Gov't Resp. in Opp'n at 17–19.)

The Court agrees with the Government and declines to preclude the use of the term "victim." *See, e.g.*, *United States v. Gasperini*, No. 16-CR-441 (NGG), 2017 WL 3140366, at *7 (E.D.N.Y. July 21, 2017), *aff'd*, 729 F. App'x 112 (2d Cir. 2018) (rejecting defendant's request to exclude terms "victim" and "victimized" based on merits of his case because the "Government is within its rights to take and advocate for a different view of the evidence" and the court did not "view the use of the challenged terms as unduly prejudicial in light of the issues being tried").

### G.   Mentioning, Raising, and/or Discussing the Sexual Charges or Marital Practices in Lev Tahor

The Malkas next seek to preclude the Government from mentioning, raising, and/or discussing the sexual charges—presumably those of which Nachman and Mayer were convicted—or marital practices in Lev Tahor. (MM Reply at 309–15.) As the Court already ruled above, insofar as the testimony from Minor-1, the Mother, and CC-1 relates to marriage involving individuals under the age of sixteen, and their intended purpose—procreation, the Court will allow the Government to present it to the jury because it constitutes direct evidence of the charged crimes. However, to the extent the Government's evidence relates to Lev Tahor's sexual practices (such as providing "[n]ew brides and grooms . . . a tutorial before marriage instructing them on when and how to have sex with their spouse" (S3 ¶7), among others), the Court agrees with the Malkas that the probative value of such evidence is substantially outweigh by unfair prejudice—particularly, in view that evidence indicating that procreation was the purpose of the alleged marriage here is admissible.

Accordingly, the Government's evidence of uncharged wrongs or bad acts within the Lev Tahor community must be limited to evidence directly related to community's rules and practices

relating to arranged marriages, for the purpose of procreation, involving children under the age of sixteen. And again, to the extent the Government intends to introduce any 404(b) evidence that is not squarely within the above approved evidence above, the Government must demonstrate that evidence's relevance at trial, and that it is more probative than prejudicial.

      H.     *Labeling or Defining the Marriages in Lev Tahor as "Forced" Marriages or and any other Similar Labels/Definitions*

The Malks next ask the Court to preclude the Government from labeling or describing underage marriages in Lev Tahor, including the alleged marriage between Jacob and Minor-1, as "forced" marriages or any other similar labels or definitions. (MM Reply at 315–17.) The Court agrees with the Malkas.

Once again, insofar as the testimony from Minor-1, the Mother, and CC-1 relates to marriage involving individuals under the age of sixteen, and their intended purpose—procreation, the Court will allow the Government to present it to the jury because it constitutes direct evidence of the charged crimes. However, the Court is of the view that describing underage marriages as "forced" is unduly prejudicial because there is a risk of implying that such marriages were celebrated against someone's will (*i.e.*, the parents or the minors themselves) under some kind of threat. At best, the Government could refer to such marriages as "arranged underage marriages" whenever they elicit testimony from Minor-1, the Mother, and CC-1 that relates to the same.

Indeed, whether the alleged arranged underage marriages in Lev Tahor—including that between Jacob and Minor-1—were "forced" is irrelevant to the elements of the charges that the Government must prove against the Malkas. Accordingly, the Court precludes the Government from describing arranged underage marriages as "forced."

I.    *Matityau Moshe Malka's Motions to Dismiss the Superseding Indictment Based on Transcripts of Conversations Conducted in Yiddish*

Lastly, Matityau asks the Court to dismiss all charges against him because he argues that the Government's translations of phone calls in Yiddish are "forged" and inaccurate, and that the Government has not timely produced translations of phone calls to the defense. (MM 2nd MIL at 85–98; MM Reply at 318–31.) The Government contends that these arguments are meritless and provides no basis for dismissing the charges against Matityau. (Gov't Resp. in Opp'n at 19–23.) After due consideration, the Court agrees with the Government.

There are "two constitutional requirements for an indictment: first, that it contains the elements of the offense charged and fairly informs a defendant of the charge against which he must defend, and, second, that it enables him to plead an acquittal or conviction in bar of future prosecutions for the same offense." *United States v. Resendiz-Ponce*, 549 U.S. 102, 108 (2007) (internal quotation mark omitted). "[A]n indictment need do little more than to track the language of the statute charged and state the time and place (in approximate terms) of the alleged crime." *United States v. Vilar*, 729 F.3d 62, 80 (2d Cir. 2013). Although the language of the statute may be used in the description of the offense, the description "must be accompanied with such a statement of the facts and circumstances as will inform the accused of the specific offence, coming under the general description, with which he is charged." *Hamling v. United States*, 418 U.S. 87, 117-18 (1974). An indictment need only address the "core of criminality" of an offense, meaning, the essence of a crime in general terms, and not the particulars of how a defendant effectuated the crime. *United States v. D'Amelia*, 683 F.3d 412, 418 (2d Cir. 2012).

Under Federal Rule of Criminal Procedure 12(b)(3)(B), a Court may dismiss an indictment if it suffers from deficiencies enumerated therein. Proving a defect, however, is a laborious task because of the low sufficiency threshold requirement, which requires only that an indictment

contain a "plain, concise, and definite written statement[s] of the essential facts constituting the offense[s] charged." Fed. R. Crim. P. 7(c)(1). In reviewing the sufficiency of an indictment, it is generally improper for the Court to consider evidentiary sufficiency or the merits of the case. *United States v. Alfonso*, 143 F.3d 772, 776–77 (2d Cir. 1998). Finally, when considering a motion to dismiss, the Court must assume the truth of the factual allegations in an indictment. *Boyce Motor Lines, Inc., v. United States,* 342 U.S. 337, 343 n.l6 (1952); *United States v. Clarke*, No. 05 CR. 017(DAB), 2006 WL 3615111, *1 (S.D.N.Y. Dec. 7, 2006).

Here, Matityau was initially charged with a complaint dated March 26, 2019. (ECF No. 1.) The complaint referenced a number of conversations conducted in Yiddish between the Mother, Nachman and Yakov. (*Id.* ¶ 19.) The complaint also explicitly noted that "[t]he recorded content that is in Yiddish ha[d] not been formally translated." (*Id.* at 6 n.2). Relying on initial translations of those conversations, the complaint cited many statements indicating that the defendants were attempting to kidnap Minor-1 again, including Yakov's statement that they would fight the Mother to the last drop of blood and Nachman's statement that they would take the children away from the Mother. (*Id.* ¶ 19). In addition, the complaint referenced a translation of one of Yakov's statements from March 22, 2019 as, "in substance and in part," "I go *with people* in America and will take them out from under your hands." (*Id.* (emphasis added)).

The Government subsequently indicted Matityau on July 8, 2019 (and later charged him in superseding indictments on April 19, 2021 and September 28, 2021). On August 14, 2019—more than two and a half years ago—the Government produced to Matityau and his co-Defendants audio of the March 22, 2019 conversation between the Mother and Yakov. That same day, August 14, 2019, the Government also produced a draft translation of the conversation. The draft translation of Yakov's statement above was slightly different than the one in the complaint, reading, in part:

"I go *with laws* in America, to take the kids out of your hands" (emphasis added). Then, on April 22, 2020—almost two years ago—the Government produced to Matityau and his co-Defendants an updated translation of the same conversation, again with slightly different language. In this translation, Yakov's statement reads, in part: "I go *with court cases* in America, to take the kids out of your hands" (emphasis added).

Hence, liberally construing his briefing, Matityau seems to argue that the charges against him are deficient because these multiple translations suggest the Government "forged" the transcripts and that the initial translation forms the only basis of the charges against him.

But for one, the Government correctly asserts that the complaint is no longer the operative charging instrument at this stage of the litigation because a grand jury has returned an indictment. In fact, two superseding indictments have been returned thereafter. *See United States v. Mancias*, 350 F.3d 800, 807 (8th Cir. 2003) ("When a grand jury returns an indictment, the previous proceedings before the magistrate judge are [superseded], and the prosecution proceeds because the defendant has been indicted, not because a criminal complaint has been filed."). That is because while "[t]he purpose of the complaint . . . is to enable the appropriate magistrate . . . to determine whether the 'probable cause' required to support issuance of warrant exists," *Giordenello v. United States*, 357 U.S. 480, 486 (1958), the purpose of an indictment is to provide notice to the defendant of the charges against him which the Government must prove at trial beyond a reasonable doubt before a jury convicts him, *see United States v. Glaziou,* 402 F.2d 8, 15 (2d Cir. 1968). Thus, after a grand jury has returned an indictment, "any determination by the Court as to the sufficiency of the complaint would be purely academic." *United States v. Battle*, No. 20-CR-349 (EK), 2020 WL 5531585, at *2 (E.D.N.Y. Sept. 15, 2020) (citations omitted).

Indeed, the S3 Superseding Indictment does not rely (or even refer) to the phone call conversation in Yiddish between the Mother and Yakov. Instead, the S3 Superseding Indictment asserts statutory allegations for the two charges against Matityau and also specifically alleges that he provided: (1) logistical help to his co-conspirators and the Minors in Mexico after the December 2018 kidnapping, (S3 ¶ 12); and (2) a cellular telephone to Minor-1 to facilitate her removal and retention for the March 2019 kidnapping, (*id.* ¶ 25g). Yet, Matityau provides no argument whatsoever as to the sufficiency of such allegations.

Matityau also claims that the Government committed misconduct by not timely producing the "complete and accurate" translations of phone calls to the defense. (MM 2nd MIL at 93–98; MM Reply at 326–31.) He argues that such alleged misconduct warrants dismissal of the charges against him. (*Id.*) But the Court disagrees.

First, while Matityau cites to cases regarding the Government's timeliness to produce recordings and transcriptions for trial preparation, none of these cases support his contention that a failure to do so warrants dismissal of an indictment with prejudice. Second, the Government produced audio and draft translations of the Yiddish phone calls to Matityau on August 14, 2019, more than two and a half years ago, and the Government subsequently sent him additional translations. (Gov't Resp. in Opp'n at 22.) And third, perhaps most importantly, unlike the prosecution team, Matityau understands Yiddish and can listen to and interpret these recordings himself. (*Id.* at 23.) Thus, the record shows that Matityau has had more than ample time to review these recordings to contest any translations that he disagrees with and to prepare his defense at trial—which as discussed above, is set to begin on May 18, 2022. Therefore, the Court concludes that Matityau's unsubstantiated claims of the Government's misconduct and his unsupported arguments asking for dismissal of the charges against him are meritless.

**CONCLUSION**

For the foregoing reasons, the Court GRANTS IN PART, DENIES IN PART the Government's motions in *limine*, and GRANTS IN PART, DENIES IN PART the Malkas' motions in *limine.* The Court further DENIES all of the Malkas' motions to dismiss. The Clerk of the Court is respectfully directed to terminate the pending motions at ECF Nos. 478, 494, and 506. Standby counsel for the Malkas are directed to serve a copy of this order to their respective *pro se* Defendants by any necessary means and to file proof of service on the docket.

Dated: May 11, 2022
       White Plains, NY

SO ORDERED:

NELSON S. ROMÁN
United States District Judge